**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| Aon plc, Aon Group, Inc., and Aon Consulting, Inc.,<br><br>Plaintiffs,<br><br>v.<br><br>Infinite Equity, Inc., Elizabeth Stoudt, Terry Adamson, Jon Burg, Daniel Coleman, Christopher DiDomenico, and Tyler Evans,<br><br>Defendants. | Case No. 1:19-CV-7504<br><br>Honorable John Kness<br>Magistrate Judge Sunil R. Harjani |

**DEFENDANTS INFINITE EQUITY, INC., JON BURG, DANIEL COLEMAN, ELIZABETH STOUDT, CHRISTOPHER DIDOMENICO AND TYLER EVANS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO STRIKE THE DECLARATIONS OF RONALD S. SCHNELL, DANIEL KAPINOS, AND PAUL GOINGS**

Dated: November 10, 2020

Respectfully Submitted,

By: /s/ Jeannil D. Boji
One of Its Attorneys

Jeannil D. Boji
Christopher R. Lepore
Daniel T. Burley
PERKINS COIE LLP
131 S. Dearborn; Suite 1700
Chicago, IL 60603
Tel: (312) 324-8400
Fax: (312) 324-9400
jboji@perkinscoie.com
clepore@perkinscoie.com
dburley@perkinscoie.com

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..... 1
ARGUMENT ..... 5
I. THE SCHNELL DECLARATIONS SHOULD BE STRICKEN AND RELATED EVIDENCE EXCLUDED BECAUSE THEY IMPROPERLY DISCLOSE NEW OPINIONS. ..... 5
A. Aon Produces the Schnell Report, Which Contains Baseless Innuendo from a Partisan, Not the Considered Opinions of an Expert Founded on Scientific Methodology. ..... 6
i. Schnell Received *All* of the Information Underlying His Expert Report by Mid-March 2020. ..... 6
ii. Schnell's Speculative Report Does Not, Because It Cannot, Conclude Any Misappropriation Occurred. ..... 7
B. Schnell Testifies that His Report Is Complete and Contains All Significant Facts. ..... 8
C. Schnell's Report Opines on the Alleged Similarities between the Source Codes of Myperformanceawards and *Peertracker*. ..... 9
D. The Schnell Declarations Belatedly Offer New Opinions. ..... 10
i. Schnell Provides No Legitimate Justification to Support the Submission of the Schnell Motion Declaration. ..... 11
ii. The Schnell Declarations Contain New Opinions, the Consideration of Which Will Prejudice Defendants. ..... 11
II. THE SCHNELL DECLARATIONS SHOULD BE STRICKEN AND RELATED EVIDENCE EXCLUDED BECAUSE THEY OFFER CONCLUSORY OPINIONS. ..... 13
III. ALL OF THE DECLARATIONS SHOULD BE STRICKEN, AND RELATED EVIDENCE EXCLUDED, BECAUSE THEY CONTRADICT DEPOSITION TESTIMONY ..... 14
A. The Schnell Declarations Contradict Schnell's Prior Deposition Testimony. ..... 14
B. The Goings Reply Declaration Contradicts Goings' Prior Deposition Testimony. ..... 15
C. The Kapinos Declarations Must Be Stricken Because They Are a Last-Minute, Transparent Attempt to Sneak in Evidence that Contradicts Kapinos' 30(b)(6) Testimony. ..... 16
i. Kapinos Did Not Know Answers to Simple Client-Related Questions at His Deposition, Despite Being Designated As a 30(b)(6) Witness on Those Topics; Now He Claims Ultimate Knowledge in His Motion Declaration. ..... 17
ii. The Kapinos Reply Declaration Provides Further Contradictions on Topics about Which Kapinos Was Designated to Testify as a 30(b)(6) Witness. ..... 21
IV. ALL OF AON'S REPLY DECLARATIONS BRIEF MUST BE STRICKEN BECAUSE THEY ADD NEW FACTS AND EVIDENCE FOR THE FIRST TIME ON REPLY. ..... 23

**TABLE OF CONTENTS**
(continued)

**Page**


A. Schnell Offers Even More New Opinions, Evidence and Contradictory Testimony in the Schnell Reply Declaration.......... 24

B. Goings Reply Declaration Must Be Stricken Because It Raises Facts for the First Time.......... 25

C. Kapinos' Reply Declaration Must Be Stricken Because It Raises Facts for the First Time.......... 26

V. SCHNELL AND GOINGS' REPLY DECLARATIONS MUST BE STRICKEN BECAUSE THEY ADD NEW FACTS AND EVIDENCE FOR THE FIRST TIME ON REPLY.......... 26

CONCLUSION.......... 27

# TABLE OF AUTHORITIES

**Page**

## CASES

*Baker v. Indian Prairie Community Unit, School Dist. 204*,
No. 96-3927, 1999 WL 988799 (N.D. Ill. Oct. 27, 1999) ....6

*Berg for Wiesner v. CI Investments, Inc.*,
No. 15 C 11534, 2017 WL 1304082 (N.D. Ill. Apr. 7, 2017) ....12

*Berryhill v. Enhanced Recovery Co. LLC*,
No. 17 C 8059, 2019 WL 2325999 (N.D. Ill. May 31, 2019) ....22

*Carlson Grp., Inc. v. Davenport*,
No. 16-CV-10520, 2016 WL 7212522 (N.D. Ill. Dec. 13, 2016) ....16

*Carter v. Finely Hosp.*,
No 01-C-50468, 2003 WL 22232844 (N.D. Ill. Sept. 22, 2003) .... 5, 6

*Caster Connection, Inc. v. Colson Grp. Holdings, LLC*,
No. 20 C 1598, 2020 WL 2745982 (N.D. Ill. May 27, 2020) ....25

*City of Sterling Heights Gen. Employees' Ret. Sys. v. Hospira, Inc.*,
No. 11 C 8332, 2013 WL 566805 (N.D. Ill. Feb. 13, 2013) ....26

*David v. Caterpillar, Inc.*,
324 F.3d 851 (7th Cir. 2003) ....5

*Horvath v. Apria Healthcare, LLC*,
No. 19 CV 4894, 2019 WL 5725378 (N.D. Ill. Nov. 5, 2019) .... 22, 23

*Murphy v. Vill. of Hoffman Estates*,
No. 95 C 5192, 1999 WL 160305 (N.D. Ill. Mar. 17, 1999), *aff'd*, 234 F.3d 1273 (7th Cir. 2000) .... 22, 23

*Reliable Fire Equip. Co. v. Arredondo*,
2011 IL 111871 .... 16, 18

*Rowe v. Intern. Corp. v. Ecast, Inc.*,
586 F.Supp.2d 924 (N.D. Ill. 2008) ....5

*Russell v. Acme-Evans Co.*,
51 F.3d 64 (7th Cir. 1995) .... 13, 16

*Solaia Tech. LLC v. ArvinMeritor, Inc.*,
361 F. Supp. 2d 797 (N.D. Ill. 2005) .... 5, 6, 10

*Stuhlmacher v. Home Depot USA, Inc.*
No. 2:10 CV 467, 2012 WL 5866297 (N.D. Ind. Nov. 19, 2012) ....6

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Wender & Ezra, P.C. v. American Intern Group, Inc.*,
521 F.3d 790 (7th Cir. 2008) ....................12

**RULES**

Fed. R. Civ. Proc. 6(c)(2) ....................23

Fed. R. Civ. Proc. 12(f) ....................26

Fed. R. Civ. Proc. 26(a)(2) ....................5

Fed. R. Civ. Proc. 26(a)(2)(B) ....................5

Fed. R. Civ. Proc. 26(a)(2)(D) ....................5

Fed. R. Civ. Proc. 26(e) ....................5

Defendants Infinite Equity, Inc. ("Infinite Equity"), Jon Burg, Daniel Coleman, Elizabeth Stoudt, Christopher DiDomenico, and Tyler Evans (collectively, "Defendants") move for an order striking the August 17th Declaration of Ronald S. Schnell (Dkt. 177-3, the "Schnell Motion Declaration"), as well as the exhibit attached thereto, the August 17th Declaration of Daniel Kapinos (Dkt. 177-2, the "Kapinos Motion Declaration"), as well as the exhibits attached thereto, the October 16th Declaration of Ronald S. Schnell (Dkt. 210-4, the "Schnell Reply Declaration"), as well as the exhibits attached thereto, the October 16th Declaration of Daniel Kapinos (Dkt. 210-1, the "Kapinos Reply Declaration"), as well as the exhibits attached thereto, and the October 16th Declaration of Paul Goings (Dkt. 210-5, the "Goings Reply Declaration"), all offered in support of Aon's motion for a preliminary injunction (Dkt. Nos., 176-177, 210).

## PRELIMINARY STATEMENT

**Aon's strategy throughout this case has been to inundate the Court (and Defendants) with as much irrelevant, unfounded material and assertions as possible, without regard to whether that information is actually true, relevant to its claims, or properly before the Court, in the hopes of creating the appearance of substance where there is none. Knowing how easily its supposed "evidence" can be debunked, Aon has also continuously attempted to deprive Defendants of the opportunity to cross-examine and respond to its baseless assertions. Most recently, Aon has attempted to create an entirely new, self-serving record to support its preliminary injunction motion by submitting five declarations in support of its initial brief and reply, all of which contain a litany of new, improper facts that contradict its own witnesses' prior deposition testimony.**[1] **For the many reasons set forth below, the Court**

[1] Aon proffers five improper declarations in a desperate attempt to prop up its deficient Motion for a Preliminary Injunction. First, Aon filed the Schnell and Kapinos Motion Declarations in support of its motion on August 17. *See* Dkt. 177-3; Dkt. 177-2. In their Response to the motion, Defendants made clear they planned to file a motion to strike both improper declarations for the reasons set forth in this Motion. *See* Dkt. 203-1, at pp. 4, 20, 21. Without even informing Defendants, much less conferring with them, Aon then filed a

**should reject Aon's attempts to create its own self-serving record in the eleventh-hour and to sandbag Defendants by depriving them the opportunity to rebut such facts through argument and discovery.**

**First, in the Schnell Declarations, Aon offers a belated expert opinion after the close of expedited expert discovery supported by no methodology whatsoever.** More specifically, in an attempt to manufacture evidence to support its trade secrets misappropriation claims where none exists, Aon has relied upon the expert report of Ronald S. Schnell (the "Report"). In the Report, Schnell traffics in baseless speculation and innuendo without concluding (because he cannot) that Defendants misappropriated a single line of *PeerTracker* code. Indeed, despite the benefit of extensive discovery, Aon still has not adduced *any* evidence to support its contention that any Defendant stole any information pertaining to *PeerTracker*, much less used that information to build MyPerformanceAwards. Even its own 30(b)(6) witness on source-code issues, Paul Goings, admitted this. Indeed, after *examining millions of lines of code*, Schnell could only cite *two* examples of overlap in the codes, both of which were *not*, as Defendants demonstrated, evidence of copying.

With all its purported evidence of misappropriation thoroughly debunked, Aon now attempts to sandbag Defendants with belated declarations from Schnell (the Schnell Motion Declaration and Schnell Reply Declaration together are the "Schnell Declarations"), containing information that it has offered, *for the first time*, in support of its motion for a preliminary injunction. The Schnell Declarations are plainly a desperate, last-ditch effort to revive Aon's utterly baseless claims (which it brought solely based on a comparison of the two publicly available websites of the programs), **through which it hopes to subject Defendants to a never-ending game of "whack-a-mole" by improperly**

---

motion requesting an extra five pages for its reply in support of its motion. *See* Dkt. 205. Aon was subsequently allotted 20 pages on reply. *See* Dkt. 206. Aon subsequently filed its nearly 21-page reply brief based *almost entirely* on new facts and arguments set forth in, and based on, three additional improper declarations: the Schnell, Kapinos, and Goings Reply Declarations. *See* Dkt. 210-4; Dkt. 210-1; Dkt. 210-5. Now, for the reasons set forth in this Motion, Defendants seek to strike those declarations as well.

**offering new evidence at every turn**. Among other incurable and fatal flaws, the Schnell Declarations must be stricken in their entirety because:

- **The Schnell Declarations Offer New Opinions After the Close of Expedited Expert Discovery.** The substance of Schnell's Declarations, *which, apart from improper argument outside the scope of his expert report, are entirely based on information within Schnell's possession since March*, consist of entirely new opinions (many of which are conclusory and unsupported) based on a brand-new comparison of *PeerTracker* and MyPerformanceAwards, none of which were cited in Schnell's expert report or deposition. Aon fails to provide any legitimate justification for submitting these declarations well after the Court's extended expert discovery deadline and Schnell's deposition. Defendants, of course, never had an opportunity to cross-examine Schnell about these opinions or otherwise critically probe them during discovery; and

- **The Schnell Declarations Provide Unsupported Facts and Opinions**. The Schnell Declarations provide no explanation whatsoever of methodology Schnell employed to reach his purported opinions. Courts have consistently recognized such bottom-line conclusions are useless.

**Second, the Schnell Declarations, the Kapinos Declarations and the Goings Reply Declaration *all* contradict the deponent's prior sworn testimony.** Faced with the reality that the record does not support their claims, Aon seeks to simply rewrite it (without providing Defendants the opportunity to respond, much less cross-examine their witnesses). This tactic is readily apparent in each declaration at issue. By way of example:

- **The Schnell Declarations Contradict Schnell's Prior Testimony**. Despite testifying that he included all significant facts and opinions in his Report, Schnell offers new facts and opinions in direct contradiction of that testimony. Indeed, even though Schnell expressly stated he declined to investigate alleged instances of copying other than those in the Report, Schnell now provides a new and different analysis on this topic.

- **The Goings Reply Declaration Contradicts Goings' Prior Testimony.** The Goings Reply Declaration blatantly contradicts Goings' prior sworn testimony. [redacted]

- **The Kapinos Declarations Contradict Kapinos' Prior Testimony.** Through the Kapinos Declarations, Aon transparently attempts to rewrite the record to pretend it had the necessary

client relationships to show a likelihood of success on its breach of contract, fiduciary duty, and tortious interference claims. But Aon cannot escape that the Kapinos Declarations directly contradict Kapinos' deposition testimony regarding client relationships. Kapinos, Aon's designated 30(b)(6) witness on client-related topics, testified that he did not know what makes a company an "Aon client" for the purposes of the outrageous list of 700-plus companies from which Aon seeks to prevent Defendants from working; he testified that he did not know when client relationships began or whether they still exist; and he testified that he did not know if Aon even maintains an accurate list of existing clients***. Kapinos cannot now be the all-knowing arbiter of alleged client information after completely and utterly disclaiming knowledge of such topics at his deposition***. Aon's last-gasp attempt, through the Kapinos Declarations, to re-create the record by establishing legally operative client relationships to salvage its dying claims should not be countenanced.

**Lastly, the Schnell Reply Declaration, the Goings Reply Declaration and the Kapinos Reply Declaration all improperly proffer new facts and evidence for the first time on reply.** Indeed, as set forth below, each declaration is littered with examples of new facts, evidence, and argument:

- **The Schnell Reply Declaration Offers New Facts and Evidence for the First Time on Reply**. Schnell asserts new facts: (1) responding to arguments made in Defendants' brief (and outside the scope of his Report); (2) attempting to advance the new opinions offered in the Schnell Motion Declaration; and (3) attempting to resuscitate his debunked methodology for measuring coder productivity he invented out of whole cloth. And Schnell attaches several new "corrected" exhibits the Report, which was served in May, along with a supposed explanation for his false prior exhibit.

- **The Goings Reply Declaration Consists Entirely of New "Facts" and Arguments.** In further recognition that the factual record is devoid of any evidence for its trade secrets claims, Aon attempts to support its trade secrets claims by sneaking in even more new "facts," unsupported speculation and argument for the first time vis-à-vis the Goings Reply Declaration. Indeed, Goings testified at length about the topics in the Goings Reply Declaration. But, unable to affirmatively cite a single line of favorable deposition testimony (because MyPerformanceAwards and *PeerTracker* are fundamentally different, and no Defendant misappropriated any *PeerTracker* information), Aon attempts to manufacture a new factual record that seeks to portray the programs as similar. Much like the Schnell Declarations, however, the Goings Reply Declaration is a blatantly improper attempt to mitigate the insurmountable deposition admissions of one of its key witnesses by adding new testimony (in direct contradiction of those admissions), while prejudicing Defendants by depriving them of the opportunity to respond to its self-serving "record."

- **The Kapinos Reply Declaration Proffers New Facts.** In the Kapinos Reply Declaration, Aon, for the first time, provides a run-down of employee departures after Defendant Terry Adamson left; claims the Equity Services Group bills clients in fixed-fee or flat-fee arrangements (despite producing countless documents to the contrary); and asserts the

valuation simulations Aon shares with clients do not contain proprietary macros or formulas (Kapinos said the opposite at his deposition).

Thus, Defendants' motion to strike the Schnell Declarations, the Kapinos Declarations, and the Goings Reply Declaration in their entirety should be granted. Specifically, Defendants respectfully request the Court strike each of these declarations in their entirety, along with any attached exhibits evidence, and any references to these declarations in Aon's Motion and Reply.[2] Failure to do so would unduly prejudice Defendants. Aon cannot be permitted to endlessly augment the evidentiary record with self-serving, unsupported "facts" without permitting Defendants the opportunity to meaningfully cross-examine or even respond. This procedural chicanery cannot be countenanced.

## ARGUMENT

### I. THE SCHNELL DECLARATIONS SHOULD BE STRICKEN AND RELATED EVIDENCE EXCLUDED BECAUSE THEY IMPROPERLY DISCLOSE NEW OPINIONS.

Federal Rule of Civil Procedure ("Rule") 26 governs expert discovery. It requires, *inter alia*, that an expert report to contain: (1) "a complete statement of all opinions the witness will express and the basis and the reasons for them"; and (2) the expert disclosures be made in accordance with deadlines set by the Court. *See* Fed. R. Civ. Proc. 26(a)(2)(B), (D), 26(e). An expert report can only be supplemented in limited circumstances. *See id.* A party that fails to comply with Rule 26(a)(2)'s or Rule 26(e)'s requirements is automatically precluded from using the improper evidence on a motion, unless the party's failure was substantially justified or is harmless. *See David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003).

Rule 26(e) does "not give a [party the] *right* to extend discovery deadlines." *Carter v. Finely Hosp.*, No 01-C-50468, 2003 WL 22232844, at *2 (N.D. Ill. Sept. 22, 2003) (emphasis in original) (citing

[2] References to Aon's memorandum of law in support of its motion for a preliminary injunction are hereinafter the "Motion." Aon's reply in further support of its motion for a preliminary injunction is referred to as the "Reply." Defendants' response (Dkt. 203) is referred to as the "Response."

*Salgado v. General Motors Corp.*, 150 F.3d 735, 742 n.6 (7th Cir. 1998)). Courts within the Seventh Circuit generally prohibit belated expert disclosures where, as here, the expert based his opinion on information available prior to drafting the original expert report and/or taking of expert depositions. *See Rowe v. Intern. Corp. v. Ecast, Inc.*, 586 F.Supp.2d 924, 962 (N.D. Ill. 2008); *Solia Tech. LLC*, 361 F.Supp.2d at 808 (striking certain portions of an expert's declaration none of the information stated by the expert was new such that it "would justify [the expert's] failure to give this opinion until this point in the proceedings."); *Carter*, 2003 WL 22232844, at *2-3; *see also Stuhlmacher v. Home Depot USA, Inc.* No. 2:10 CV 467, 2012 WL 5866297, at *3 (N.D. Ind. Nov. 19, 2012) ("A litigant cannot use a supplemental report to 'sandbag one's opponent with claims and issues which should have been included in the expert witness' report.'") (citations omitted); *Baker v. Indian Prairie Community Unit, School Dist. 204*, No. 96-3927, 1999 WL 988799, *2 (N.D. Ill. Oct. 27, 1999) (striking reports containing "new conclusions which d[id] not merely correct or complete prior opinions").

Here, as set forth in below in Sections A-D *infra*, the Schnell Motion Declaration and the Schnell Reply Declaration improperly disclose new opinions based on information Schnell possessed since March 2020, and facts that support those opinions, after the deadline for expert discovery, and must be stricken. *See e.g., Solaia Tech. LLC v. ArvinMeritor, Inc.*, 361 F. Supp. 2d 797, 806-07 (N.D. Ill. 2005)( "The Court must exclude the Declaration (specifically, the portions of the Declaration that constitute new opinions) from consideration unless [plaintiff] has offered 'substantial justification' for failing to offer the new opinions or the new opinions offered are harmless").

**A. Aon Produces the Schnell Report, Which Contains Baseless Innuendo from a Partisan, Not the Considered Opinions of an Expert Founded on Scientific Methodology.**

**i. Schnell Received *All* of the Information Underlying His Expert Report by Mid-March 2020.**

In accordance with this Court's order (*see* Dkt. No. 67), on March 13, 2020, the parties exchanged the source code for MyPerformanceAwards and *PeerTracker* from June 1, 2019 to present.

This was the *only* production of *MyPerformanceAwards* source code throughout expedited discovery. On May 20, Aon produced Schnell's report, which analyzed the source code in that production. *See* Dkt. 195-6 ("Schnell Report"). On June 10, Defendants produced the rebuttal report of Chad Gough. *See* Dkt. 203-8. (the "Rebuttal Report"). The Rebuttal Report responded to Schnell's report based on an analysis of the material exchanged in discovery as of that date.

**ii. Schnell's Speculative Report Does Not, Because It Cannot, Conclude Any Misappropriation Occurred.**

The Report, to put it mildly, trafficked in innuendo. Indeed, Schnell did not, because he could not, opine that Defendants misappropriated any *PeerTracker* code. [redacted] But Schnell cited no evidence from the code of either program to support this conclusion. Nor did he attempt to cite any methodology for reaching this conclusion.[3] Unsurprisingly, there is simply no evidence, either in expert or fact discovery, to support Schnell's claims.[4] [redacted]

[3] [redacted]

[4] [redacted]

[5] In fact, at his deposition, [redacted]

- *First*, [redacted]
- *Second*, [redacted]
- *Third*, [redacted]
- *Fourth*, [redacted]
- *Fifth*, [redacted]

**B. Schnell Testifies that His Report Is Complete and Contains All Significant Facts.**

***Following the exchange of expert reports discussed in Section I(A)(i) above, no new information or analysis pertaining to the source code of these two programs was exchanged after the Rebuttal Report***. The parties agreed to hold expert depositions on August 5 (for Schnell) and August 7 (for Gough).[6] Expedited expert discovery concluded with the completion of expert depositions.

[6] The parties agreed, for scheduling purposes, to hold depositions after the expert discovery deadline of August 1, 2020.

At the time of Schnell's deposition, Defendants' source code had been in his possession for nearly five months. He also had the opportunity to examine Gough's Rebuttal Report for approximately two months. As such, during his deposition, Schnell unequivocally affirmed that the opinions offered in his report were complete and included *all significant facts*. Specifically, Schnell expressly affirmed:

- [redacted]

In total disregard of this testimony, the Schnell Declarations offer new opinions based on new facts in an area he purports to believe is important. All the information upon which these opinions are based was long available to Schnell.

**C. Schnell's Report Opines on the Alleged Similarities between the Source Codes of Myperformanceawards and *Peertracker*.**

At his deposition, Schnell expressly affirmed that:

- [redacted]
- [redacted]

- [redacted]

In other words, apart from what is contained in his Report, [redacted]

### D. The Schnell Declarations Belatedly Offer New Opinions.

Here, the Schnell Motion Declaration and the Schnell Reply Declaration improperly disclose new opinions and facts that support those opinions, after the deadline for expert discovery, and therefore must be stricken. *See Solaia Tech. LLC v. ArvinMeritor, Inc.*, 361 F. Supp. 2d 797, 806-07 (N.D. Ill. 2005)( "The Court must exclude the Declaration (specifically, the portions of the Declaration that constitute new opinions) from consideration unless [plaintiff] has offered 'substantial justification' for failing to offer the new opinions or the new opinions offered are harmless").

[7] That Schnell repeatedly attempted to punt and leave the door open to supplementation does not change the equation. [redacted] When pressed, [redacted]



LEGAL150097760.1

**i. Schnell Provides No Legitimate Justification to Support the Submission of the Schnell Motion Declaration.**

As a threshold matter, in the Schnell Motion Declaration, Schnell attempts to provide a tortured and false justification for why he should be able to supplement his Report and testimony. [redacted] In truth, Schnell was never asked about [redacted] Nor did he ever utter the word [redacted] response to a single question at his deposition. As such, Schnell has not submitted a legitimate justification for the submission of the Schnell Motion Declaration.

**ii. The Schnell Declarations Contain New Opinions, the Consideration of Which Will Prejudice Defendants.**

[redacted]

[8] Of course, [redacted] The time for Schnell to review the source code was in the preparation of his Report, and if necessary, prior to deposition.

[9] [redacted]

[10] [redacted] And, as Schnell admits, those

[redacted] *ee* Schnell Motion Declaration ¶¶ 7-8. The Schnell Reply Declaration similarly offers new facts and evidence in support of these new opinions in the Schnell Motion Declaration for the first time on reply. None of these statements or evidence were included in Schnell's original report or formed the basis of his original opinions, even though the underlying source code (Schnell Motion Decl., ¶ 8), was available to Schnell since March. In fact, even though Schnell had the opportunity to analyze the entire source code prior to the submission of his Report, he voluntarily limited his review to exclude the evidence and opinions included in the Schnell Motion Declaration. *See* Schnell Dep. 192:3-14 [redacted]

Notably, even though Defendants had no chance to critically examine this evidence (and importantly cross-examine Schell about it) during expedited discovery, Aon directly cites and heavily

[redacted]

11 [redacted]

12 [redacted]

relies upon the Schnell Declarations in support of its drastic request that the Court to enjoin Defendants from using and marketing MyPerformanceAwards, in its entirety, on a going-forward basis for an indefinite period of time (a request that, as set forth in Infinite Equity's response, threatens the very existence of Infinite Equity). *See* Dkt. 203. Indeed, with these belated submissions, Aon and Schnell have plainly attempted to sandbag Defendants by depriving them of opportunity to cross-examine Schnell about the contents of the Schnell Declarations. It thus would prejudice and harm Defendants if the Court were to consider them.

## II. THE SCHNELL DECLARATIONS SHOULD BE STRICKEN AND RELATED EVIDENCE EXCLUDED BECAUSE THEY OFFER CONCLUSORY OPINIONS.

The Court also has grounds to strike the Schnell Declarations because it only offers vague opinions regarding evidence of purported copying. "An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Berg for Wiesner v. CI Investments, Inc.*, No. 15 C 11534, 2017 WL 1304082, at *5 (N.D. Ill. Apr. 7, 2017) (quoting *Mid-State Fertilizer Co. v. Exch. Natl. Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989)). Indeed, the Seventh Circuit has repeatedly held that an expert's *ipse dixit* is inadmissible. *See Wender & Ezra, P.C. v. American Intern Group, Inc.*, 521 F.3d 790, 791 (7th Cir. 2008).

Here, Schnell fails to identify any specific facts or sources to support his reasoning for his opinions in the Schnell Declarations. [redacted] And, in the Schnell Reply Declaration, he can [redacted]

[redacted] Schnell Reply Decl., ¶¶ 12-13.) Essentially, Schnell offers nothing more than circular logic that his subjective assessment of similarities equals evidence of copying. This is not enough. For this reason, too, the Schnell Declarations must be stricken.

## III. ALL OF THE DECLARATIONS SHOULD BE STRICKEN, AND RELATED EVIDENCE EXCLUDED, BECAUSE THEY CONTRADICT DEPOSITION TESTIMONY.

The Seventh Circuit has been highly critical of efforts to patch up a deponent's testimony with his own subsequent declaration. *See Russell v. Acme-Evans Co.*, 51 F.3d 64, 67–68 (7th Cir. 1995) (collecting cases). When a declaration and deposition testimony are in conflict, the declaration should be disregarded unless there is a plausible explanation for the discrepancy. *See id.* ("Where deposition … and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy.").

As set forth below in Sections A-C infra, ***the Court should strike the Schnell Declarations, the Kapinos Declarations and the Goings Reply Declaration because they directly contradict Schnell's, Kapinos' and Goings' previous deposition testimony***.

### A. The Schnell Declarations Contradict Schnell's Prior Deposition Testimony.

Here, there is no plausible explanation for Schnell's provision of additional facts in his declaration that directly contradict his previous sworn testimony. Nearly every substantive point in the Schnell Motion Declaration (and the Schnell Reply Declaration, which supports the Schnell Motion Declaration) is contradicted by his deposition testimony. Indeed, by way of example, Schnell testified:

- He had included all significant facts and opinions in his Report (*see* Section I(b), *supra*), ***yet he included new facts and opinions in the Schnell Declarations***; and

- [redacted] (Schnell Decl., at ¶ 11; Schnell Reply Dec. at ¶ 9).

Accordingly, the Schnell Declarations must be stricken in its entirety, along with all portions of Aon's briefs that rely upon it.

### B. The Goings Reply Declaration Contradicts Goings' Prior Deposition Testimony.

Moreover, Aon incorporates new testimony on topics Goings already testified about at his deposition in contradiction of his sworn testimony. Much like the "facts" included in the other declarations Aon has submitted, Goings repeatedly contradicts his prior sworn testimony in the Goings Reply Declaration. By way of example:

- As set forth in the Response, [redacted]. *See* Goings Dep., 183: 9-18.[13] But now, in the Goings Reply Declaration, Goings claims, without any support whatsoever, that the procedures are similar. [redacted]
- Moreover, at his deposition, Goings [redacted] But now, in an attempt muddy the waters, Goings claims that [redacted] This is either an attempt to mislead the Court through an overly general comparison [redacted] or it is a direct contradiction of

[13] [redacted]

[14] This "fact" is highly disputed. Goings, of course, is purposefully [redacted]

Goings' deposition testimony. Either way, it is improper.

- Goings claims, for the first time, that the use of different software frameworks in each program are a [redacted] Goings Reply Decl. ¶ 14. At his deposition, however, Goings expressly testified that [redacted] Goings Dep. at 191:25-192:3.
- After admitting that [redacted] Goings then baselessly, for the first time, claims that [redacted] ee *id.* Tellingly, [redacted]
- Goings admits that [redacted] Goings Reply Decl. ¶ 15. But this statement directly contradicts Goings' testimony. This idea was never [redacted] *See id*, at 198-202.

Accordingly, the Goings Reply Declaration must be stricken in its entirety, along with all portions of Aon's briefs that rely upon it.

**C. The Kapinos Declarations Must Be Stricken Because They Are a Last-Minute, Transparent Attempt to Sneak in Evidence that Contradicts Kapinos' 30(b)(6) Testimony.**

After expedited discovery closed, Aon found itself in a conundrum. To show a likelihood of success on its breach of contract, fiduciary duty, and tortious interference claims, it had the burden of establishing a near-permanent relationship with the companies it claimed were "clients"[17] and that

---

[15] Goings, notably, does not comment on the obvious fact that MyPerformanceAwards' use of an entirely different software framework than *PeerTracker* is clear evidence that it was not a copy.

[16] Of course, this has no bearing on the point that the calculation is performed *differently*, further evidence that the products are not the same.

[17] To be enforceable, a postemployment restrictive covenant "must be reasonable and necessary to protect a legitimate business interest of the employer." *Carlson Grp., Inc. v. Davenport,* No. 16-CV-10520, 2016 WL 7212522, at *4 (N.D. Ill. Dec. 13, 2016). "Factors to be considered in this analysis include, but are not limited to, the *near-permanence of customer relationships*, the employee's acquisition of confidential information through his

those "clients" met the contractual definition of the term as laid out in Coleman's RSU Agreement.[18] But the record provided no such support. Facing a losing battle, Aon turned to manufacturing evidence (where none exists) through the Kapinos Declarations to support the client relationships necessary to show its claims were likely to succeed.[19] But the Kapinos Declarations *directly contradict* Kapinos' deposition testimony, where he disavowed knowledge of basic information regarding alleged clients (on which he was designated as a 30(b)(6) witness). Aon cannot now patch up Kapinos' testimony to conjure an advantageous record out of thin air. *See Russell*, 51 F.3d 67-68.

### i. Kapinos Did Not Know Answers to Simple Client-Related Questions at His Deposition, Despite Being Designated As a 30(b)(6) Witness on Those Topics; Now He Claims Ultimate Knowledge in His Motion Declaration.

**Who is an Aon "client"?** After failing to provide any evidence to meet its burden to prove near-permanent relationships with alleged clients (or even that any given client on the Aon Client List meets the legally operative definition), Aon, in self-serving fashion, submitted the Kapinos Motion Declaration, which unequivocally declares, without qualification, that 30 companies allegedly are or were Aon clients. *See* Dkt. 177-2, ¶¶ 9-38. At his deposition, however, Kapinos, Aon's 30(b)(6) witness concerning alleged Aon clients,[20] *did not know* how Aon determines whether a company is an

---

or her employment, and time and place restrictions." *Reliable Fire Equip. Co. v. Arredondo,* 2011 IL 111871, ¶ 43 (emphasis added).

[18] The full definition from the non-competition provision in the agreement states that Coleman is prohibited from servicing "(i) clients of Aon with respect to whom the Participant provided services, either alone or with others, or had a business relationship, or on whose account the Participated worked or became familiar, or supervised directly or indirectly the servicing activities related to such clients, during the twenty-four (24) months prior to Participant's Termination Date and, *further provided such clients were clients of Aon either on the Participant's termination date or within the twelve (12) months prior to such Termination Date. 'Client' means any person or entity listed on the books of Aon as such*." *See* Am. Compl. Dkt. 106. (emphasis added).

[19] Aon has claimed, and continues to claim, a protectable interest in *no fewer than 770 companies* (the "Aon Client List").

[20] Kapinos was designated to testify, as a 30(b)(6) witness, on "[i]nformation related to Aon Clients, including the timeframe of the client relationships, nature of work and deliverables provided to each client, relevant Equity Services Group employees who worked with the client and when such employees performed such work, contracts for works for such clients and validity of and signatories to such contracts, and revenue or other evidence that illustrates a 'near and permanent' relationship between Aon and the client." *See* Boji Decl. Ex. D.

existing client that should have been included on the Aon Client List. In fact, Kapinos, *who is leader of the Equity Services Group*, testified that an "account manager," not him, is best positioned to judge who is and who is not a client. ("Q. So do you consider [redacted] to be a current Aon client? … A: I'm not the account manager that would make that judgment." *See* Boji Decl. Ex. C (hereinafter "Kapinos Dep.") 199:2-200:6. Kapinos similarly could not answer a question as basic as whether a company was a "client" if it never signed an engagement letter with Aon. ("Q. What if the client didn't accept the engagement via email or signed [an] engagement letter? A. **I don't know**. Q. Would they still be considered a client of Aon? . . . A. I mean, **I don't know**." Kapinos Dep., 266:14-22.).[21] Kapinos testified that Aon developed the Aon Client List using "billing spreadsheets for 2017, 2018 and 2019, and utilization reports covering the same timeframe." Kapinos Dep., 72:11-18.[22] Yet he offered conflicting explanations for whether a company should have been included on that spreadsheet (and thus the Aon Client List).[23]

- *First*, Kapinos testified that the spreadsheet included all existing clients, and that a company would be "removed from the spreadsheet" if it "was no longer possible to be a client." Kapinos Dep. 76:10-77:2. The 2019 spreadsheet included the clients that Aon "expected to be current" and with which Aon had agreed to verbal or written terms. *Id.*

- *Next*, Kapinos testified that revenue, as reflected on the 2019 spreadsheet (instead of the actual list on the spreadsheet), is the measure of whether a client relationship is "active," even though: (i) there is no revenue reflected on the billing spreadsheet for certain clients (e.g., Abiomed; Aviat Networks); or (ii) the way Aon tracks revenue (and thus determines clients) is not clear. *See, e.g.* ("*Like I said, this is not a perfect science*. Things get missed and we rely on a lot of different

---

[21] Kapinos' Motion Declaration claims he is "well versed in Aon's Equity Services Group, including its current and former employees and clients, as well as its corporate records." *See* Dkt. 177-2, ¶ 3. Yet at his deposition, often in response to questions on those topics, Kapinos answered that he did not "recall" 115 times, that he did not "know" 84 times, and that he did not "remember" 10 times. *See, generally*, Kapinos Dep.

[22] Despite the spreadsheets being the basis for Aon's *entire* client list, Aon refused to turn over the spreadsheets until July 1, 2020, almost two months after the court-ordered deadline to produce documents and roughly a week before depositions began. *See* Dkt. 152.

[23] Kapinos also did not know how Aon determined whether certain Defendants serviced the supposed Aon clients. For example, Aon claims Evans and DiDomenico are tied to all 700-plus clients on the list because they operated "tools" to support the clients, (*See* Kapinos Dep. 115:16-25), but Kapinos, who swore such information was true in Aon's interrogatory responses, did not know how Aon figured out that information. *Id.* 117:13-118:16. ("Q. So when compiling this [client] list, did you check that all 700 of these clients were users of one of these tools? A. **I don't recall** specifically."); *see also id.* at 113:9-11 ("Q. Did [Evans and DiDomenico] deal with each one of these clients? A. **I do not know**.").

systems. This is the best of our ability in terms of tracking things, but it was a very manual process." Kapinos Dep. 157:10-158:2) (emphasis added).

- Kapinos also admitted that he does not know whether a client without revenue and that is labeled "closed" on the spreadsheet is, in fact, a client or just a carry-over from a previous list. ("Q. So what's your understanding of the current status of [redacted] with respect to being an Aon client? A. I **do not know.** Q. As you sit here today, [redacted] could have been closed as of years ago, but they are still reflected on the list? . . . A. **I don't know**. **I don't recall** specifically in this situation what this could mean." Kapinos Dep. 145:6-20).[24]

- Finally, if there is *no revenue* for the client on the spreadsheet, Kapinos said it was up to the individual "account manager" to determine who is a client, the spreadsheet notwithstanding. ("I think that's based on the account manager overseeing that relationship to understand if there are still conversations present and what potential projects could exist." Kapinos Dep. 191:25-192-10).[25]

In short, Kapinos clearly *did not know* how Aon decided which companies were clients and whether they should be included on the Aon Client List. He could not even say whether the list included former clients.[26] Kapinos cannot now, in his Motion Declaration, assert 30 companies are Aon clients without qualification.

**When did alleged client relationships begin?** Simply saying a company is a client because it is listed on a spreadsheet isn't enough. As stated above, Aon must have a near-permanent relationship with those clients. *See Reliable Fire Equip. Co.,* 2011 IL 111871, ¶ 43.[27] Realizing the record was void of such facts, Aon's Kapinos Motion Declaration attempts to re-write the record and add new facts to

[24] Kapinos also did not know whether the spreadsheets, the information source for the Aon Client List, were current and, if not, how stale they were. *See* Kapinos Dep. 122:16-123:17 ("A**. I honestly don't remember**. I see this spreadsheet a lot, and **I don't remember** exactly when. I would say sometime in the last six months, **but I don't remember** anything more specific than that.").

[25] This begs the question: How are former employees with supposed restrictive covenants supposed to know whether an Equity Services account manager is having "conversations" or thinks "potential projects could exist" with a company (and therefore, if those arbitrary factors are met, the company is a client the former employee cannot work with)? Kapinos offered a non-answer to this pressing question: "From the process that we followed in terms of creating the relevant list, we looked at these billing spreadsheets from 2017, 2018, and 2019, and then also time reports, to understand when revenue was received and when billable time would have been entered. That was the basis." *See* Kapinos Dep. 192:14-20.

[26] "Q. Is this list restricted to current clients of Aon? A. From what I recall . . . Q. So does it include former clients? A. It includes clients that we invoiced, so -- Q. So what interest would Aon have in restricting the defendants from former clients? . . . A. **I don't know.**" *See* Kapinos Dep. 105:4-106-4.

[27] Further, as stated *supra*, for a client to be relevant under Coleman's RSU Agreement, it must be one to which Coleman provided services or had a business relationship in the two years before leaving Aon, it must have been a client at least a year before Coleman left, *and* it must be a "person or entity listed on the books of Aon as such." *See* Am. Compl. Dkt. 106.

establish the year alleged companies supposedly became Aon clients. The Motion Declaration claims 27 companies started working with Aon before 2017 -- 19 of those in 2014 or prior. *See* Dkt. 177-2, ¶¶ 9-38. Kapinos' Motion Declaration relies on supposed engagement letters attached as exhibits. *Id.* at Exs. 1-9. But only one of the engagement letters is signed by the alleged client (*see* Ex. 3); the rest are unsigned, with no indication the client *ever even saw them*. *See id.* Exs. 1-2, 4-9.[28] What's more, the earliest engagement letters do not evidence the beginning of the alleged client relationships. For example, [redacted] letter is dated in 2018, but it supposedly became a client in 2012. *See id* ¶ 18. A 2018 letter is no evidence that a relationship started in 2012.[29]

Besides being wholly unsupported by the record or the exhibits attached, Kapinos' false claims in the Motion Declaration *directly contradict* his deposition testimony, where he could only testify about the origin and longevity of alleged relationships to the extent the information could be found in the spreadsheets dating back to 2017. ("Q: If there is no revenue listed for [redacted] in the timesheets, would you still consider Abiomed a long-standing client relationship? A: **I'm not sure** that there isn't time to Abiomed in the timesheets back to 2017." Kapinos Dep. 157:10-15; *see also* 152:4-156:23). Nor did Aon produce information that allows Defendants to discern when alleged client relationships began. The billing spreadsheets only contained information as far back as 2017, and the earliest document related to supposed clients that Aon produced was created in 2014. If the alleged "long-standing" client relationships began before 2014, Defendants had no way to know or verify such information. And even if a supposed relationship began after 2014, *none* of the documents produced

[28] Notably, Aon does not attach engagement letters or *any other evidence of a client relationship* for 21 companies listed in the Motion Declaration. *See* Dkt. 177-2, ¶¶ 9-38.

[29] This is especially true given the limited scope of Aon's work for these companies. As an example, an (unsigned) engagement letter with [redacted] says Aon will notify the company of "any work outside the scope of this engagement before we begin any new assignment. We will separately agree to the terms and scope of any additional projects." *See* Dkt. 177-2, Ex. 8. Simply put, Aon's work was limited by time and discrete in subject matter, and Defendants cannot be forced to accept, without evidence, that supposed client relationships date back as far as Aon claims based on Kapinos' Motion Declaration (especially when he could not credibly testify about such relationships at his deposition).

evidence the *origin* of such a relationship; they are irrelevant emails that do not pertain to *any company* cited in the Kapinos Motion Declaration. Defendants were simply left in the dark about when Aon claimed certain client relationships started, and now, with the Kapinos Motion Declaration, Aon attempts to shoe-in last-minute, conclusory evidence to meet its burden of establishing those relationships, without giving Defendants a chance to cross-examine or otherwise challenge such baseless information.

**ii. The Kapinos Reply Declaration Provides Further Contradictions on Topics about Which Kapinos Was Designated to Testify as a 30(b)(6) Witness.**

Aon continues to manufacture a new record in the Kapinos Reply Declaration. Kapinos misleadingly generalizes how Aon keeps track of supposed clients. This misdirection is a transparent attempt to paper over that Kapinos admitted at his deposition Aon does not maintain an accurate client list. *See, e.g.* Kapinos Dep. 157:10-158:2 ("*Like I said, this is not a perfect science*. Things get missed and we rely on a lot of different systems.).

In the Reply Declaration, Kapinos baldly claims, in contradiction to his muddled and uncertain deposition testimony, that Aon "maintains a client spreadsheet in the regular course of business," and therefore, because companies such as [redacted] are listed on that spreadsheet as "clients," they must be clients that deserve a spot on Aon's Client List. *See* Kapinos Reply Decl. at ¶10. But as noted *supra*, at his deposition, Kapinos admitted the 2017-2019 billing spreadsheets -- the "client spreadsheet" to which Kapinos presumably refers -- were not necessarily current, and that companies with no revenue during that span, which by one of Kapinos' conflicting definitions of a "client" would render them as an inactive client, were still on the spreadsheet. *See* Section III C.i. What's more, despite being designated to testify on the topic as a 30(b)(6) witness, Kapinos admitted he did not know whether referral partners such as [redacted]

had current engagement letters with Aon.[30] *See* Kapinos Dep., 244:10-20 ("Q. Do you have an engagement letter with [redacted]? A. **I don't know** . . . Q. Do you have an engagement letter with [redacted]? A. **I don't know**. **I don't recall** seeing one specifically.").[31] The Kapinos Reply Declaration's claim that Aon "maintains a client spreadsheet" is not merely an issue of semantics; Aon relied on the supposed clients on the billing spreadsheets to devise the Aon Client List with which it attempts to destroy Infinite Equity's book of business. But, as Kapinos admitted, those spreadsheets cannot be trusted, and as stated above, just because a company is listed as a client in a spreadsheet does not make them such. A Reply Declaration that baldly asserts there is a definitive, accurate client spreadsheet directly contradicts Kapinos deposition testimony and should be stricken.

Further, Kapinos' claim that there is an all-encompassing "client spreadsheet" is not a throwaway fact. It forms the basis for rampant misrepresentations of the record throughout Aon's Reply. By way of example only, the assumption that an accurate "client spreadsheet" exists, and that [redacted] is on the spreadsheet and therefore a client, allows Aon to misrepresent or re-invent the record in the following ways:

- Aon claims a purported client that was "lifted" had a deliverable from Infinite Equity due on June 4, 2019, three days after the company's "public debut." *See* Dkt. 210 at 1 (citing Dkt. 177-1, Ex. EEE). This "client" is [redacted] the very company Kapinos claims is a "client" in his Reply Declaration. But, as Defendants have repeatedly stated, [redacted] (along with [redacted] (whose CEO attested to Defendants' understanding), and [redacted]) is a *referral partner* of Aon (and Infinite Equity). It passes its clients to Aon for equity-compensation services; it does not receive equity-compensation services from Aon. The notion that [redacted] is a "client" that could be "lifted" is not grounded in fact.[32]

---

[30] Aon does not provide services to referral partners such as [redacted]; any billings for services by Aon to those companies are only with respect to services Aon performs for their clients. *See, e.g.,* Dkt. 203-6, Decl. of Clearbridge CEO.

[31] When asked who may know whether Aon had engagement letters with referral partners, Kapinos, Aon's 30(b)(6) witness on the topic, replied that Defendants Stoudt and Adamson were somehow in a better position to know those answers. *See* Kapinos Dep., 244:21-23.

[32] Aon claims Defendants "similarly recognize" [redacted] and [redacted] as "clients" on their internal spreadsheet. *See* Dkt. 210 at 13 (citing Dkt. 177-1, Ex. EEE). This misrepresents the record. Defendants' internal spreadsheet refers to each company as a "partner," in direct contrast to a "client," the other type of relationship listed under that column in the spreadsheet. *See* Dkt. 177-1, Ex. EEE. Aon shamelessly misrepresents the record as to alleged "clients" in many other respects in its Reply. By way of example only,

- Kapinos' alleged "client spreadsheet" also allows Aon to distort the legally relevant definition of "client." Kapinos' contradictory allegation implies that because a company is listed on the spreadsheet it is therefore a "client" with which Infinite Equity should be prevented from working. *See* Dkt. 210, Ex. 1. But, as stated above, for a client to be relevant under Coleman's RSU Agreement, it must be one to which Coleman provided services or had a business relationship in the two years before leaving Aon, it must have been a client at least a year before Coleman left, *and* it must be a "person or entity listed on the books of Aon as such." *See* Am. Compl. Dkt. 106. Kapinos' definition of "client" is misleading and not supported by the record.

Through the Kapinos Declarations, Aon desperately seeks to improperly squeeze in evidence of the beginning and existence of its supposed client relationships, how it determines those relationships, and how it keeps track of them, in support of its request to enjoin Defendants from working with *more than 700 companies*. Kapinos, designed as a 30(b)(6) witness on all of these topics, *plainly* failed to answer questions about them, mostly claiming he did not know. Aon cannot at this crucial time funnel in evidence to the contrary. The Court should strike the Kapinos Declarations and exhibits thereto.

## IV. ALL OF AON'S REPLY DECLARATIONS BRIEF MUST BE STRICKEN BECAUSE THEY ADD NEW FACTS AND EVIDENCE FOR THE FIRST TIME ON REPLY.

"'A reply brief is for replying'—not for sandbagging." *Horvath v. Apria Healthcare, LLC*, No. 19 CV 4894, 2019 WL 5725378, at *2 (N.D. Ill. Nov. 5, 2019) ("[B]y waiting until its reply to submit new evidence and new arguments based on that evidence, Apria denied plaintiff a fair chance to respond."); *Murphy v. Vill. of Hoffman Estates*, No. 95 C 5192, 1999 WL 160305, at *2 (N.D. Ill. Mar. 17, 1999), *aff'd*, 234 F.3d 1273 (7th Cir. 2000) ("It is established beyond peradventure that it is improper to sandbag one's opponent by raising new matter in reply."); *Berryhill v. Enhanced Recovery Co. LLC*, No. 17 C 8059, 2019 WL 2325999, at *1–2 (N.D. Ill. May 31, 2019)(striking evidence "set forth for the first time" on reply and observing "[i]t is 'well-settled' that litigants cannot make new arguments or

---

Aon claims Coleman referred to [redacted] as a "client" in an email. *See* Dkt. 210 at 13 (citing Dkt. 177-1, Exs. QQ and YY). But in the cited exhibits, Coleman *never called* the company a "client."

present new facts in a reply brief.")(citing *Gold v. Wolpert*, 876 F.2d 1327, 1331 n.6 (7th Cir. 1989)). Indeed, "[a] lawyer who plays dirty by sneaking in new evidence [on reply] disserves his clients and tarnishes his credibility." *Horvath*, No. 19 CV 4894, 2019 WL 5725378, at *2. Courts have even stricken a party's entire reply brief as a sanction for this conduct. *See id.* (striking "[a]s a sanction… not only … belated affidavits, but [the] reply brief in its entirety").[33] "It is also "procedurally inappropriate" and "untimely" to submit a supporting declaration on reply. *Horvath*, No. 19 CV 4894, 2019 WL 5725378, at *2; *see also* Fed. R. Civ. P. 6(c)(2). ("Any affidavit supporting a motion must be served with the motion.").[34]

**A. Schnell Offers Even More New Opinions, Evidence and Contradictory Testimony in the Schnell Reply Declaration.**

In support of Aon's preliminary injunction reply, Schnell submitted *yet another declaration*, the Schnell Reply Declaration. The Schnell Reply Declaration, for the first time, references new evidentiary exhibits in an apparent effort to correct the deficient and misleading exhibits in the Report. Schnell now claims, after testifying at length about the exhibits J and K to the Schnell report at his deposition [redacted]g.[36] Schnell Reply Declaration ¶ 7; Schnell Dep.,131-32: 23-25, 1-4. And Schnell adds several brand-new purported facts. For example:

---

[33] Notably, "[r]aising an argument generally in a motion … does not give a litigant license to be vague in his original submissions and provide the necessary detail in his reply." *Murphy*, No. 95 C 5192, 1999 WL 160305, at *2.

[34] For this reason, the Court would also be well within its rights to strike the reply declaration of James Witz, dated October 16, 2020, because it attaches new evidentiary exhibits for the first time on reply. For example, Witz attaches a decision from a separate lawsuit filed by Burg in California. *See* Witz Decl. ¶ 3. Witz also cites new facts by characterizing (without attaching) email correspondence between counsel. *See id.* ¶ ¶ 4-5. And Witz attaches new excerpts of deposition testimony from 11 different witnesses. *See id.* ¶ ¶ 6-16.

[35] In fact, Schnell offered that Exhibits J and K were the primary examples he cited of identical source code. *See* Schnell Deposition 189:8-10 [redacted]

[36] Defendants, of course, have had no opportunity to cross-examine this representation. This "error" excluded the very code that was the supposed *primary purpose* of Schnell's comparison.

- Schnell avers that public a YouTube video with *PeerTracker* source code does not contain code exchanged in this litigation. This alleged fact is well outside the scope of opinions offered in Schnell's Report (which is limited to his opinion on whether the source code of MyPerformanceAwards is a copy). Notably, Aon's own 30(b)(6) witness, [redacted][37]
- Moreover, in an attempt to revive his baseless metrics for code productivity, [redacted]
- Schnell also claims, for the first time, [redacted]

Thus, in a transparent attempt to prejudice Defendants by depriving them of the opportunity to even respond to his assertions, much less explore them via discovery, Schnell adds new facts and opinions *again* in the Schnell Reply Declaration. It must be stricken.

**B. Goings Reply Declaration Must Be Stricken Because It Raises Facts for the First Time.**

Similarly, the Goings Reply Declaration, for the first time on reply, outlines purported high-level similarities between MyPerformanceAwards and *PeerTracker*. Aon *never* referenced these or any other similarities between the two programs in its preliminary injunction motion.[40] Similarly, Goings adds a series of new facts related to arguments raised in Defendants' briefs (Goings Reply Decl. at ¶¶ 12-16). It is, simply put, impermissible to introduce these new facts for the first time on reply.

[37] Whether or not this code was exchanged in discovery, the fact that Aon posted code from the *PeerTracker* repository to the internet demonstrates its selective approach to treating the code as a trade secret.

[38] Even if Schnell's claim is true, [redacted].

[39] Schnell then argues that the fact that *MyPerformanceAwards* does not use the code cited in his Declaration somehow supports his opinions. *See id.* at ¶ 13. In reality, this demonstrates that the code cited by Schnell is insignificant, and in any event, cannot support a showing of irreparable harm going forward.

[40] These "back-end" similarities referred to in Goings' declaration merely amount to claims that the programs perform the same general function and are written in the most common software programming language. *See* Goings Reply Decl. ¶ 7.

### C. Kapinos' Reply Declaration Must Be Stricken Because It Raises Facts for the First Time.

Kapinos' Reply Declaration also raises other new facts *for the first time*:

- Kapinos claims Aon had 40 employees in the Equity Services Group when Terry Adamson left in February 2019; that Aon had 33 employees in the group as of June 2019; and that 12 employees left in that span. *See* Kapinos Reply Decl. at ¶¶4-6. None of this information is included in the documents produced by Aon. Nor did Kapinos or any other Aon witness testify about it. These are completely new facts that must be disregarded.
- Kapinos claims the Equity Services Group does not bill clients hourly but provides fixed or flat-fee arrangement. *Id.* at ¶7. This is another improper new fact and belied by documents actually produced by Aon, which list the *hourly* billing rate for each employee on a particular project. *See* Dkt. 177-2, Ex. 3 (listing hourly billing rate for Aon partner, project manager, and analyst).
- Kapinos attempts to distinguish the *simulations* of valuation models with the proprietary macros and formulas, and claims "Aon does not share the proprietary macros and formulas." *Id.* at ¶8. This an entirely new position on Reply, and one that is contradicted by Kapinos' testimony about client deliverables, in which he said those macros and formulas are embedded in spreadsheets shared with clients. *See* Kapinos Dep., 308:17-19 ("Q. Where are the macros imbedded in this spreadsheet? A. I accessed them by hitting F11.").

Thus, much like the Goings Reply Declaration and the Schnell Reply Declaration, the Kapinos Reply Declaration must be stricken in its entirety.

## V. SCHNELL AND GOINGS' REPLY DECLARATIONS MUST BE STRICKEN BECAUSE THEY ADD NEW FACTS AND EVIDENCE FOR THE FIRST TIME ON REPLY.

Lastly, both Goings and Schnell attempt (unsuccessfully) to rebut Defendants' arguments (as if they are attorneys), and in doing so, make sweeping conclusions based on their opinions and belief, which forms yet another basis to strike these declarations. *See Caster Connection, Inc. v. Colson Grp. Holdings*, *LLC*, No. 20 C 1598, 2020 WL 2745982, at *2 (N.D. Ill. May 27, 2020) (striking reply declaration "present[ing] what [a party] 'believes,' and which "reads more like an argumentative brief written by an attorney"). For example, Goings attempts a point-by-point response to Defendants' brief, complete with citations. *See* Goings Reply Dec. ¶¶ 12-16. And Goings makes speculative, unsupported conclusions based on his experience and belief masquerading as fact. *See id.* [redacted]

[redacted] Similarly, Schnell responds to arguments raised in Defendants' brief that fall well outside the scope of the Report and similarly makes conclusory statements as if they are fact. See Schnell Reply Dec. ¶¶ 13 [redacted] Accordingly, because they offer speculative, unsupported opinions, Goings and Schnell's reply declarations must be stricken.

**CONCLUSION**

**WHEREFORE**, for the foregoing reasons, the Schnell Declarations, and their attached exhibits, must be stricken because they: (1) improperly disclose new opinions, and (2) offer conclusory opinions. *See City of Sterling Heights Gen. Employees' Ret. Sys. v. Hospira, Inc.*, No. 11 C 8332, 2013 WL 566805, at *11 (N.D. Ill. Feb. 13, 2013) (explaining that the Court may strike documents other than pleadings pursuant to Federal Rule of Civil Procedure 12(f) or the Court's inherent power to strike impermissible filings). The Schnell Declarations, the Kapinos Declarations and the Goings Declarations, along with all exhibits, also must be stricken because they contradict prior sworn testimony of each deponent. *See id.* And the Reply Declarations, along with all exhibits, must be stricken because they offer new facts and evidence, as well as speculative arguments and beliefs masquerading as facts. Defendants further request that the Court exclude Aon's reply brief in its entirety or all statements in Aon's motion for preliminary injunction that are dependent on the contents of these declarations. Alternatively, if the Court declines to grant this motion, Defendants request leave to file a sur-reply.

Dated: November 10, 2020

Respectfully Submitted,

**INFINITE EQUITY, INC., JON BURG, DANIEL COLEMAN, ELIZABETH STOUDT, CHRISTOPHER DIDOMENICO, AND TYLER EVANS**

By: /s/ Jeannil D. Boji
One of Its Attorneys

Jeannil D. Boji
Christopher R. Lepore
Daniel T. Burley
PERKINS COIE LLP
131 S. Dearborn; Suite 1700
Chicago, IL 60603
Tel: (312) 324-8400
Fax: (312) 324-9400
jboji@perkinscoie.com
clepore@perkinscoie.com
dburley@perkinscoie.com

**CERTIFICATE OF SERVICE**

I, Jeannil D. Boji, certify that on November 10, 2020, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may also access this filing through the Court's ECF system.

By: /s/ Jeannil D. Boji