## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

AON PLC, AON GROUP, INC., and
AON CONSULTING, INC.

      Plaintiffs,

      v.

INFINITE EQUITY, INC., TERRY
ADAMSON, JON BURG, DANIEL
COLEMAN, ELIZABETH STOUDT,
TYLER EVANS, and CHRISTOPHER
DIDOMENICO,

      Defendants.

No. 19-cv-07504

Judge John F. Kness

## MEMORANDUM OPINION AND ORDER

This case concerns the fallout from the 2019 resignations of several high-level employees who worked for Plaintiff Aon's Equity Services Group ("ESG"). ESG's bread and butter is a web-based application called *PeerTracker* that Aon markets and sells to clients to help them track executive compensation. Beginning in 2018, several partners in ESG (including Defendants Terry Adamson, Jon Burg, Daniel Coleman, and Elizabeth Stoudt) began to discuss leaving Aon to form a new competing company that would market and sell its own software akin to *PeerTracker*. They jumped ship the next year to form a new company: Defendant Infinite Equity. At the new rival company, these former Aon partners (with the aid of Defendants Tyler Evans and Christopher DiDomenico—two erstwhile Aon developers who had access to the *PeerTracker* code) developed *MyPerformanceAwards*, a direct competitor to Aon's

*PeerTracker.* Burg, Coleman, and Stoudt then began soliciting Aon's clients to leave Aon and shift their business to Infinite Equity.

Aon sued its former employees and Infinite Equity and alleges, in general, that Defendants (1) misappropriated its trade secrets (namely the code for *PeerTracker*, as well as other confidential documents and models) and (2) solicited its employees and clients, in violation of various contractual and fiduciary duties, to leave Aon and join Infinite Equity. Now before the Court are numerous motions to dismiss: the combined motion to dismiss under Rule 12(b)(6) by Defendants Coleman, Evans, Stoudt, and Infinite Equity (Dkt. 111); a separate combined motion to dismiss under Rule 12(b)(2) by Infinite Equity, Stoudt, and Evans (Dkt. 115); and additional motions to dismiss by individual defendants Adamson (Dkt. 108), Burg (Dkt. 113), and DiDomenico (Dkt. 181). After voluminous briefing and a two-day evidentiary hearing to resolve questions of fact related to jurisdiction, the motions are now ready for resolution.

For the reasons discussed below, DiDomenico's motion to dismiss (Dkt. 181) is granted. The motion to dismiss under Rule 12(b)(2) by Infinite Equity, Stoudt, and Evans (Dkt. 115) is granted as to Evans but denied as to Infinite Equity and Stoudt. The remaining motions to dismiss (Dkts. 108, 111, 113) are granted in part and denied in part.[1]

---

[1] The Court has reviewed the voluminous briefing in this case and duly considered all Parties' arguments. To the extent any individual arguments are not addressed in this order, the Court respectfully finds them not to require individual treatment.

## I.    BACKGROUND

### A.    <u>The Parties</u>

#### 1.    **Plaintiff Aon**

Plaintiffs Aon Group, Inc. and Aon Consulting, Inc. (collectively, "Aon") are headquartered in Chicago, Illinois.[2] (First Amended Complaint ("FAC"), Dkt. 106 ¶ 20; Transcript of 1/19/2021 and 2/10/2021 Evidentiary Hearing ("Tr."), Dkts. 315, 316 at 157:14-23, 184:5-11.[3]) Aon describes itself as "the leading provider of state-of-the-art products and services to help companies with employees around the world effectively use equity compensation." (FAC ¶ 2.) One division of Aon is the Equity Services Group ("ESG"), which offers "valuation services, design of long-term incentive based programs and employee stock purchase plans, and proprietary tools to track equity compensation metrics." (*Id*. ¶ 21.) Among these proprietary tools is *PeerTracker*, a "web-based application that tracks the performance of equity for clients." (*Id*. ¶ 83.) Before Defendants' departure from Aon, ESG had about 40 clients based in Illinois. (Tr. 61:23-62:11.) Among those Illinois clients were Company A[4] (Plaintiffs' Hearing Exhibits ("Pl. Exs.") 7, 76; Tr. 73:14-75:7; 199:1-14; 203:7-19; 280:25-281:6; 403:11-13); Company B (Pl. Ex. 13; Tr. 69:25-72:11; 117:17-118:2; 194:16-196:2; 198:9-11; 306:9-10; 402:13-21); Company C (Pl. Exs. 9, 18, 42; Tr. 75:15-79:2, 207:17-208:3); Company D (Tr. 80:17-22; 220:21-23; 573:10-11); and Company E (*Id*. 81:8-10; 573:12-13).

#### 2.    **Individual Defendants**

Defendant Terry Adamson is a Pennsylvania resident who joined Aon in 1995.

(FAC ¶ 40.) Adamson was a partner in ESG and was eventually promoted to Global Practice Group Leader. (*Id*. ¶¶ 3, 41.) In that role, he was responsible for overseeing Aon's entire Equity Services division, and all employees in that division reported to him. (*Id*.) Adamson left Aon in May 2019. (*Id*. ¶ 45.)

Defendant Jon Burg is a California resident who began work for Aon as a "Vice President – Consulting" in January 2009. (*Id*. ¶ 51.) Burg was eventually promoted to Partner and practice leader of ESG. (*Id*.) While at Aon, Burg was responsible for at least five clients headquartered in Illinois. (*Id*. ¶ 53.) Burg's last day at Aon was May 29, 2019. (*Id*. ¶ 148.)

Defendant Daniel Coleman is a citizen of Illinois and was an Associate Partner in ESG until his departure from Aon on June 10, 2019. (*Id*. ¶ 24.) At the time he left Aon, Coleman was responsible for at least 17 clients headquartered in Illinois. (*Id*. ¶ 61.) Coleman had access to Aon's trade secret information, including *PeerTracker* and "highly proprietary" modeling tools Aon used to project stock prices for clients. (*Id*. ¶ 64.)

Defendant Elizabeth Stoudt joined ESG in 2005 as an Associate Partner. (*Id*.

---

[2] A third plaintiff, Aon plc, is a United Kingdom public limited company and is the corporate parent of Aon Group, Inc. (FAC ¶ 18.)

[3] The Court cites facts established at the evidentiary hearing described below to the extent they are relevant to the resolution of Defendants' motions to dismiss under Rule 12(b)(2) for lack of personal jurisdiction.

[4] The Court uses Company A, Company B, etc. to refer to the various Aon clients whose true identities are contained in documents and briefs filed under seal. Although these entities were discussed in open Court during the January 19 and February 10, 2021 evidentiary hearing and no Party has requested that those discussions or the identities of those clients be redacted from the official transcript, the Court, out of an abundance of caution, refers to those entities pseudonymously.

¶ 65.) At the time of her departure in June 2019, she was the Philadelphia Market Leader, where she was responsible for business development, managing client relationships, and mentoring other employees. (*Id.* ¶¶ 25, 66, 159.) In that role, Stoudt was responsible for developing and maintaining personal contacts and relationships with Aon's clients, including three clients based in Illinois. (*Id.* ¶¶ 67-68.) While at Aon, Stoudt was also provided access to Aon's confidential and trade secret information. (*Id.* ¶ 72.)

Defendants Christopher DiDomenico and Tyler Evans are Pennsylvania residents who worked at Aon as developers until their departure in April 2019. (*Id.* ¶¶ 27, 73, 82, 142.) As developers, Evans and DiDomenico were among the few Aon employees with access to the *PeerTracker* code. (*Id.* ¶¶ 84, 99, 142.)

### B.  Planning a Rival Company

As early as January 2018, Adamson and Burg met to discuss forming a new "equity company" that would compete against Aon. (*Id.* ¶ 122.) The talks expanded by July 2018 to include Coleman and Stoudt. (*Id.* ¶ 125.) Evans also participated in these early meetings, and at one point stated that he could "print" the code for *PeerTracker* for use at the new company. (*Id.* ¶ 126.) Around this same time, Adamson and Burg approached Aon employee Daniel Kapinos about leaving Aon. (*Id.* ¶ 128.) Burg, Coleman, and Stoudt also eventually solicited Ben Allen, a Senior Consultant at Aon, to leave and join them at the new venture. (*Id.* ¶¶ 36, 158.)

In November 2018, Adamson, Burg, Coleman, and Stoudt attended an ESG leadership meeting in Chicago. (*Id.* ¶ 127; Tr. 546:10-14.) Following the official ESG

meeting, the small group met after hours in the same conference room to discuss forming their competing equity services business. (Tr. 101:20-22; 173:3-19; 390:25-391:8; 465:10-14; 550:5-7.) Specifically, the group discussed (1) the new company's infrastructure and applications; (2) *PeerTracker*; (3) the current Aon employees they would seek to take with them, and (4) the salaries required for those employees. (Pl. Ex. 10; Tr. 31:3-32:1; 32:17-20; 33:14-35:24; 40:5-8; 44:12-45:7; 50:1-15; 175:21-23; 388:10-389:3; 393:9-394:13; 395:9-18; 551:24-553:3; 553:4-10.)

The plans for that meeting were memorialized on a whiteboard that included the names of the Aon employees who might be involved in the new company, legal issues that would need to be addressed, and the name for the new enterprise: Infinite Equity.



(Pl. Ex. 10.) Stoudt photographed the whiteboard and sent the photograph via email

to Burg, Coleman, and Kapinos on December 13, 2018. (*Id.*)

A few days after Stoudt sent Burg the image of the whiteboard, Burg sent a meeting invitation to seven Aon employees for "IES Planning #1."[5] (Pls. Exs. 10, 11; Tr. 555:17-558:15.) Burg then initiated weekly conference calls with Aon employees, including Coleman in Illinois, to discuss forming Infinite Equity, the products and services the new company would offer, and how employees would be compensated. (Pl. Ex. 66 at 5; Tr. 245:14-23, 247:13-20, 251:16-252:1, 553:19-555:13.) By January 2019, an Infinite Equity email domain name was created. (FAC ¶ 129.)

### C.  **The Exodus**

In April 2019, a deluge of resignations and departures washed over Aon. Evans left Aon on April 5, 2019, DiDomenico on April 29, Burg on May 29, Stoudt on June 7, and Coleman on June 10. (*Id.* ¶¶ 142, 144, 148, 149, 159.) All now work for Infinite Equity. (*Id.* ¶¶ 143, 145, 165.) By June 2019, a total of nine Aon colleagues had resigned from ESG. (*Id.* ¶ 162.)

On his last day at Aon, Coleman printed dozens of documents in Aon's Chicago offices, including a proprietary financial model for Aon client Company F, and brought the printed-out model to his residence. (FAC ¶ 155; Tr. 297:18-21; 298:22-299:5; 299:6-14; 301:4-13.) Three days later, Coleman announced he was officially

---

[5] When asked at the evidentiary hearing whether "IES" referred to "Infinite Equity Solutions," Stoudt replied that she could not "attribute a specific meaning" to the initialism. When the Court questioned her why "IES" was chosen instead of something like "XYZ," Stoudt replied "innocence." (Tr. 557:5-558:7.) The Court finds Stoudt's testimony on this point not to be credible, especially considering that the whiteboard image she attached to her email to Burg and Coleman three days earlier clearly contains a reference to "Infinite Equity." (Pl. Ex. 10.)

joining Infinite Equity (Tr. 253:3-23; 258:1-8; 436:7-8.), and a few weeks after that, Coleman worked with Burg to create a model for Company F on behalf of Infinite Equity. (*Id*. 295:4-296:4.)

### D. Infinite Equity and *MyPerformanceAwards*

Infinite Equity was incorporated in Delaware on May 1, 2019. (FAC ¶ 28.) It marketed itself as having an Illinois location, and its website reflected that it had a Chicago office. (Tr. 275-8-13.) Infinite Equity also represented to clients that it had a Chicago office and provided clients with promotional materials that described a Chicago location. (Pl. Ex. 49; Tr. 213:25-214:15; 215:25-216:14; 217:17-21; 275:14-21.)

Infinite Equity's website was live by June 2019. (FAC ¶ 168.) According to the website, "Infinite Equity's product and service offerings mirror those offered by Aon's" ESG. (*Id*.) One of the tools that Infinite Equity markets and sells is *MyPerformanceAwards*, which Aon alleges is "virtually identical" to *PeerTracker*. (*Id*. 176.) Evans and DiDomenico, who worked on *PeerTracker*, also developed *MyPerformanceAwards*. (Tr. 407:11-14; 535:20-536:7.) The *MyPerformanceAwards* code is structured similarly to the code of *PeerTracker* and has "code that is word for word the same, down to . . . there being identical typographical errors." (*Id*. 361:24-363:22; 375:2-20.) Aon alleges Burg, Coleman, Stoudt, Evans, and DiDomenico misappropriated Aon's trade secret *PeerTracker* information to create *MyPerformanceAwards*.

As discussed in greater detail below, Burg, Coleman, and Stoudt have all solicited the clients they worked with at Aon to work with their new company. (FAC

8

¶¶ 185, 188, 192-194.) To date, at least 45 of Aon's clients have transitioned all or some of their business to Infinite Equity. (*Id.* ¶ 191.) Many of these clients now use *MyPerformanceAwards* instead of *PeerTracker*. (*Id.* ¶ 195.)

\* \* \*

On May 1, 2020, Aon filed its First Amended Complaint, which includes claims for violation of the federal Defend Trade Secrets Act ("DTSA"), Pub. L. No. 114-153, 130 Stat. 376, against Infinite Equity, Burg, Coleman, Stoudt, Evans, and DiDomenico (Count I); violation of the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065/1 *et seq.*, against those same Defendants (Count II); breach of contract against Coleman and Adamson (Count III); breach of fiduciary duty against Burg, Coleman, Stoudt, Adamson, and Evans (Count IV); tortious interference against Infinite Equity, Burg, Coleman, Stoudt, and Adamson (Count V); tortious interference with prospective economic advantage against all Defendants (Count VI); and unjust enrichment against Infinite Equity, Burg, Coleman, Stoudt, Evans, and DiDomenico (Count VII). (FAC ¶¶ 205-263.)

As discussed above, Defendants filed several motions to dismiss the FAC. (*See* Dkts. 108, 111, 113, 115, 181.) All Defendants, other than Adamson and Coleman, argue that they are not subject to the Court's personal jurisdiction and that dismissal is thus warranted under Rule 12(b)(2) of the Federal Rules of Civil Procedure. (*See generally*, Dkts. 106 (Infinite Equity, Stoudt, and Evans), 114 at 5-9 (Burg), 182 at 5-8 (DiDomenico).) Defendants Burg, Stoudt, and Infinite Equity also challenge venue under Rule 12(b)(3). (Dkt. 116 at 13-14 (Infinite Equity and Stoudt); Dkt. 114 at 8-9

(Burg)). Finally, Defendants present numerous arguments why the Court should dismiss Aon's claims under Rule 12(b)(6) for failure to state a claim. Each of these arguments is addressed in turn.

## II. DISCUSSION

### A. Motions to Dismiss Under Rule 12(b)(2)

All Defendants but Adamson and Coleman argue that the Court should dismiss all claims against them under Rule 12(b)(2) of the Federal Rules of Civil Procedure for lack of personal jurisdiction. (*See* Dkts. 114 at 5-8 (Burg), 115 (Infinite Equity, Stoudt, and Evans), 182 at 5-8 (DiDomenico).) Courts must dismiss any action against a party over whom the Court lacks personal jurisdiction. *See* Fed. R. Civ. P. 12(b)(2). The burden is on the plaintiff to make a *prima facie* case for personal jurisdiction. *uBID, Inc. v. GoDaddy Grp., Inc.,* 623 F.3d 421, 423 (7th Cir. 2010). When determining whether a plaintiff has met this burden, jurisdictional allegations pleaded in the complaint are accepted as true unless proved otherwise by the defendant's affidavits or exhibits. *Purdue Rsch. Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). If the district court determines that any facts regarding jurisdiction are in dispute, "it must hold an evidentiary hearing to resolve them, at which point the party asserting personal jurisdiction must prove what it alleged." *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002). If an evidentiary hearing is held, "the plaintiff must establish jurisdiction by a preponderance of the evidence." *Purdue Research*, 338 F.3d 773 at 782.

After reviewing the Parties' briefing on the motions to dismiss under Rule

12(b)(2), the Court determined that an evidentiary hearing was necessary to resolve factual disputes related to personal jurisdiction. (*See* Dkt. 200.) For example, as the Court noted in its minute order of September 27, 2020, it appeared there were various factual disputes regarding the nature and locations of several entities and individuals that Aon alleged Defendants solicited to leave Aon for Infinite Equity. (*Id.* (citing Dkt. 123 at 3 ("[N]one of the exhibits demonstrate that either of the two clients at issue were based in Illinois or that they eventually transferred their business to Infinite Equity").) Accordingly, on January 19 and February 10, 2021, the Court held an evidentiary hearing via video on the issue of personal jurisdiction. (Dkts. 253, 257.) Following the hearing, the parties submitted post-hearing briefs and responses. (*See* Dkts. 289, 290, 302, 304.) The Court—somewhat reluctantly, considering the voluminous record already before it—also allowed the Parties to file objections to each other's' exhibits presented at the evidentiary hearing.[6] (*See* Dkts. 303, 310.) The Court will examine the pleadings and evidentiary record as to each of the Defendants challenging personal jurisdiction in turn.

### 1. Infinite Equity

---

[6] The Court notes that the Parties submitted nearly 300 pages of briefing and correspondence on Defendants' various motions to dismiss, not including the additional hundreds of pages of exhibits entered in connection with the above-referenced evidentiary hearing. As both this Court and Magistrate Judge Harjani have admonished the Parties (*see, e.g.*, Dkts. 259, 260), most of this briefing was not compliant with the Local Rules or the Court's standing orders and contained unnecessarily lengthy footnotes in miniscule font, single spaced text, block quotes, narrow margins, and non-standard typefaces. The Court regrets the delay in resolving the numerous dispositive motions presently before it, but at least some of this delay is attributable to the significant efforts the Court expended in untangling the web of briefing the Parties wove. In retrospect, the Court bears accountability for allowing the Parties' noncompliance with the Rules to go unremedied. Any future noncompliance, therefore, will be promptly addressed.

### a. General personal jurisdiction

A corporation is subject to general personal jurisdiction only where it is "essentially at home." *Kipp v. Ski Enter. Corp. of Wis., Inc.*, 783 F.3d 695, 698 (7th Cir. 2015). This condition is ordinarily met only in "the state of the corporation's principal place of business and the state of its incorporation." *Id*. A corporation may be "at home" in another state, however, in the "exceptional" case that it has such substantial operations in that other state "as to render the corporation at home in that State." *Daimler AG v. Bauman*, 571 U.S. 117, 139 n.19 (2014). Aon does not dispute, for purposes of Defendants' motion to dismiss, that Infinite Equity is not subject to general personal jurisdiction in Illinois. (Dkt. 123 at 3 n.1.) Thus, the Court will proceed to the question whether it has specific personal jurisdiction over Infinite Equity.

### b. Specific personal jurisdiction

Because the Court does not have *general* personal jurisdiction over Infinite Equity, Aon must establish *specific* personal jurisdiction for its claims against Infinite Equity to remain before this Court. The Seventh Circuit has broken out the specific personal jurisdiction inquiry into three parts. *See Kinslow v. Pullara*, 538 F.3d 687, 691 (7th Cir. 2008). First, the defendant must have "minimum contacts with the forum state." *Id*. To determine whether the defendant has such contacts, the court must ask whether "the defendant should reasonably anticipate being haled into court in the forum State, because the defendant has purposefully availed itself of the privilege of conducting activities there." *Id*. Second, the plaintiff's claims must "arise

out of" the defendant's contacts with the forum. *GCIU-Emp. Ret. Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1023 (7th Cir. 2009). Third, and finally, maintenance of the suit must not "offend traditional notions of fair play and substantial justice." *Kinslow*, 538 F.3d at 691.

To establish specific personal jurisdiction, Aon must first show that Infinite Equity has "minimum contacts" with Illinois. *Id.* But "not just any contacts will do." *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 801 (7th Cir. 2014) (citing *Walden v. Fiore*, 571 U.S. 277, 284 (2014)). Instead, Infinite Equity's "*suit-related conduct* must create a substantial connection with" Illinois. *Id.* (emphasis added) (quoting *Walden*, 571 U.S. at 1121). The tortious conduct that Aon alleges falls into three general categories: (1) misappropriation of trade secrets, (2) solicitation of Aon clients, and (3) solicitation of Aon employees. (*See generally*, FAC ¶¶ 205-63.) To establish specific personal jurisdiction, therefore, Aon must show that Infinite Equity's alleged misappropriation and solicitation (the suit-related conduct) has a substantial connection with Illinois.

Aon attempts to establish personal jurisdiction over Infinite Equity mainly through the actions of Defendant Coleman. As a partner and agent of Infinite Equity, Coleman's activities can be imputed to Infinite Equity. *See Felland v. Clifton,* 682 F.3d 665, 676 n.3 (7th Cir. 2012) (finding personal jurisdiction by imputing to the principal of corporate agents the communications made by those agents); *Jacobson v. Equitable Life Assurance Soc'y,* 381 F.2d 955, 960 (7th Cir. 1967) ("The general rule which imputes an agent's knowledge to the principal is well established" (quoting

13

*Mut. Life Ins. Co. of N.Y. v. Hilton-Green*, 241 U.S. 613, 622 (1916)).

Aon alleges that Coleman, while working as an agent of Infinite Equity but still employed at Aon in Aon's Chicago office, misappropriated Aon's trade secrets. (FAC ¶ 212.) On his last day of employment with Aon (but after he had already signed ownership papers in Infinite Equity), Coleman printed a proprietary financial model for Company F. (Tr. 297:18-21; 298:22-299:5.) Coleman brought this printed model home, even though he supposedly had no business purpose for doing so.[7] (*Id.* 299:6-14; 301:4-13.) Three days after Coleman announced he was officially joining Infinite Equity, Coleman worked with Burg to create a model on behalf of Infinite Equity for that same Aon client. (*Id.* 295:4-296:4.)

Infinite Equity also interfered with Coleman's Illinois contracts in Illinois. As discussed in greater detail below, Coleman executed Restricted Stock Unit ("RSU") Agreements with Aon that included covenants not to solicit Aon employees or clients following his departure from Aon. (Dkt. 106-1, Ex. E; Tr. 183:4-187:5.) Coleman provided a copy of the RSU Agreement to Burg and Stoudt, co-owners and agents of Infinite Equity. (Pl. Ex. 25; Tr. 191:21-194:6.) Despite being aware of the RSU Agreements, Infinite Equity—via Burg and Stoudt—induced Coleman to breach the non-solicitation covenants in several ways.

For example, Coleman worked with Illinois-based Company B while still employed at Aon. (Tr. 194:7-15; 195:25-196:2.) Within weeks of leaving Aon and joining Infinite Equity, Coleman prepared a presentation of *MyPerformanceAwards*

---

[7] The Court does not find Burg's testimony that he printed the model as a "memento" of his work for Aon to be credible. (Tr. 299:9-18.)

for Company B. (Pl. Ex. 28; Tr. 306:3-13; 308:20-25.) Stoudt and Coleman, on behalf of Infinite Equity, then met with Company B in Illinois to pitch *MyPerformanceAwards* and later had dinner with their Company B contact in Libertyville, Illinois. (Tr. 196:12-24, 198:6-8, 306:14-22.) Infinite Equity ultimately sold *MyPerformanceAwards* to Company B. (*Id.* 197:21-198:1.)

As another example, Coleman worked with Illinois-based client Company A during his time at Aon. (*Id.* 199:15-21.) On August 19, 2019, Allen, who "worked for" Coleman at Infinite Equity, emailed a contact at Company A to set up a "demo of *MyPerformanceAwards*." (Pl. Ex. 35; Tr. 301:18-302:16.) Coleman and Allen later met with the Company A contact in Illinois, while Stoudt participated in the meeting by telephone. (Tr. 198:15-25; 199:1-14; 302:17-18.) During the meeting, they discussed Infinite Equity's "capabilities" and did a "demonstration of *MyPerformanceAwards*." (*Id.* 200:1-8; 201:3-8, 19-21.) The purpose of the meeting was to "get [Company A's] business."[8] (*Id.* 302:19-23.) After that meeting, Company A became an Infinite Equity client and replaced *PeerTracker* with *MyPerformanceAwards*. (*Id.* 201:22-24; 203:1-6; 302:24-303:5.)

---

[8] Although Coleman testified at the evidentiary hearing that he only attended the meeting with Company A for personal reasons (Tr. 201:9-13), the Court does not find this testimony credible. To begin, Coleman's demeanor and testimony reflected a degree of evasiveness consistent with a lack of candor. During his testimony, Coleman could easily recall details that were favorable, but Coleman purported to struggle with recalling unfavorable details. Moreover, the Court cannot envision why, if the Company A meeting were purely personal, Coleman and his team would have presented *MyPerformanceAwards* and discussed Infinite Equity's capabilities. (*Id.* 200:3-6, 201:3-21.) Similarly, the Court finds that Stoudt's testimony that this meeting was merely a "social visit" (at which she and Coleman discussed "Infinite Equity's capabilities") to be likewise not credible. (*Id.* 420:7-421:8.)

At the evidentiary hearing, Aon also established that Coleman solicited several of Aon's Illinois-based clients who would fall under the umbrella of the non-solicitation covenants in his RSU Agreements, including Company C (Pl. Exs. 42, 47; Tr. 204:8-14, 205:14-21, 209:19-211:15, 213:25-215:3), Company D (Pl. Ex. 22; Tr. 218:25-219:23, 220:10-23; 221:12-16), and Company E (P. Ex. 24; Tr. 227:5-229:14, 231:10-19, 276:10-277:5).

In view of these facts, the Court finds that Aon has established "by a preponderance of the evidence" that Infinite Equity—through its agents Burg, Coleman, and Stoudt—engaged in suit-related conduct in Illinois such that this Court has specific personal jurisdiction over Infinite Equity. *See Purdue Research*, 338 F.3d at 782.

## 2. Individual Defendants

For an individual defendant, "the paradigm forum for the exercise of general jurisdiction is the individual's domicile." *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 137 S. Ct. 1773, 1780 (2017) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011)). Defendants argue—and Aon does not dispute—that Stoudt, Evans, and DiDomenico (as Pennsylvania residents), Burg (as a California resident), and Infinite Equity are not domiciled in Illinois and thus are not subject to the Court's general personal jurisdiction. The inquiry thus turns on whether the Court may exercise specific personal jurisdiction over these Defendants.

### a. Stoudt

Elizabeth Stoudt is Pennsylvania resident who worked at Aon as an Associate

Partner in ESG until she left the company on June 7, 2019. (FAC ¶ 25.) Stoudt worked in Pennsylvania the entire time she was employed by Aon. (Declaration of Elizabeth Stoudt ("Stoudt. Decl."), Dkt. 116-3 ¶ 5.[9]) Stoudt is now a partner at Infinite Equity. (FAC ¶ 25.)

Among the claims that Aon brings against Stoudt is tortious interference with contract (Count V), in which Aon alleges that Stoudt induced Coleman to breach the non-solicitation covenants contained in his RSU Agreements with Aon. (*See* FAC ¶¶ 241-248.) The evidence presented at the hearing established that Stoudt was aware of Coleman's non-solicitation covenants in his RSU Agreements and interfered with those agreement by colluding with Coleman to solicit the business from the Aon clients subject to the covenants. Stoudt acknowledged at the evidentiary hearing that she was aware "from a high level" that Coleman "had some kinds of restrictions." (Tr. 419:9-11.) Nevertheless, Stoudt worked with Coleman to meet with his former Aon clients in Illinois to pitch Infinite Equity. (*Id.* 293:3-5.) For example, as discussed above, one of the clients Coleman worked with in his last two years at Aon was Illinois-based Company B. (*Id.* 306:9-22.) Stoudt participated in virtual meetings with Coleman and a contact at Company B and flew to Chicago to meet with that contact. (*Id.* 402:22-403:4.) Company B now does business with Infinite Equity. (*Id.* 402:11-

---

[9] On a motion to dismiss under Rule 12(b), the Court may consider materials outside the pleadings, including affidavits. *See MG Design Assocs., Corp. v. CoStar Realty Info., Inc.*, 267 F. Supp. 3d 1000, 1010 (N.D. Ill. 2017) (citing *Purdue Research*, 338 F.3d at 782). As Aon has not contested or refuted the sworn testimony set forth in any Defendant's declaration, the Court accepts them as true. *See Connolly v. Samuelson*, 613 F. Supp. 109, 110-11 (N.D. Ill. 1985) ("If a defendant's affidavit contesting jurisdiction is not refuted by a counter-affidavit filed by the plaintiff, the facts alleged in the defendant's affidavit are taken as true").

21.) The Court finds that these activities are sufficient to establish that Stoudt was aware of Coleman's contract and interfered with that contract by aiding Coleman in soliciting Aon clients in breach of that contract. This evidence thus shows that Stoudt engaged in suit-related conduct in Illinois such that the Court has personal jurisdiction over her. *See Curry v. Revolution Labs., LLC,* 949 F.3d 385, 398 (7th Cir. 2020).

### b. Burg

Burg, a California resident, was a partner in ESG until May 29, 2019. (FAC ¶ 23.) Burg is now a partner at, and a co-founder of, Infinite Equity. (*Id.*) Burg solicited Allen, an Illinois resident who worked at Aon's office in Illinois, to leave Aon and join Infinite Equity. (Tr. 540:16-24; FAC ¶ 158.) Allen resigned from Aon on May 28, 2019 to "pursue other opportunities." (Pl. Ex. 20; Tr. 55:9-23; 56:22-57:23; 181:18-20; 383:6-8; 441:12-13.) Burg left Aon the next day. (FAC ¶ 23.) At the evidentiary hearing, Burg admitted he directly solicited Allen by sending him an offer letter to join Infinite Equity. (Tr. 541:14-22.) Burg does not recall when he sent Allen the offer letter, but speculated it was late May while both Burg and Allen were still employed at Aon. (*Id.* 541:23-542:7; 543:3-12.)

This evidence is enough to support the conclusion that Burg conducted recruitment efforts in Illinois. Employee solicitation forms part of the basis for Aon's breach of fiduciary duty claim (*see* FAC ¶ 237), and this evidence directly relates to that conduct. These activities support personal jurisdiction over Burg. *Cf. TEKsystems, Inc. v. Modis, Inc.*, No. 08 C 5476, 2008 WL 5155667, at *3 (N.D. Ill.

18

Dec. 5, 2008) (finding personal jurisdiction where defendant solicited an individual in Illinois to leave plaintiff's Illinois office to work for defendant in Illinois); *Allstate Ins. Co. v. Ameriprise Fin. Servs., Inc.*, 317 F. Supp. 3d 1006, 1011 (N.D. Ill. 2018) (finding personal jurisdiction in tortious interference case where "defendant directed recruitment efforts at Illinois").

### c. *DiDomenico and Evans*

DiDomenico and Evans are Pennsylvania residents who lived in Pennsylvania the entire time they worked for Aon. (FAC ¶ 26; DiDomenico Decl., Dkt. 182-1 ¶¶ 3-4; Evans Decl., Dkt. 116-1 ¶¶ 2, 5; Tr. 449:3-7.[10]) Both now work for Infinite Equity from their homes in Pennsylvania. (FAC ¶¶ 26-27; DiDomenico Decl. ¶ 6; Evans Decl. ¶ 8.)

Again, to establish personal jurisdiction over a particular defendant, that defendant's "*suit-related conduct* must create a substantial connection with the forum State." *Advanced Tactical*, 751 F.3d at 801 (emphasis added). But "[w]hen no such connection exists, specific jurisdiction is lacking." *Bristol-Myers Squibb,* 137 S. Ct. at 1776. As discussed above, Aon's claims generally fall into three categories: (1) misappropriation of trade secrets, (2) solicitation of Aon clients, and (3) solicitation of Aon employees. Neither the allegations in the First Amended Complaint, taken as true, nor the evidence presented at the evidentiary hearing, establishes that either Evans or DiDomenico engaged in suit-related conduct related to Illinois such that

---

[10] Neither Plaintiffs nor Defendants chose to call DiDomenico or Evans at the evidentiary hearing and did not present any evidence at the hearing regarding personal jurisdiction as to those two Defendants.

this Court has personal jurisdiction over them.

Aon argues that this Court has jurisdiction over DiDomenico because he "misappropriated the trade secrets of . . . Aon, which is located in Illinois, and those acts were purposefully directed at Illinois." (Dkt. 199 at 2-3.) But even if DiDomenico misappropriated the *PeerTracker* code, neither the allegations in the complaint nor the evidence presented at the evidentiary hearing demonstrate that this allegedly tortious conduct occurred in or had any connection with Illinois. Aon's corporate representative, Christopher Lepore, even testified at the evidentiary hearing that there is no evidence that DiDomenico or Evans removed, copied, or inappropriately accessed any of the *PeerTracker* source code while employed at Aon. (Tr. 373:10-17.)

Aon also argues that DiDomenico "knowingly pitched and worked on *MyPerformanceAwards* site for former clients in Illinois, interfering with Aon's relationship with those clients in Illinois." (Dkt. 199 at 4-5.) But the testimony presented at the evidentiary hearing shows that neither DiDomenico nor Evans ever worked in client-facing roles at either Aon or Infinite Equity, and Aon has not presented any evidence that either defendant interacted with any Illinois client. (Tr. 438:10-444:10, 448:18-449:4.)

The other tenuous connections that DiDomenico and Evans have to Illinois are not enough to establish personal jurisdiction. Aon makes much of the fact that Evans and DiDomenico worked for a company headquartered in Illinois, (*see* Dkt. 199 at 3), but "the mere fact that [a defendant] worked for a company with its headquarters in Illinois is not sufficient to establish personal jurisdiction over him." *Guaranteed Rate,*

*Inc. v. Conn*, 264 F. Supp. 3d 909, 921 (N.D. Ill. 2017). Similarly, Aon's allegations that Evans and DiDomenico "traveled to Illinois for business" (FAC ¶¶ 36-37) are not enough to establish personal jurisdiction. *See Consol. Com. Controls, Inc. v. 5 Star Supply, LLC*, No. 08C4388, 2008 WL 5094402, at *4 n.1 (N.D. Ill. Nov. 26, 2008) (defendant's attendance at meetings at plaintiff's headquarters and trade shows in Illinois insufficient to establish personal jurisdiction). And, even if travel to Illinois for business were enough, Plaintiffs have not alleged DiDomenico or Evans engaged in any suit-related activities while on those business trips in Illinois. *Indag GmbH & Co. v. IMA S.P.A.*, 150 F. Supp. 3d 946, 965 (N.D. Ill. 2015) ("Even if Defendant's [business travel] were enough, however, Plaintiffs have not shown that the factual basis of the alleged claims . . . relates to" that travel).

In short, neither the allegations in the FAC nor the evidence presented at the evidentiary hearing establishes that DiDomenico or Evans engaged in any "suit-related" conduct in Illinois such that this Court would have personal jurisdiction over them. *Advanced Tactical*, 751 F.3d at 801. Accordingly, Aon's claims against Evans and DiDomenico are dismissed for lack of personal jurisdiction.

*       *       *

To summarize, a court has specific jurisdiction over an out-of-state defendant if three criteria are met: (1) the defendant's contacts with forum state show that it "purposefully availed itself of the privilege of conducting business in the forum state" or "purposefully directed" its activities at that state, (2) the plaintiff's injury arose out of the defendant's forum-related activities, and (3) the exercise of jurisdiction

21

comports with "traditional notions of fair play and substantial justice." *Curry*, 949 F.3d at 398. Those three criteria are met as to Burg, Stoudt, and Infinite Equity. The evidence described above demonstrates that each of these defendants "purposefully directed" activities to Illinois. These Defendants' contacts are "related" to Aon's claims. *Curry*, 949 F.3d at 401. Finally, maintaining this suit in this forum would not offend traditional notions of fair play and substantial justice, as Defendants conducted business in Illinois and "Illinois has a strong interest in providing a forum for its residents . . . to seek redress for harms suffered within the state by an out-of-state actor." *Id*. at 402. Accordingly, the Court finds that it has specific personal jurisdiction over Burg, Stoudt, and Infinite Equity and denies those Defendants' motions to dismiss under Rule 12(b)(2) for lack of personal jurisdiction. As for DiDomenico and Evans, however, Aon has not established that these Defendants engaged in "suit-related" conduct in Illinois, and the Court accordingly grants DiDomenico and Evans's motions to dismiss for lack of personal jurisdiction. All claims against DiDomenico and Evans are dismissed.

## B. <u>Motions to Dismiss Under Rule 12(b)(3)</u>

Next, several defendants argue that the Court should dismiss this case for improper venue. (Dkt. 116 at 13-14 (Infinite Equity and Stoudt); Dkt. 114 at 8-9 (Burg)).[11] Rule 12(b)(3) of the Federal Rules of Civil Procedure provides for the

---

[11] DiDomenico and Evans also argue that venue in this District is improper. (*See* Dkt. 182 at 8-9 (DiDomenico); Dkt. 116 at 13-14 (Evans).) But because the Court lacks personal jurisdiction over these Defendants (*see* Section II.A.2.c, *above*), the Court declines to address these Defendants' venue arguments.

dismissal of an action for improper venue. *See* Fed. R. Civ. P. 12(b)(3). In ruling on a motion to dismiss under Rule 12(b)(3), "the court takes all the allegations in the complaint as true unless contradicted by an affidavit and may examine facts outside of the complaint." *Interlease Aviation Investors II (ALOHA) L.L.C. v. Vanguard Airlines, Inc.*, 262 F. Supp. 2d 898, 913 (N.D. Ill. 2003).

### 1. Burg

Burg argues the Court should dismiss Aon's amended complaint in its entirety under Rule 12(b)(3) for improper venue because the RSU Agreements he signed during his employment with Aon require that Aon's claims against him be arbitrated. (FAC ¶ 104; Dkt. 106-1; Dkt. 114 at 8-10.) The RSU Agreements contain the following arbitration provision:

> "The Participant and the Company . . . agree that . . . all claims and disputes between or involving the Participant and Aon . . . (i) *arising under or relating to* this Agreement . . . or (ii) involving the interpretation, applicability, enforceability or formation of this agreement . . . shall be determined and resolved exclusively by arbitration in Chicago, Illinois . . ."

(Dkt. 114-2 at 28 (emphasis added).) Burg contends that this provision should be read with "extraordinary breadth." (Dkt. 114 at 10.) Although Aon does not bring a breach of contract claim against Burg for violation of the RSU Agreements (as it does for Coleman and Adamson), under Burg's reading, the arbitration provision would still "cover all the alleged conduct at issue" in this litigation because other sections of the RSU Agreement contain provisions referencing disclosure of trade secrets and employee solicitation. (*Id*. at 8-10.)

Aon argues that the scope of the arbitration provision is "limited to claims arising under or related to . . . the RSU Agreement" and does not encompass "other tortious conduct Burg may have engaged in totally separate and part from his RSU Agreement." (Dkt. 131 at 6.) The Court agrees that this is the better reading. Aon's claims against Burg (misappropriation of trade secrets (Counts I and II), breach of fiduciary duty (Count IV), tortious interference with contract (Count V), tortious interference with prospective economic advantage (Count VI), and unjust enrichment (Count VII)) can all be adjudicated without reference to Burg's RSU Agreements. As such, those claims do not "aris[e] under or relate[] to" the RSU Agreements. Accordingly, the Court finds that the arbitration provision in Burg's RSU Agreements does not compel arbitration such that venue would be improper before this Court.

## 2. Stoudt and Infinite Equity

Stoudt and Infinite Equity argue that venue is improper in this District because Aon has not adequately alleged that a "substantial portion" of the events giving rise to Aon's claims occurred here. (Dkt. 116 at 13-14 (citing 28 U.S.C. § 1391(b)(2) ("A civil action may be brought in . . . a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred")).) These Defendants contend that Aon's decision to file suit here is nothing more than "jurisdiction games and venue and forum shopping" and that venue in the Northern District of Illinois is improper because Aon has not alleged that any misconduct occurred in Illinois and because all individual Defendants (other than Coleman) live and worked for Aon in other states. (Dkt. 116 at 14.) The evidence presented by Aon

at the evidentiary hearing and discussed in Section II.A, however, establishes that Stoudt and Infinite Equity's suit-related conduct has substantial ties to Illinois. *See Cont'l Cas. Co. v. Am. Nat. Ins. Co.*, 417 F.3d 727, 733 (7th Cir. 2005) ("Upon holding an evidentiary hearing to resolve material disputed facts, the district court may weigh evidence, assess credibility, and make findings of fact that are dispositive on the Rule 12(b)(3) motion" (quoting *Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1140 (9th Cir. 2004))). Accordingly, Stoudt and Infinite Equity's motion to dismiss under Rule 12(b)(3) for improper venue is denied.

## C. <u>Motions to Dismiss Under Rule 12(b)(6)</u>

Under the Federal Rules of Civil Procedure, a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). Documents attached to a complaint are considered part of the complaint. Fed. R. Civ. P. 10(c).

As the Seventh Circuit has explained, this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)). A complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to

raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. In evaluating a motion to dismiss, the Court must accept as true the complaint's factual allegations and draw reasonable inferences in the plaintiff's favor. *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). But, although factual allegations are assumed to be true, mere legal conclusions are not. *Iqbal*, 556 U.S. at 678-79.

### 1. Violation of the Federal Defend Trade Secrets Act (Count I) and the Illinois Trade Secrets Act (Count II)

In Counts I and II of the First Amended Complaint, Aon alleges that all Defendants (except Adamson) violated the federal Defend Trade Secrets Act ("DTSA"), Pub. L. No. 114-153, 130 Stat. 376, and the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065/1 *et seq.* by misappropriating "proprietary compilations, designs, methods, techniques, and processes," including trade secrets related to *PeerTracker*, when they left Aon.[12] (FAC ¶¶ 205-227.)

The DTSA allows "[a]n owner of a trade secret that is misappropriated . . . [to] bring a civil action . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). For the purposes of the DTSA, "misappropriation" means either: "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or "(B) disclosure or use of a trade secret of another without express or implied consent" under certain conditions. *Id.* § 1839(5). "[I]mproper means," in turn, is defined as "theft, bribery, misrepresentation, breach

---

[12] Because the Court lacks personal jurisdiction over DiDomenico and Evans (*see* Section II.A.2.c, *above*), it does not address Aon's claims for misappropriation of trade secrets (Counts I and II) against those two defendants.

or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Id.* § 1839(6).

Similarly, the ITSA authorizes a civil action for "[a]ctual or threatened misappropriation[s]" of trade secrets. 765 ILCS 1065/3. The ITSA defines "misappropriation," "improper means," and "trade secrets" similarly to the DTSA, and for purposes of Defendants' motions to dismiss, the slight differences are immaterial. *Compare id.* 1065/2(a), (b), (d), *with* 18 U.S.C. § 1839(3), (5), (6); *see also Molon Motor & Coil Corp. v. Nidec Motor Corp.*, No. 16 C 03545, 2017 WL 1954531, at \*3 (N.D. Ill. May 11, 2017) (differences in definitions between DTSA and ITSA are "immaterial" for purposes of resolving a motion to dismiss).

Courts often analyze motions to dismiss DTSA and ITSA claims together because "the pertinent definitions of the two acts overlap." *PrimeSource Bldg. Prods. v. Felten*, No. 16-CV-11468, 2017 WL 11500971, at \*6, n.5 (N.D. Ill. July 6, 2017) (quoting *Molon*, 2017 WL 1954531, at \*2). Thus, for both its DTSA and ITSA claims, Aon must allege that (1) there are trade secrets (2) that Defendants misappropriated. *Molon*, 2017 WL 1954531, at \*3. Defendants do not challenge that Plaintiffs have sufficiently alleged the existence of trade secrets (the first element). Defendants argue, however, that Aon has not sufficiently alleged Defendants misappropriated Aon's trade secrets (the second element). (*See* Dkts. 112 at 7-9 (Coleman, Stoudt, and Infinite Equity), 114 at 12 (Burg).)

Aon alleges that Burg, Coleman, and Stoudt "acquired, used and disclosed Aon's confidential, proprietary, and trade secret *PeerTracker* Information to create

27

*MyPerformanceAwards* on behalf of Infinite Equity." (FAC ¶ 180.) Aon further alleges that they will "inevitably continue to disclose Aon's trade secrets relating to *PeerTracker* in their virtually identical positions at Infinite Equity, which offers a materially similar product and services." (*Id*. ¶ 184.)

As an initial matter, Defendants argue that Aon "casually lumps" Defendants together and does not "allege enough facts to assert a claim against each individual Defendant." (Dkt. 112 at 7 (emphasis omitted).) The Court agrees that such pleading is impermissible. Although Aon alleges generally that "upon information and belief, Burg, Coleman, [and] Stoudt . . . acquired used and disclosed" Aon's trade secrets, this allegation does not state with sufficient specificity the actions that each individual Defendant undertook to misappropriate the specific trade secrets. *See Opus Fund Servs. (USA) LLC v. Theorem Fund Servs., LLC*, No. 17 C 923, 2018 WL 1156246, at *2-3 (N.D. Ill. Mar. 5, 2018) (dismissing trade secret misappropriation claim where plaintiff merely alleged that "all the individual defendants improperly acquired trade secrets from [plaintiff] and absconded" because it was "unclear whether [plaintiff was] alleging that each defendant acquired the same information and absconded with it in the same fashion" such that the plaintiff failed to "put each defendant on notice"); *see also Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013) ("Each defendant is entitled to know what he or she did that is asserted to be wrongful. A complaint based on a theory of collective responsibility must be dismissed"). The Court must thus examine the specific allegations against each Defendant and determine whether Aon has stated a claim for misrepresentation of

trade secrets against each Defendant individually.

### a. *Coleman and Infinite Equity*

Coleman gave Aon his notice of departure on April 24, 2019, but he did not actually leave the company until June 10, 2019. (FAC ¶ 149.) During the interim period, Coleman forwarded emails containing "confidential, proprietary and trade secret information." (*Id.* ¶ 150.) Specifically, Aon alleges Coleman forwarded ten of Aon's "proprietary models" used to project stock prices from his Aon email to his personal email address and, before he left the company, printed documents containing Aon's trade secret information for the use and benefit of Infinite Equity. (*Id.* ¶¶ 151, 212.) On June 10, 2019, Coleman's final day with Aon, Coleman printed 191 documents, including documents containing "equity compensation information, reports prepared for a client, and . . . Aon's highly proprietary methodology and formula used to project EBITDA." (*Id.* ¶ 155.) These allegations are detailed and specific such that Aon has adequately given Coleman "fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. Accordingly, the Court denies Coleman and Infinite Equity's motion to dismiss Counts I and II.

### b. *Burg and Stoudt*

Burg argues that Aon does not "make any allegations specific to Burg that he misappropriated any trade secrets." (Dkt. 114 at 12.) The Court agrees. Other than general, vague allegations that "Burg . . . acquired, used and disclosed Aon's confidential, proprietary, and trade secret *PeerTracker* Information to create *MyPerformanceAwards* on behalf of and for Infinite Equity" (FAC ¶180), Aon does

not plead any specific acts of misappropriation sufficient to put Burg on notice as to the claims against him. *See Iqbal*, 556 U.S. at 678.

Aon's misappropriation allegations against Stoudt are similarly lacking. Aon alleges that "a USB drive was connected to Stoudt's computer" on June 5, 2019—two days before her last day at Aon—and that Stoudt "had full USB read/write access to USB removable storage." (FAC ¶ 160.) In other words, Aon merely alleges that Stoudt had a USB drive plugged into her computer. Nowhere does it allege that she uploaded any proprietary files to that drive, that she took the drive with her after she left Aon, or that the drive contained any files that she later used in furtherance of Infinite Equity. This allegation does not support the reasonable inference that Stoudt misappropriated any of Aon's confidential, proprietary information.

In the absence of any allegations of direct misappropriation, Aon relies on a theory of inevitable disclosure. (*See* FAC ¶ 184 (Burg and Stoudt will "inevitably continue to disclose Aon's trade secrets relating to *PeerTracker* in their virtually identical positions at Infinite Equity").) The "inevitable disclosure" doctrine allows a plaintiff to "prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets." *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995). Under a theory of inevitable disclosure, "a plaintiff need not point to concrete evidence of misappropriation. He must merely allege that the employee 'cannot operate without inevitably disclosing the confidential information.' " *Allied Waste Servs. of N. Am., LLC v. Tibble*, 177 F. Supp. 3d 1103, 1112 (N.D. Ill. 2016) (citing *Complete Bus. Sols.,*

*Inc. v. Mauro*, 2001 WL 290196, at *6 (N.D. Ill. Mar. 16, 2001)). In evaluating whether the facts justify this circumstantial-evidence inference, courts consider: "(1) the level of competition between the former employer and the new employer; (2) whether the employee's position with the new employer is comparable to the position he held with the former employer; and (3) the actions the new employer has taken to prevent the former employee from using or disclosing trade secrets of the former employer." *Saban v. Caremark Rx, L.L.C.*, 780 F. Supp. 2d 700, 734-35 (N.D. Ill. 2011).

Aon has pleaded sufficient facts under a theory that Burg and Coleman will inevitably disclose trade secret information. Aon alleges that *MyPerformanceAwards* is "virtually identical" to *PeerTracker*, (FAC ¶ 9, 176-178), and that there are "significant similarities between the source codes, database design, and architecture of the two products." (*Id.* ¶ 13). Burg and Stoudt also occupy roles at Infinite Equity that are nearly identical to their roles at Aon. (*Id.* ¶¶ 24-25, 152, 155, 212.) They now sell *MyPerformanceAwards* as part of their work for Infinite Equity. (*Id.* ¶¶ 183, 212.) This is sufficient to state a claim for misappropriation of trade secrets under a theory of inevitable disclosure. *See Molon*, 2017 WL 1954531, at *7 (allegations of "direct competition between the parties, as well as the allegations on the employment breadth and similarity of . . . [the] work at the two companies, are enough to trigger the circumstantial inference that the trade secrets inevitably would be disclosed"). Accordingly, the Court denies Defendants' motions to dismiss as to Counts I and II.

### 2. Breach of Contract (Count III)

#### a. *Adamson*

Aon alleges Adamson breached two separate agreements: (1) the non-solicitation covenant in the RSU Agreement, and (2) the non-disparagement clause in his 2019 separation agreement. (FAC ¶ 232.) Although Adamson is a citizen of California, the Parties do not dispute that Illinois law applies to Aon's breach of contract claim as it relates to the 2017 RSU Agreement. (Dkt. 109 at 5; Dkt. 138 at 3.)

##### i. *Non-solicitation covenant*

While employed at Aon, Adamson signed a series of RSU Agreements (Dkt. 106-1, Exs. C-E)) that prohibited him from soliciting Aon employees to leave Aon:

> **Covenant Not to Hire.** [Adamson] . . . agrees, for [the period of his employment and two years thereafter] not to . . . solicit or induce, or cause any person or other entity to solicit or induce, any employee of Aon to work for [Adamson] or for any third party or entity, or to leave the employ of [Aon].

(Adamson RSU Agreements, Dkt. 106-1, Ex. D § 9(c).) To state a claim for breach of contract under Illinois law, Aon must allege: "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 631 (7th Cir. 2007) (citing *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 967 (Ill. 2004)).

Adamson argues that Aon has failed to state a claim for breach of contract under Illinois law as it relates to the RSU Agreements because Aon has not alleged

Adamson breached the non-solicitation covenant by soliciting "any ex-Aon employee to leave Aon or join Infinite Equity." (Dkt. 109 at 6.) Adamson also believes that Aon has "lumped" him indiscriminately "into the employee recruitment effort with all the other defendants." (*Id*.) This argument ignores the clear allegation that Adamson breached the RSU Agreements by soliciting Aon employee Daniel Kapinos to leave Aon in the fall of 2018. (FAC ¶ 128.) This allegation plausibly states a claim that Adamson encouraged Kapinos to leave Aon's employment, thereby breaching the non-solicitation covenant. Accordingly, the Court denies Adamson's motion to dismiss Count III as it relates to the non-solicitation covenant.

### ii.     *Non-disparagement clause*

Aon alleges that Adamson breached the non-disparagement clause contained in his May 31, 2019 Confidential Separation and General Release ("Separation Agreement"). The Separation Agreement contained a non-disparagement clause that required Adamson to "refrain from all conduct, verbal or otherwise, that disparages or damages the reputation, goodwill, or standing in the community of [Aon]." (FAC ¶ 49.) Aon alleges that on September 16, 2019—about four months after he left Aon— Adamson breached this clause by disparaging Aon at an industry conference in front of a group of 10-15 industry members, including at least one Aon client. (*Id*. ¶ 201.) Aon further alleges that Adamson told this group that the employees Aon chose to replace him—Burg, Coleman, and Stoudt—"did not deserve the roles they were in" and "did not know what they were doing." (*Id*.)

The Parties do not dispute that Pennsylvania law governs the Separation

Agreement. To state a claim for breach of contract under Pennsylvania law, a plaintiff must allege "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999). Adamson challenges only the third element—that Aon has failed "to allege a plausible basis that it incurred any damages stemming from Adamson's purported disparagement." (Dkt. 109 at 7.) Adamson argues that "[n]one of [Aon's] allegations give color to how Adamson's purported remarks to a few people at a September 2019 conference harmed Aon's goodwill and reputation." (*Id.*) Aon does not have much to say in response: it doubles down on its allegation that it "suffered damages" because of the disparagement, including harm to its "reputation, goodwill, and standing in the community," and argues that this "explicit" allegation is sufficient to state a claim. (Dkt. 138 at 4; FAC ¶¶ 232-33.)

The Court concludes that Aon has not adequately alleged damages to survive Adamson's motion to dismiss its breach-of-contract claim based on the non-disparagement clause. To state a claim, Aon must plausibly allege damages resulting from Adamson's alleged breach. *Hongbo Han v. United Cont'l Holdings, Inc.*, 762 F.3d 598, 600 (7th Cir. 2014). "Threadbare recitals of the elements of a cause of action" do not suffice. *Iqbal*, 556 U.S. at 678; *see also Illinois ex rel. Hammer v. Twin Rivers Ins. Co.*, No. 16 C 7371, 2017 WL 2880899, at *5 (N.D. Ill. July 5, 2017) ("The perfunctory allegation that Plaintiff 'has suffered, and will suffer damages of a pecuniary nature' is exactly that: a threadbare recital of damages that is not adequate to state a claim").

The allegation that Aon suffered a blow to its "goodwill" because of Adamson's allegedly disparaging statements has no factual content that would allow the Court to draw the plausible conclusion that Aon suffered actual, concrete harm. In other words, Aon alleges nothing more than a "sheer possibility" that it suffered damages because of the breach, and its claim based on the non-disparagement clause must be dismissed. *Iqbal*, 556 U.S. at 678.

> b. *Coleman*

Aon also brings a claim for breach of contract against Coleman. (FAC ¶¶ 228-234.) Aon alleges Coleman breached the RSU Agreements in two ways. First, Aon says Coleman breached the covenant not to solicit Aon's clients or certain prospective clients, which states in relevant part:

> **Covenant Not to Solicit.** [Coleman] hereby covenants and agrees that, . . . [he] . . . will not, during the course of employment, and for a period of two (2) years after the [his] Termination Date . . . call upon, solicit, accept, engage in, service or perform, other than on behalf of Aon, any business of the same type or kind as the business performed by Aon from or with respect to (i) clients of Aon with respect to whom the [Coleman] provided services . . . or had a business relationship, or on whose account he worked or became familiar, or supervised directly or indirectly the servicing activities related to such clients, during the twenty-four (24) months prior to [Coleman's] Termination Date and (ii) prospective clients of Aon which the Participant alone, in combination with others, or in a supervisory capacity, solicited during the six (6) months prior to [Coleman's] Termination Date and to which a proposal for services was rendered by Aon during the six (6) months prior to [Coleman's] Termination Date.

(Coleman RSU Agreement dated December 20, 2017, Dkt. 106-1, Ex. E § 9(b).) The RSU Agreement also contains a covenant not to solicit Aon employees to leave Aon:

> **Covenant Not to Hire.** [Coleman] . . . agrees, for [the period of his employment and two years thereafter] not to . . . solicit or induce, or

> cause any person or other entity to solicit or induce, any employee of Aon
> to work for [Coleman] or for any third party or entity, or to leave the
> employ of [Aon].

(*Id.* § 9(c).)

As for Adamson, Coleman's non-solicitation covenants are governed by Illinois law. (*Id.* § 10(j).) To reiterate, a plaintiff bringing a claim for breach of contract under Illinois law must allege "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." *TAS Distrib. Co.*, 491 F.3d at 631. Coleman argues that the non-solicitation covenants are invalid on their face because they are "overbroad and unenforceable." (Dkt. 112 at 10.) Specifically, Coleman argues that the employee non-solicitation covenant is overbroad because it "lacks any geographical limitations whatsoever" and would prevent the "recruitment of *any* Aon employee . . . anywhere in the world." (*Id.* at 11.) Similarly, Coleman argues that the client non-solicitation covenant is overbroad because it prohibits him from soliciting not only existing Aon clients, but potential clients as well. (*Id.*)

Aon argues that determining the enforceability of the non-solicitation covenants is inappropriate at this juncture, as "[o]nly once the facts are developed can the Court assess whether a restrictive covenant is reasonable under the circumstances." (Dkt. 132 at 9.) The Court agrees. The presumption under Illinois law is that post-employment restraints such as non-solicitation covenants are "*usually* justified on the ground that the employer has a legitimate business interest in restraining the employee from appropriating the employer's (1) confidential trade

36

information, or (2) customer relationships." *Reliable Fire Equip. Co. v. Arredondo*, 965 N.E.2d 393, 401 (Ill. 2011.) In evaluating whether an employer has a legitimate business interest, a court may consider factors including "the near-permanence of customer relationships, the employee's acquisition of confidential information through his employment, and time and place restrictions." *Id.* at 403.

This inquiry, however, is "highly fact-specific and intensive," and may not be appropriate until "the circumstances have been fleshed out through litigation." *Instant Tech., LLC v. DeFazio,* No. 12 C 491, 2012 WL 2567033, at *6-7 (N.D. Ill. June 26, 2012); *see also Baird & Warner Residential Sales, Inc. v. Mazzone*, 893 N.E.2d 1010, 1015 (Ill. App. Ct. 2008) (unable to determine enforceability of non-solicitation covenant "without additional evidence that does not appear on the face of the complaint"); *Abbott-Interfast Corp. v. Harkabus*, 619 N.E.2d 1337, 1343 (Ill. App. Ct. 1993) (finding it "impossible" to evaluate reasonableness of restrictive covenant without developed record of the "particular facts and circumstances of the case"); *Nortek Prods. (Taicang) Ltd. v. FNA Grp., Inc.*, No. 10 C 2813, 2011 WL 2110043, at *4 (N.D. Ill. May 24, 2011) ("whether such restrictions are reasonable in this case requires the Court to make a fact-based determination that is not appropriate at the motion-to-dismiss stage"); *Integrated Genomics, Inc. v. Kyrpides*, No. 06 C 6706, 2008 WL 630605, at *7 (N.D. Ill. Mar. 4, 2008) ("[B]ecause the facts of the case are of such importance to the issue of reasonableness, the court could not find . . . that making all reasonable inferences in favor of [the plaintiff], it has not stated a claim for relief"); *AutoMed Techs., Inc. v. Eller*, 160 F. Supp. 2d 915, 923 (N.D. Ill. 2001) (the legitimacy

of an employer's business interest is "an inherently fact-based determination that is not appropriate at the motion to dismiss stage").

The Court is thus unable to evaluate the reasonableness of the non-solicitation covenants until it can consider all the relevant facts that a more developed record would provide. But at this early stage, the Court can discern from the facts alleged that Aon has a valid interest in the non-solicitation covenants to protect its confidential proprietary information. Even reading Aon's allegations charitably for Coleman, Aon has adequately stated a claim for relief based on a legitimate business interest. Its allegations are "sufficient to survive a motion to dismiss, for the court cannot now evaluate fully whether the scope of the [restrictive covenant] is reasonable to protect this interest in light of the absence of information in the record at this stage." *Instant Tech.*, 2012 WL 2567033, at *7. The Court thus denies Coleman's motion to dismiss as to the enforceability of the non-solicitation clauses.[13]

### 3. Breach of Fiduciary Duty (Count IV)

Aon also brings a claim for breach of fiduciary duty (Count IV) against Adamson, Burg, Coleman, and Stoudt.[14] To state a claim for breach of fiduciary duty under Illinois law, a plaintiff must allege: (1) that a fiduciary duty exists; (2) the

---

[13] In his reply brief, Coleman also argues that Aon has failed to state a claim against him for breach of the client non-solicitation covenant because the First Amended Complaint is "completely devoid of allegations" that Coleman solicited any Aon clients. (Dkt. 140 at 11.) The Court declines to address this argument because Coleman raised it for the first time in his reply brief and Aon has not been given adequate opportunity to respond. *See Darif v. Holder*, 739 F.3d 329, 336 (7th Cir. 2014) ("arguments raised for the first time in a reply brief are waived").

[14] Because the Court lacks personal jurisdiction over Evans (*see* Section II.A.2.c, *above*), it does not address Aon's claim for breach of fiduciary duty (Count IV) against him.

defendant breached that fiduciary duty; and (3) that the breach proximately caused plaintiff injury. *Lawlor v. N. Am. Corp. of Ill.*, 983 N.E.2d 414, 433 (Ill. 2012). Aon alleges that Adamson, Burg, Coleman, and Stoudt breached their fiduciary duties to Aon by (1) "secretly creating a competitive company during work hours" and "exploiting Aon's resources" to do so; (2) soliciting Aon employees to leave Aon; (3) coordinating a "planned group departure" and withholding knowledge of the same from Defendants' superiors; (4) "taking steps . . . to sabotage Aon's business and not devoting their best efforts" to Aon; (5) directing former Aon employees to "create a competitive product for Infinite Equity" while they were still employed by Aon; and (6) using Aon's proprietary and confidential information to compete against Aon. (FAC ¶ 237.) Aon further alleges that, because of these breaches, it has suffered lost business, lost profits, and damage to its goodwill. (*Id.* ¶ 238.)

### a.     *Existence of a fiduciary duty*

Adamson argues that Aon has not adequately alleged that he owed a fiduciary duty to Aon (the first element of a claim for breach of fiduciary duty) because he was not an "officer" of the company. (Dkt. 148 at 5-7.) Although Aon does not allege that Adamson was a corporate officer or director *per se*, it does allege that he was in a significant leadership position: a Partner and Global Practice Group Leader for ESG. (FAC ¶¶ 3, 41.) Adamson directed the daily operations of ESG, and all employees in ESG reported to him. (*Id.* ¶ 41.) These allegations are sufficient to establish that Adamson had "significant autonomy and discretion," which are the "hallmarks of a fiduciary." *Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003); *see also Radiac*

*Abrasives, Inc. v. Diamond Tech., Inc.*, 532 N.E.2d 428, 434 (Ill. App. Ct. 1988) (a defendant who is "neither an officer nor a director of the plaintiff corporation" still "owe[s] a fiduciary duty to the corporation because there [is] an agency relationship"). Accordingly, Aon has plausibly alleged that Adamson, in his role as Partner and Global Practice Group Leader, owed a fiduciary duty to Aon.

### b. Breach

Adamson, Burg, Coleman, and Stoudt all argue that, even if they owed a fiduciary duty, Aon has not properly alleged they engaged in any conduct in breach of that fiduciary duty. (Dkts. 109 at 8-11 (Adamson); 112 at 12 (Coleman and Stoudt); 114 at 12-14 (Burg).) These Defendants argue that planning and forming a competing company is a lawful and "permissible preparatory activity," and, accordingly, engaging in such activity cannot constitute the breach of a fiduciary duty. (*See, e.g.*, Dkts. 112 at 12-13; 109 at 9 ("under Illinois law employees may plan, form, and equip a competing corporation while still working for their employer as long as they don't begin competition").)

Defendants are correct that, as a general rule, "employees may plan, form, and outfit a competing corporation while still working for the employer." *Alpha Sch. Bus Co. v. Wagner*, 910 N.E.2d 1134, 1149 (Ill. App. Ct. 2009). But Aon alleges that these Defendants' activities went beyond mere planning. It explicitly alleges that Adamson, Burg, Coleman, and Stoudt—while they were still employed at Aon—solicited Aon employees to leave Aon and join Infinite Equity. (*See, e.g.*, FAC ¶¶ 128 (Burg and Adamson solicited Daniel Kapinos in Fall 2018 to leave Aon); 142 (Burg and Stoudt

solicited Evans to leave Aon and work for Infinite Equity while they were still employed by Aon); 146 (Burg, Coleman, and Stoudt solicited DiDomenico); 147 (Burg, Coleman, and Stoudt solicited CJ Van Osterbridge, a Director in ESG who reported to Burg).) As described above, Aon also adequately alleges that Coleman misappropriated Aon's trade secrets before his departure. (*See* Section II.C.1, *above*.) These allegations are sufficient to allege a breach of fiduciary duty as to Adamson, Burg, Coleman, and Stoudt. *See Nat'l Auto Parts v. Automart Nationwide, Inc.*, No. 14 C8160, 2015 WL 5693594, at *5 (N.D. Ill. Sept. 24, 2015) (fiduciary duty claim sufficiently pleaded where it is alleged that defendants, while they were still employed "removed . . . trade secret information" and "solicited key employees"); *ABC Trans Nat. Transp., Inc. v. Aeronautics Forwarders, Inc.*, 379 N.E.2d 1228, 1237 (Ill. App. Ct. 1978) ("a fiduciary cannot . . . entice coworkers away from his employer, or appropriate his employer's personal property"); *PrimeSource*, 2017 WL 11500971, at *9 (allegations that defendants misappropriated confidential information before resigning, contacted their former employer's customers, and failed to disclose their conflicts of interest while accessing the former employer's confidential information adequately stated a claim for breach of fiduciary duty). The motions to dismiss Count IV are accordingly denied.

### 4. Tortious Interference with Contract (Count V)

Aon brings a claim for tortious interference with contract (Count V) against Adamson, Burg, Coleman, Stoudt, and Infinite Equity. (FAC ¶ 241-48.) The contracts that form the basis for this claim are the non-solicitation covenants in Aon's RSU

Agreements with Adamson, Burg, and Coleman. (FAC ¶ 242.) Aon alleges Infinite Equity was aware of these agreements and acknowledged as much when it stated in its Employee Handbook that "many of our consultants may have restrictive clauses with respect to existing clients and prospects." (*Id*. ¶ 243.) Aon also alleges that Burg and Adamson were aware of each other's RSU Agreements, that Burg and Coleman were aware of each other's RSU Agreements, and that Stoudt was aware of all three. (*Id*. ¶ 244.) These Defendants all "permitted and/or encouraged breaches of the RSU Agreements . . . intentionally and without justification." (*Id*. ¶ 245.) These alleged breaches include Adamson, Burg, and Coleman's solicitation of Aon clients in violation of the RSU Agreements' non-solicitation covenants.

To state a claim for tortious interference with contract under Illinois law, a plaintiff must allege: (1) the existence of a valid contract; (2) the defendant had knowledge of the contract; (3) the defendant intentionally and without justification induced a breach of the contract; (4) the defendant's wrongful conduct caused the contract to be breached; and (5) the plaintiff suffered damages because of the breach. *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 676 (Ill. 1989). To survive a motion to dismiss a claim for tortious interference with contract, Aon must allege that Defendants "intended to cause the breach." *Webb v. Frawley*, 906 F.3d 569, 579 (7th Cir. 2018) (applying Illinois law). Intent to induce "requires some active persuasion, encouragement, or inciting that goes beyond merely providing information in a passive way." *In re Estate of Albergo*, 656 N.E.2d 97, 103 (Ill. App. Ct. 1995).

Defendants challenge the third element: intentional and unjustified inducement of a breach. (*See* Dkt. 109 at 11 (Aon "never identifies what [Adamson] did to induce anyone to breach a contractual duty"; Dkt. 140 at 13 (Aon does not plead facts "to adequately allege [Defendants] *intentionally* and *justifiably* induced a breach"; Dkt. 141 at 14.) Defendants argue that Aon's allegations Defendants solicited each other to breach their contracts are "conclusory and speculative" and that "any specific allegations regarding [Defendants'] conduct that procured a single purported breach of an Aon contract are notably absent" from the FAC. (Dkt. 141 at 14.)

Defendants are correct that Aon does not allege Defendants specifically and explicitly induced Aon, Burg, and Coleman to breach the non-solicitation clauses in their RSU Agreements. Aon does, however, allege that Defendants were aware of the agreements and worked together to form a competing venture that aimed to take business from Aon and funnel it toward Infinite Equity. An allegation that "the interferon [*sic*] had knowledge of a contract and then placed a contracting party in a position to breach sufficiently pleads intentional inducement." *Wells Lamont Indus. Grp. LLC v. Richard Mendoza & Radians, Inc.*, No. 17 C 1136, 2017 WL 3235682, at *4 (N.D. Ill. July 31, 2017). The Court can thus draw the reasonable inference that Defendants knew of the RSU Agreements and put Adamson, Burg, and Coleman in a position to breach by "permitting" or "encouraging" them to breach those Agreements by soliciting Aon employees and clients. (FAC ¶¶ 165 ("while they were still with Aon, Adamson, Burg, Coleman, Stoudt, and Evans recruited each other, and . . . Aon

colleagues, to leave Aon, compete against Aon, and/or join Infinite Equity"; 245 ("Infinite Equity, Burg, Coleman, Stoudt, and Adamson permitted and/or encouraged breaches of the RSU Agreements").) Aon's allegations rise above "threadbare recitals" of the elements of tortious interference with contract and put Defendants sufficiently on notice of Aon's claim. *Iqbal*, 556 U.S. at 678. The details of the alleged solicitation may be fleshed out with a more developed record. Accordingly, the motions to dismiss Count V are denied.

### 5. Tortious Interference with Prospective Economic Advantage (Count VI)

Aon also brings a claim for tortious interference with prospective economic advantage against all Defendants.[15] (FAC ¶ 249-59.) To state such a claim under Illinois law, Aon must allege that: (1) Aon had a reasonable expectancy of entering into a valid business relationship; (2) Defendants knew about this expectancy; (3) Defendants intentionally interfered with the expectancy preventing the expectancy from ripening into a valid business relationship; and (4) Defendants' intentional interference injured Aon. *See J. Eck & Sons, Inc. v. Reuben H. Donnelley Corp.*, 572 N.E.2d 1090, 1092 (Ill. App. Ct. 1991). In doing so, it is "well established that the assertedly tortious interference allegedly committed by the defendant must be directed toward the third party or parties with whom the plaintiff had the business expectancy—not simply toward the plaintiff." *Int'l Star Registry of Ill. v. ABC Radio Network, Inc.*, 451 F. Supp. 2d 982, 992 (N.D. Ill. 2006) (cleaned up). Alleging conduct

---

[15] Because the Court lacks personal jurisdiction over DiDomenico and Evans (*see* Section II.A.2.c, *above*), it does not address Aon's claim for tortious interference with prospective economic advantage (Count VI) against those two defendants.

that merely "affect[s]" a third party is not sufficient to state a claim. *Id.*

Aon's claim against Adamson for tortious interference with prospective economic advantage is premised on interference with two types of relationships: (1) the relationships between Aon and its employees, including Burg, Coleman, Stoudt, Evans, and DiDomenico; and (2) the relationships between Aon and its clients. (FAC ¶ 250.) Defendants argue that Aon has failed to state a claim for tortious interference with prospective economic advantage because Aon fails to "identify any third-party client toward which . . . Defendants intentionally and unjustifiably directed specific conduct aimed at ending a business relationship." (Dkt. 112 at 14.) Similarly, Adamson argues that Aon has not properly alleged Adamson solicited or induced any employee or Aon client to leave Aon or that he solicited any Aon clients to move their business from Aon to Infinite Equity. (Dkt. 109 at 13.)

But Aon is not required to identify any specific third parties at this stage in the litigation. *See Cook v. Winfrey*, 141 F.3d 322, 328 (7th Cir. 1998) (to survive a motion to dismiss, plaintiff had no obligation to allege the specific third party with whom he had a valid business expectancy). Aon's allegations that it had business relationships with its clients and employees, (FAC ¶ 250)—taken in concert with the allegations that Defendants solicited those clients and employees to leave Aon and join Infinite Equity (*see, e.g.*, *id.* ¶¶ 165, 192-94)—provides sufficient factual detail for the Court to infer that Aon was involved in business relationships with those clients and employees or would have had "greater prospective business advantage" with them. (*Id.* ¶ 252.) The motions to dismiss Count VI are therefore denied.

### 6.  Unjust Enrichment (Count VII)

Finally, Aon brings a claim for unjust enrichment against Burg, Coleman, Stoudt, and Infinite Equity.[16] Aon's allegations here are vague. It alleges only that certain Defendants unjustly enriched themselves to Aon's detriment through their "wrongful conduct" including procuring "increased compensation and clients." (FAC ¶¶ 261-62.) To state a claim for unjust enrichment under Illinois law, "a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Gagnon v. Schickel*, 983 N.E.2d 1044, 1052 (Ill. App. Ct. 2012) (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. App. Ct. 1989)). Unjust enrichment is a "quasi-contractual equitable remed[y]" that is available when "no actual agreement between the parties occurred, but a duty is imposed to prevent injustice." *Byram v. Danner*, No. 4-17-0058, 2018 WL 1831819, at *14 (Ill. App. Ct. Apr. 13, 2018) (quoting *Hayes Mech., Inc. v. First Indus., L.P.*, 812 N.E.2d 419, 426 (Ill. App. Ct. 2004)). In general, "there can be no claim for unjust enrichment where there is an express contract between the parties." *NEXT Payment Sols., Inc. v. CLEAResult Consulting, Inc.*, No. 17 C 8829, 2018 WL 3637356, at *10 (N.D. Ill. July 31, 2018) (citing *Stark Excavating, Inc. v. Carter Constr. Servs., Inc.*, 967 N.E.2d 465, 474 (Ill. App. Ct. 2012)). But if "no contract covers the benefit that the plaintiff conferred to the defendant, then recovery

---

[16] Because the Court lacks personal jurisdiction over DiDomenico and Evans (*see* Section II.A.2.c, *above*), it does not address Aon's claim for unjust enrichment (Count VII) against those two defendants.

under a theory of unjust enrichment is possible." *Id.*

Defendants advance several arguments for why the unjust enrichment claim should be dismissed.[17] First, Defendants argue that, to the extent Aon's unjust enrichment claim is based on the misappropriation of trade secrets, the claim is preempted by the ITSA. (Dkt. 112 at 15; Dkt. 114 at 15 (citing *Segerdahl Corp v. Ferruzza*, No. 17-cv-3015, 2019 WL 77426, at *7 (N.D. Ill. Jan. 2, 2019) (dismissing unjust enrichment claim as preempted by the ITSA)).) The Court agrees. The ITSA provides that it is "intended to displace conflicting tort, restitutionary, unfair competition, and other laws of this State providing civil remedies for misappropriation of a trade secret." 765 ILCS 1065/8(a). As Illinois courts have held, "[u]njust enrichment is essentially a claim for restitution." *Pope v. Alberto-Culver Co.*, 694 N.E.2d 615, 619 (Ill. App. Ct. 1998) (dismissing unjust enrichment claim as preempted by the ITSA). Accordingly, the Court dismisses Aon's unjust enrichment claim—to the extent it is premised on the misappropriation of trade secrets—as preempted by the ITSA. *See Spitz v. Proven Winners N. Am., LLC,* 759 F.3d 724, 733 (7th Cir. 2014) (upholding dismissal of unjust enrichment claim premised on misappropriation of trade secrets as preempted by the ITSA).

Defendants also argue that an unjust enrichment claim is unavailable because a specific contract governs the relationship between the parties (Dkt. 112 at 15 (citing

---

[17] Defendants Coleman, Stoudt, and Infinite Equity also argue in their reply belief that Aon "fails to distinguish between [Defendants] with detail sufficient to put each [Defendant] on notice of the claims against him or her." (Dkt. 140 at 15.) But, again, Aon brings this argument for the first time in a reply to which Aon has not had a chance to respond. This argument is thus waived. *See Darif*, 739 F.3d at 336.

*People ex rel. Hartigan v. E & E Hauling, Inc.,* 607 N.E.2d 165, 177 (Ill. 1992) ("where there is a specific contract which governs the relationship of the parties, the doctrine of unjust enrichment has no application")).) Defendants do not state what these contracts are, but as far as Coleman is concerned, the Court presumes Coleman refers to the contracts that form the partial basis of Aon's breach of contract claim (Count III): his RSU Agreements. Thus, to the extent that these contracts govern the relationship between Coleman and Aon, the court dismisses Aon's unjust enrichment claim as duplicative of the relief available under Aon's breach of contract claim. *See Shaw v. Hyatt Int'l Corp.*, 461 F.3d 899, 902 (7th Cir. 2006) ("[plaintiff] fails to present a claim for unjust enrichment, because that is unavailable where the claim rests on the breach of an express contract").

The same cannot be said, however, for Burg, Stoudt, or Infinite Equity, as Aon does not bring a breach of contract claim against these Defendants. The Court thus denies Defendants' motions to dismiss Aon's unjust enrichment claim against Burg, Stoudt, and Infinite Equity to the extent, as discussed above, the unjust enrichment claim is based on conduct other than misappropriation of trade secrets.

## III.   CONCLUSION

For the reasons discussed above, Defendant Adamson's motion to dismiss (Dkt. 108) is granted in part and denied in part. The Court denies Adamson's motion to dismiss Aon's claims for breach of contract (Count III) to the extent that claim is based on the non-solicitation covenants in his RSU Agreements, breach of fiduciary duty (Count IV), tortious interference with contract (Count V), and tortious

interference with prospective economic advantage (Count VI), but dismisses without prejudice Aon's claim for breach of contract (Count III) to the extent that claim is based on the non-disparagement clause in his Separation Agreement,

Defendants Coleman, Evans, Stoudt, and Infinite Equity's motion to dismiss under Rule 12(b)(6) (Dkt. 111) is granted in part and denied in part. As described above, the Court does not have jurisdiction over Evans, and dismisses the claims against him. That leaves Defendants Coleman, Stoudt, and Infinite Equity. The Court denies the motion to dismiss as to all claims other than the unjust enrichment claim (Count VII). As to these Defendants, the Court dismisses Count VII as preempted to the extent it is based on misappropriation. To the extent it is based on a breach of Coleman's RSU Agreements, the claim is dismissed as duplicative of the remedies available under Count III. The Court grants the motion to dismiss that claim to the extent it is based on other wrongful conduct.

Defendant Burg's motion to dismiss (Dkt. 113) is granted in part and denied in part. The Court grants Burg's motion to dismiss Aon's claim for unjust enrichment (Count VII)—to the extent that claim is based on the misappropriation of trade secrets—as preempted, but the Court denies the motion to the extent it is based on other wrongful conduct.

Defendants Evans, Stoudt, and Infinite Equity's motion to dismiss under Rule 12(b)(2) (Dkt. 115) is granted in part and denied in part. The Court dismisses all claims brought against Defendant Evans for lack of personal jurisdiction but denies the motion with respect to Defendants Stoudt and Infinite Equity.

Finally, Defendant DiDomenico's motion to dismiss (Dkt. 181) is granted. The Court dismisses all counts against DiDomenico under Rule 12(b)(2) for lack of personal jurisdiction.

SO ORDERED in No. 19-cv-07504.

Date: September 3, 2021

_____

JOHN F. KNESS
United States District Judge