**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| AON PLC, AON GROUP, INC., and AON CONSULTING, INC., | |
| Plaintiffs, | |
| v. | Case No. 19 C 7504 |
| INFINITE EQUITY, INC., TERRY ADAMSON, JON BURG, DANIEL COLEMAN, and ELIZABETH STOUDT, | Magistrate Judge Sunil R. Harjani |
| Defendants. | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

In this action, Plaintiffs Aon PLC, Aon Group, Inc, and Aon Consulting, Inc. (collectively, "Aon") sued six former employees of their Equity Services Group (Terry Adamson, Jon Burg, Daniel Coleman, Elizabeth Stoudt, Tyler Evans, and Christopher DiDomenico) and Infinite Equity, Inc. ("Infinite"), a rival company co-founded by Burg, Coleman, and Stoudt, for allegedly misappropriating certain trade secrets and poaching Aon employees and clients. Aon moves for a preliminary injunction which would restrain Defendants from selling its *MyPerformanceAwards* ("*MPA*") product, soliciting or servicing clients with whom Defendants Burg, Coleman, and Stoudt worked at Aon in the two years prior to their departures, and soliciting or hiring any further employees from Aon's Equity Services Group pending the conclusion of this litigation. Also before the Court is Defendants' motion to strike [220]. The parties consented to this Court's jurisdiction for the limited purpose of resolving Aon's preliminary injunction motion. Docs. 178, 249-50. For the following reasons, Aon's motion for preliminary injunction [176, 194] is granted in part and denied in part, and the Court will enter the terms of the injunction and bond in a separate

document consistent with the analysis set forth herein. Defendants' motion to strike [220] is denied, and Defendants' motion for leave to re-file two briefs in excess of their respective page limits [264] is granted.

## I. Factual Background

The parties vigorously dispute many of the facts giving rise to this lawsuit. Aon presents a version in which a "massive corporate raid was, and remains, a foot." Pls' Prelim. Inj. Memo., Doc. 177 at 7. Aon claims that Burg, Coleman, and Stoudt (collectively, the "individual Defendants"), the "Equity Services Group leaders, whom Aon generously compensated and trusted to act in Aon's best interests, instead plotted to gut the business, and take some of its most valuable employees, clients, and trade secrets, and continue to benefit from same at the expense of Aon's protectable interests." *Id*.

Defendants, on the other hand, assert that this "is a case of a multibillion-dollar conglomerate trying to take out a ten-person start-up to nip potential competition in the bud." Defs' Resp., Doc. 270 at 11. Defendants allege that when "each of the [individual] Defendants respectively left Aon, after giving transparent and advance notice, and working hard to transition clients and duties, they of course took nothing, and, on advice of counsel, and prior to starting with Infinite Equity, they searched for (and made sure to delete) any Aon information they inadvertently had in their possession by way of their duties for Aon." *Id*. at 25. Defendants also allege that they developed Infinite's *MPA* software program from scratch. *Id*. at 26. Finally, Defendants claim that the former Aon Equity Services Group employees who now work for Infinite made unsolicited decisions regarding whether they would stay at Aon or leave for other employment. *Id*. at 22.

At this stage, the following facts are drawn from the First Amended Verified Complaint ("FAC")[1] and the parties' preliminary injunction briefs and exhibits.[2] The Court's findings are preliminary and limited only to the current record; they do not bind the district court and are subject to change after a full evidentiary record is presented following discovery. *Moss Holding Co. v. Fuller*, 2020 WL 1081730, at *1 (N.D. Ill. March 6, 2020).

Aon describes itself as the "leading provider of state-of-the-art products and services to help companies with employees around the world effectively use equity compensation." FAC, ¶ 2. Equity compensation is "non-cash pay that is offered to employees," which "allows the employees of the firm to share in the profits via appreciation." Will Kenton, *Equity Compensation*, Investopedia (January 23, 2021), https://investopedia.com/terms/e/equity-compensation.asp (last visited September 15, 2021). Aon offers equity valuation services, design of long-term incentive based programs and employee stock purchase plans, and tools to track equity compensation metrics, like its *PeerTracker* ("*PT*") program. FAC, ¶ 21.

Burg joined Aon in January 2009. FAC, ¶ 50. At the time of his resignation on May 29, 2019, Burg was a Partner and practice leader of Aon's Equity Services Group. *Id*., ¶¶ 3, 23. Stoudt joined Aon Equity Services in 2005, and Coleman started with Aon in 2014. *Id*., ¶¶ 58, 65. Until

---

[1]     On May 1, 2020, Daniel Kapinos, the current leader of Aon's Equity Services Group, signed Aon's First Amended Verified Complaint under penalty of perjury pursuant to 28 U.S.C. §1746. Doc. 106. At the preliminary injunction stage, verified complaints are the functional equivalent of affidavits. *IDS Life Ins. Co. v. SunAmerica Life Ins. Co.*, 136 F.3d 537, 542 (7th Cir. 1998) ("Verified complaints [are] the equivalent of affidavits."); *see also Beal v. Beller*, 847 F.3d 897, 901 (7th Cir. 2017) (internal citation omitted) ("a verified complaint is not just a pleading; it is also the equivalent of an affidavit for purposes of summary judgment, because it 'contains factual allegations that if included in an affidavit or deposition would be considered evidence, and not merely assertion.'"). While "[a]ffidavits are ordinarily inadmissible at trials . . . they are fully admissible in summary proceedings, including preliminary-injunction proceedings." *Goodman v. Illinois Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432, 439 (7th Cir. 2005).

[2]     The parties agreed to submit the preliminary injunction motion for a decision on the briefing without an evidentiary hearing. Doc. 178.

June 7, 2019 and June 10, 2019, respectively, Stoudt and Coleman were Associate Partners and the Philadelphia and Central practice leaders for Aon Equity Services. *Id*., ¶¶ 3, 24, 25. Evans worked for Aon from 2010 until March 19, 2019. *Id*., ¶¶ 26, 73. At the time of his departure, Evans was a Senior Developer in Aon Equity Services and led the software development team. *Id*., ¶ 26; Evans Dep., 38:5-9. DiDomenico started with Aon in early 2015. FAC, ¶ 93. Until April 19, 2019, DiDomenico was a developer in Aon Equity Services. *Id*., ¶ 27.[3]

In their positions at Aon, Burg, Coleman, Stoudt, Evans, and DiDomenico received, cumulatively, decades of training, support, development, client introductions, exposure to confidential, proprietary and trade secret information, and lucrative opportunities from Aon. FAC, ¶¶ 4, 55-57, 62-64, 70-72, 80, 82, 96, 98. Aon takes several steps to maintain the secrecy of its confidential, proprietary and trade secret information, including: (1) requiring employees who have access to such information to sign confidentiality agreements, (2) promulgating confidentiality and information security policies, (3) limiting disclosure and distribution of such information to only a small number of employees on a need to know basis, and/or (4) requiring that such information be saved on password protected networks or servers. *Id*., ¶¶ 74, 89, 92, 94, 101, 114-119, 210; Kapinos Decl., ¶¶ 4-7.

Over the years, Burg, Coleman, Stoudt, Evans, and DiDomenico were involved in overseeing, formulating, and developing Aon's *PT* software program. FAC, ¶ 4; Evans Dep., 45:3-46:24, 50:9-51:3, 51:19-52:17, 53:22-54:11; DiDomenico Dep., 16:13-16, 33:7-34:9. *PT* is a web-based application that tracks the performance of equity for clients. FAC, ¶ 83. Aon alleges that

---

[3]     Terry Adamson joined Aon in 1995 and was a partner in Aon Equity Services. FAC, ¶¶ 22, 40. Effective May 31, 2019, Adamson entered into a Confidential Separation Agreement and General Release with Aon Consulting & Insurance Services, an Aon subsidiary. *Id*. ¶ 45. Aon alleges that Adamson is affiliated with Infinite and is "working behind the scenes for or with Infinite." *Id*., ¶¶ 171, 202. Aon does not seek a preliminary injunction based on its claims against Adamson.

*PT* "is unique to the industry, differentiating Aon from its competitors." *Id.*, ¶¶ 4, 88.  Aon first developed *PT* in 2007 and has spent years and millions of dollars to refine and update its *PT* program. FAC, ¶¶ 4, 86; Goings Reply Decl., ¶ 2.  Only Aon's developers have access to the source code to *PT*, including Evans and DiDomenico, who now work for Infinite. FAC, ¶ 87.

During his employment, Coleman entered into a Restricted Stock Unit ("RSU") Agreement with Aon. FAC, ¶ 104, Ex. E.[4]  In the RSU Agreement, Coleman agreed, among other things, that during the course of his Aon employment, and for two years thereafter, he will not "directly or indirectly, call upon, solicit, accept, engage in, service, or perform, other than on behalf of Aon, any business of the same type or kind as that performed by Aon" from or with respect to a subset of Aon clients.[5] *Id.*, ¶ 108, Ex. E, § 9(b).  Coleman also agreed that during and for two years after his employment, he would not "directly or indirectly" solicit or induce, or cause another person to solicit or induce, any Aon employee to leave Aon. *Id.*, ¶ 109, Ex. E, § 9(c).

By October 2018 and while still working for Aon, the individual Defendants had begun planning the creation of their own equity services company, Infinite Equity, Inc.  On October 17, 2018, Evans created the infiniteequitycs.com domain, created an Infinite email address for DiDomenico, and set DiDomenico up with an administrative account for Infinite with Amazon Web Services. Pls' Prelim. Inj. Memo., Exs. N, O.  Later that month, Evans and DiDomenico

---

[4]    Burg also entered into a RSU Agreement with Aon. FAC, ¶ 104, Ex. C.  Burg sought a preliminary injunction in California seeking to invalidate his contract, which the court denied and compelled Burg to arbitrate his claims in Illinois. Writz Reply Decl., ¶ 3, Ex. A.  Aon therefore brings its breach of contract claim against Burg in arbitration and does not assert a breach of contract claim against Burg in this case. Stoudt was not party to a RSU Agreement with Aon.

[5]    This provision applies to clients with whom Coleman provided services, either alone or with others, or had a business relationship with, or on whose account he worked or became familiar, or supervised directly or indirectly the servicing activities related to such clients, during the 24 months prior to his termination date (and further provided the clients were clients of Aon within 12 months prior to his termination date). FAC, ¶ 108, Ex. E, § 9(b).

exchanged text messages about leaving Aon. *Id*., Ex. T.  They discussed "not everyone is going at the same time" and "not everyone knows about it." *Id*. at 58936 & 58937.

While at an Aon leadership year end planning meeting for the Equity Services Group in November 2018, Burg, Coleman, Stoudt, Adamson, and Kapinos met to discuss leaving Aon and forming a competing company, among other options. Burg Dep., 260:19-261:25; Stoudt Dep., 92:16-95:19, 104:9-107:5; Kapinos Dep., 29:11-30:21.   In discovery, Defendants produced pictures of a whiteboard with notes from the meeting. Pls' Prelim. Inj. Memo., Ex. V.  The whiteboard pictures contain a logo for "Infinite Equity" and lists Aon employees Evans, Deidre Salisbury, Carly Sanfilipo, CJ Van Ostenbridge, and Ben Allen—all of whom they "wanted to continue working together as a group." *Id*.; Burg Dep., 275:8-14.  Beginning in December 2018 and continuing until the third week of May 2019, Burg, Coleman, Stoudt, and Evans held weekly planning calls to discuss Infinite. Pls' Prelim. Inj. Memo., Exs. W, YYY, Answer to Interr. No. 1. As of January 2019, Evans was designing a logo for Infinite and a framework for Infinite's website was also created. Pls' Prelim. Inj. Memo., Exs. X, Z, AA.

On April 24, 2019, Coleman gave notice of his resignation from Aon. FAC, ¶ 149.  In the weeks leading up to his notice of resignation, Coleman forwarded emails from his Aon email address to his personal email address, attaching models that Aon used to project stock prices for clients. *Id*., ¶ 8; Coleman Dep. 260:13-261:21, 270:8-272:3, Exs. 24, 25; Kapinos Dep., 290:8-20; Kapinos Decl., ¶¶ 43, 48-53, Exs. 14, 19, 20-24; Surdel Dep., 182:21-183:3, 192:6-23.   For example, on April 16, 2019, Coleman emailed Monte Carlo simulations for an Aon client from his Aon email address to his personal email address and saved it on his home computer. Kapinos Decl., ¶¶ 21, 49, Ex. 20; Coleman Dep., 260:13-261:4; Surdel Dep., 182:21-183:3, 192:6-23.  That client

is now an Infinite client and Infinite performs Monte Carlo simulations for that client. Coleman Dep., 261:12-21.

On May 1, 2019, and while still employed at Aon, Burg filed a Certificate of Incorporation of Infinite with the Secretary of State of Delaware. FAC, ¶ 10.  Between May 1, 2019 and June 10, 2019, Burg, Coleman, Stoudt and other Aon Equity Services employees resigned from Aon. *Id*., ¶ 11.  By June 10, 2019, nine employees (Burg, Coleman, Stoudt, Evans, DiDomenico, Van Ostenbridge, Sanfilipo, Salisbury, and Allen) left Aon, all of whom now work for Infinite. *Id*., ¶¶ 12, 26, 170.  These nine employees represented approximately 15% of Aon's Equity Services Group. *Id*., ¶ 12.

Coleman's last day with Aon was June 10, 2019. FAC, ¶ 149.  On his last day with Aon, Coleman printed 46 documents related to earnings before interest, taxes, depreciation, and amortization ("EBITDA") projections for an Aon client and "brought them home" because he thought they were a "clever solution." *Id*., ¶ 155; Coleman Dep., 252:14-257:9.  Coleman admitted he "had no business purpose at all in printing them out." Kapinos Decl., ¶ 45, Ex. 16; Coleman Dep., 259:12-16.  Infinite performs EBITDA projections for this same client. Coleman Dep., 253:9-19.

Infinite was officially launched on June 1, 2019. Burg Dep., 122:17-20; DiDomenico Dep., 14:21-24.  Burg, Coleman, and Stoudt are listed as "Partners" on Infinite's website. https://infiniteequity.com.  Infinite describes itself as a "professional services firm that enables companies to increase the effectiveness and return of their equity programs" by partnering with clients on "plan design, valuation, performance tracking and communication, tax, and financial accounting services related to stock-based compensation." *Id*.

7

Infinite competes directly with Aon Equity Services and offers services and products similar to those offered by Aon Equity Services, including Infinite's *MPA* program. FAC, ¶¶ 13, 28, 88, 152, 155, 172; Kapinos Dep., 86:12-25; Goings Dep., 164:16-165:3; Coleman Dep., 230:14-231:2; Burg Dep., 94:5-95:23. *MPA* is a "real-time solution for tracking performance equity plans and providing award holders clear insight into the current value of their outstanding awards." https:/infiniteequity.com/solution/my-performance-awards. According to Aon, *MPA* is a product virtually identical to Aon's *PT* product. FAC, ¶¶ 9, 13. There is no evidence that any individual Defendant, Evans, or DiDomenico removed, copied, or improperly accessed *PT* source code prior to leaving Aon. Goings Dep., 208:1-211:15.

Beginning on June 17, 2019, Burg, Coleman, and Stoudt contacted numerous Aon clients on behalf of Infinite. Pls' Prelim. Inj. Memo., Exs. PP-CCC. Many of the clients they contacted were clients they gained knowledge of or worked with at Aon. *Id.*, Exs. PP-SS, UU, VV, XX-CCC; Coleman Dep., 66:2-9, 150:1-3, 177:21-181:4. 186:3-16, Burg Dep., 204:19-206:6, 210:15-211:12; Kapinos Decl., ¶¶ 9-14, 16, 18, 19; FAC ¶¶ 192-94.

Aon filed this action on November 13, 2019. Aon's FAC alleged seven counts: (1) violation of the federal Defend Trade Secrets Act ("DTSA") against Infinite, Burg, Coleman, Stoudt, Evans, and DiDomenico; (2) violation of the Illinois Trade Secrets Act against Infinite, Burg, Coleman, Stoudt, Evans, and DiDomenico; (3) breach of contract against Coleman and Adamson; (4) breach of fiduciary duty against Burg, Coleman, Stoudt, Adamson, and Evans; (5) tortious interference with contract against Infinite, Burg, Coleman, Stoudt, and Adamson; (6) tortious interference with prospective economic advantage against all Defendants; and (7) unjust enrichment against Infinite, Burg, Coleman, Stoudt, Evans, and DiDomenico. Doc. 106.

On January 2, 2020, Aon moved for a temporary restraining order. Doc. 23. On January 29, 2020, Defendants agreed to a voluntary Consent Order which remained in place for 90 days. Doc. 41. As part of the Consent Order, Defendants represented that 49 clients had transferred their business from Aon to Infinite as of January 26, 2020. Doc. 41, ¶ 4. The Consent Order expired at the end of April 2020. Defendants continued to contact and perform services for Aon clients after the Consent Order expired. Pls' Prelim. Inj. Memo., Doc. 177 at 20-21, (iii)-(rrr). In May 2020, Defendants provided a "non-exhaustive list" of over 91 Aon clients with whom they have had contact. *Id*., Ex. YYY, Answer to Interr. No. 5. In July 2020, Defendants produced a spreadsheet showing that they have, or are currently, servicing and working with at least 58 Aon clients with whom they previously worked at Aon. *Id*., Ex. EEE; Burg. Dep. 172:11-17.

On August 17, 2020, Aon filed its motion for a preliminary injunction. The parties then engaged in expedited fact and expert discovery, including Aon's access to *MPA's* source code as of June 1, 2019 when Infinite started doing business. Following expedited discovery, the parties submitted voluminous preliminary injunction briefing, expert reports, declarations, and accompanying exhibits.

Defendants filed several motions to dismiss the FAC. On September 3, 2021, the district court granted in part and denied in part Defendant Adamson's motion to dismiss, Defendants Coleman, Evans, Stoudt, and Infinite's motion to dismiss under Rule 12(b)(6), Burg's motion to dismiss, and Defendants Evans, Stoudt, and Infinite's motion to dismiss under Rule 12(b)(2) and granted Defendant DiDomenico's motion to dismiss. *Aon PLC, et al. v. Infinite Equity, Inc., et al.*, 2021 WL 4034068 (N.D. Ill. Sept. 3, 2021). The district court found that Defendants Burg, Stoudt, and Infinite are subject to personal jurisdiction in Illinois, but it dismissed all claims against Evans

and DiDomenico for lack of personal jurisdiction. *Id.* at *4-9.[6]  As courts may not enjoin parties over which they do not have personal jurisdiction, this Court waited until the district court resolved the issue of personal jurisdiction before considering whether injunctive relief is appropriate. *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) ("Personal jurisdiction . . . is an essential element of district court jurisdiction, without which the court is powerless to proceed to an adjudication."); *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 800 (7th Cir. 2014) ("In order for the district court's preliminary injunction to be valid, that court had to have personal jurisdiction over the defendant.").

In its September 3, 2021 opinion, the district court also dismissed without prejudice Aon's claim for breach of contract against Adamson to the extent that claim is based on the non-disparagement clause in his Separation Agreement; dismissed Aon's unjust enrichment claim against Defendants Burg, Coleman, Stoudt, and Infinite to the extent it is based on misappropriation; and dismissed Aon's unjust enrichment claim against Coleman to the extent it is based on a breach of Coleman's RSU Agreement as duplicative of the remedies available under Count III. *Aon PLC, et al.*, 2021 WL 4034068, at *20.  The motions to dismiss were denied in all other respects. *Id.*

## II.  Analysis

In support of its preliminary injunction motion, Aon argues that Defendants' actions are causing Aon immediate, irreparable harm by impairing Aon's goodwill and reputation with its clients, destroying Aon's established customer relationships that it has invested years to build, destroying Aon's employee relationships that it has invested years to cultivate, disrupting the stability of Aon's Equity Services business and workforce, and threatening the continued

---

[6]    Defendants Adamson and Coleman did not challenge personal jurisdiction. *Aon PLC, et al.*, 2021 WL 4034068, at *4.

misappropriation of Aon's confidential, proprietary, and trade secret information. The Court finds that Aon is entitled to some of the relief sought in its preliminary injunction motion.

To obtain a preliminary injunction, a plaintiff must make a threshold showing that: (1) it will suffer irreparable harm absent a preliminary injunction during pendency of the action; (2) inadequate remedies at law exist; and (3) it has some likelihood of success on the merits. *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020). As the Seventh Circuit recently explained, under the likelihood of success on the merits factor, a "possibility of success is not enough" and "[n]either is a 'better than negligible' chance." *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020). The movant must make a "strong showing" of a likelihood of success on the merits, but "need not show that it definitely will win the case." *Id*. at 762-63. "A 'strong' showing . . . does not mean proof by a preponderance . . . . But it normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Id*. at 763.

If the moving party makes a threshold showing, "the court proceeds to a balancing analysis, where the court must weigh the harm the denial of a preliminary injunction would cause the plaintiff against the harm to the defendant if the court were to grant it." *Mays*, 974 F.3d at 818. "This balancing process involves a 'sliding scale' approach: the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa." *Id.* Finally, the Court decides whether the proposed injunction is in the public interest, which includes considering the potential impact on non-parties. *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018). "Ultimately, the moving party bears the burden of showing that a preliminary injunction is warranted." *Id*.

**A.  Likelihood of Success on the Merits**

**1.  Trade Secret Misappropriation Claims**

Aon alleges Defendants violated the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq*., and the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065/1 *et seq*., by misappropriating Aon's trade secrets.  To prevail on its misappropriation claims, Aon must "demonstrate that (1) a trade secret existed; (2) it was misappropriated through improper acquisition, disclosure, or use; and (3) the misappropriation damaged the trade secret's owner." *Aon Risk Servs. Cos., Inc. v. Alliant Ins. Servs. Inc.*, 415 F.Supp.3d 843, 848 (N.D. Ill. 2019). Because the pertinent definitions of the DTSA and ITSA overlap and the parties do not identify any relevant differences in the statutes, the Court analyzes the likelihood of success of the trade secret misappropriation claims together. *Id*.  Defendants argue that Aon has not demonstrated it is likely to succeed on the merits of its trade secrets misappropriation claims because it fails to show that (1) the information it identifies constitutes a trade secret and (2) Defendants engaged in misappropriation.

The trade secrets claimed by Aon consist of three categories of information: (1) "*PT*" information; (2) valuation models to project stock prices and EBITDA; and (3) client information. In determining whether a trade secret exists, Illinois courts consider six factors as "instructive guidelines": "(1) the extent to which the information is known outside of the plaintiff's business; (2) the extent to which the information is known by employees and others involved in the plaintiff's business; (3) the extent of measures taken by the plaintiff to guard the secrecy of the information; (4) the value of the information to the plaintiff's business and to its competitors; (5) the amount of time, effort and money expended by the plaintiff in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 722 (7th Cir. 2003).

12

a. *PeerTracker* **Source Code**[7]

As to the first category of information, Aon's alleged *PT* information trade secrets are "source code, system architecture, functionality, know-how, including research, development, site builds and client customizations, processes (quality control, website, and database processes), methods, and proprietary tools." Pls' Prelim. Inj. Memo., Doc. 177 at 20-21. Because Aon's expert's ultimate conclusion in support of Aon's *PT* misappropriation claim focuses on the alleged similarity between *PT*'s source code and *MPA*'s source code, the Court considers only whether Aon has established that its source code qualifies as a trade secret.

Confidential source code information may qualify as a trade secret. *Inventus Power, Inc. v. Shenzhen Ace Battery Co., Ltd.*, 2020 WL 3960451, at *8 (N.D. Ill. July 13, 2020); *Geraci v. Macey*, 2016 WL 3671400, at *5-8 (N.D. Ill. July 11, 2016); *Computer Assocs. Intern. v. Quest Software, Inc.*, 333 F.Supp.2d 688, 695 (N.D. Ill. 2004) ("the entire EDBA source code may qualify for trade secret protection."). Here, Aon has offered evidence that its *PT* source code has over 2 million lines of code and was the product of years of research and development. Goings Dep., 54:6-96:18; Evans Dep., 44:20-47:4; DiDomenico Dep., 33:11-34:9, 36:2-8, Ex. 2. If a competitor acquired Aon's *PT* source code, it could avoid this significant cost and investment. The evidence also shows that Aon takes reasonable secrecy measures to protect its *PT* source code, including restricting access to the code to developers, password protecting its network and computers, requiring employees to sign confidentiality agreements, and requiring employees to take annual confidentiality training. Goings Dep., 134:18-135:16; Benincasa Dep., 80:8-12; Surdel Dep., 116:4-9; Evans Dep., 42:4-13, 59:4-12, 61:2-7; DiDomenico Dep., 39:24-40:2; Pls' Prelim.

---

[7] Even though Aon's claims against Evans and DiDomenico for misappropriation of *PT* source code have been dismissed for lack of personal jurisdiction, Aon's claims related to misappropriation of *PT* source code remain pending against Infinite, Burg, Coleman, and Stoudt.

Inj. Memo., Exh. M, Answer to Interr. No. 10; *see Geraci*, 2016 WL 3671400, at *5. Since *PT* was developed in 2007, only nine individuals have had access to the *PT* source code. Goings Dep., 132:13-18. The deposition testimony of Evans and DiDomenico, two of Aon's former programmers and now Infinite employees, confirms that they knew the *PT* source code was intended to remain secret. Evans Dep., 62:2-7; DiDomenico Dep., 39:19-22.

Defendants argue that Aon cannot show that its *PT* source code is a trade secret because much of it is in the public domain and Aon does not take secrecy measures to protect the entirety of its source code. In support, Defendants claim portions of the *PT* source code are publicly available on an Aon-sponsored YouTube channel, Aon's 30(b)(6) witness admitted that not all *PT* source code is proprietary, *PT* relies heavily on third-party code and merely performs calculations that are in the public domain, and client *PT* sites are not a secret.

The Court rejects at this preliminary stage Defendants' argument that Aon's source code for its *PT* program is not sufficiently secret to constitute a trade secret. *First*, Aon submitted expert evidence that "none of the source code in the YouTube video is contained in the *PeerTracker* source code produced in this case." Schnell Reply Decl., ¶ 8. *Second*, Aon's 30(b)(6) witness confirmed that Aon considers all of its *PT* source code to be proprietary. Goings Dep., 122:17-19; 123:1-2; 123:8-10; 157:2-10.

*Third*, even if *PT* source code relies in part on third-party code and performs calculations that are in the public domain, such as relative total shareholder return ("TSR"), "a compilation of data, even if the component parts are in the public domain, may be protectable as a trade secret if it would require substantial time, effort, and expense to recreate the compilation." *Abrasic 90 Inc. v. Weldcote Metals, Inc.*, 364 F.Supp.3d 888, 897 (N.D. Ill. 2019); *3M v. Pribyl*, 259 F.3d 587, 595-96 (7th Cir. 2001) ("[a] trade secret can exist in a combination of characteristics and

components, each of which, by itself, is in the public domain, but the unified process design and operation of which, in unique combination, affords a competitive advantage and is a protectable trade secret."); *Geraci v. Amidon*, 2013 WL 6836581, at *17 (Ill. App. Dec. 23, 2013). Moreover, the *PT* source code "is not solely a compilation of public information." *Signal Financial Holdings LLC v. Looking Glass Financial LLC*, 2018 WL 636769, at *4 (N.D. Ill. Jan. 31, 2018); Goings Dep., 62:22-63:6, 73:17-23, 77:19-78:24; Gough Report, ¶ 87. There is no evidence that the *PT* source code as a whole is known to others in the industry and developing the *PT* source code required "substantial time, effort, and expense." *Abrasic 90 Inc.*, 364 F.Supp. 3d at 898. Further, while Defendants argue that there are "multiple competing products, software, or programs offered in the marketplace that perform one or more of the same or similar functions as *PeerTracker* (including automated TSR calculations)," they did not provide any evidence identifying those other competing products or describe how long it took the competitors to create the purported competing products. *See* Defs' Resp., Doc. 270 at 30. With respect to competing products, Defendants cite only Goings' testimony that he had "heard the name" AwardTraq by Equity Methods as a potential *PT* competitor, but he had never visited the program's website. Goings Dep., 165:18-166:2, 166:14-169:9. Specifically, Goings testified that other than Infinite, he was not aware of any competitors that provide TSR tracking like *PT*. *Id*. at 164:16-165:3.

*Fourth*, while Aon's clients see the *PT* site, Defendants have not presented any evidence that Aon shares with its clients the *PT* information and code that makes the site function. The evidence demonstrates that Aon's clients never had access to *PT*'s source code. Accordingly, the Court concludes that the evidence submitted is sufficient to establish a substantial likelihood of success in Aon demonstrating that its *PT* source code constitutes a trade secret under the DTSA and ITSA.

The Court next turns to the most critical factor concerning the *PT* source code misappropriation issue, which is whether Aon has shown a likelihood of success on the merits that Defendants wrongfully acquired and used Aon's *PT* source code in Infinite's *MPA* program. Aon may establish misappropriation in "one of three ways—by improper acquisition, unauthorized disclosure, or unauthorized use." *Inmar, Inc. v. Vargas*, 2018 WL 6716701, at *4 (N.D. Ill. Dec. 21, 2018). "Courts often consider a defendant's suspicious downloading of company information before his departure and attempts to 'cover his tracks' in determining whether the defendant misappropriated trade secrets." *Lumenate Technologies, LP v. Integrated Data Storage, LLC*, 2013 WL 5974731, at *5 (N.D. Ill. Nov. 11, 2013).

Aon alleges that Infinite started with an exact copy of *PT*'s source code and then modified it to create the source code for *MPA*. The individual Defendants deny taking Aon's *PT* source code prior to their departure to work for Infinite and deny using the *PT* source code in developing their program for *MPA*. There is no evidence in the preliminary injunction record that Evans or DiDomenico (or any other Defendant) actually copied, improperly accessed, or printed *PT* source code prior to leaving Aon. Goings Dep., 208:1-211:15.[8]

Aon's lack of direct evidence that Evans or DiDomenico improperly acquired and used *PT*'s source code in the development of *MPA* is not fatal because "direct evidence of theft and use of trade secrets is often not available" and a "plaintiff can rely on circumstantial evidence to prove misappropriation by drawing inferences from perhaps ambiguous circumstantial evidence." *RKI, Inc. v. Grimes*, 177 F.Supp.2d 859, 876 (N.D. Ill. 2001). However, Aon's lack of direct evidence that the individual Defendants, Evans, or DiDomenico physically took the *PT* source code before

---

[8] The evidence shows that Aon wiped and repurposed Evans' laptop before it conducted a forensic analysis of his laptop. Kapinos Dep., 279:20-280:2. Furthermore, Aon's inspection of DiDomenico's device did not indicate any wrongdoing. *Id.* 281:2-283:17.

they left Aon presents a weaker likelihood of success in establishing misappropriation than other cases where courts in this district have granted injunctive relief. *See Inventus Power, Inc.*, 2020 WL 3960451, at *9 (plaintiff presented "persuasive forensic evidence" that "other Inventus employees who left the company for Defendant engaged in suspicious mass downloads as part of leaving to senior positions in Defendant's R&D technology group."); *QSRSoft, Inc. v. Restaurant Technology, Inc.*, 2006 WL 2990432, at *9 (N.D. Ill. Oct. 19, 2006) ("[t]he internet access logs establish that [defendant's] employees repeatedly accessed [plaintiff's] DotComm System through the password protected website, viewed and printed the Screen Shots, and downloaded and saved the DotComm data archive containing historical FAF data that establishes the Specific ISP Data."); *Computer Ass. Intern.*, 333 F.Supp.2d at 696 (forensic records "show[ed] that defendants repeatedly accessed the EDBA source code while developing their program."); *see also WeRide Corp. v. Kun Huang*, 379 F.Supp.3d 834, 848 (N.D. Cal. 2019).

Without direct evidence that the individual Defendants, Evans, or DiDomenico physically took *PT* source code when they left Aon and used stolen source code to develop *MPA*, the Court focuses on the circumstantial evidence. In this respect, the parties' positions mainly involve a "battle of the experts" on the issue of whether Defendants misappropriated *PT* source code.[9] Both sides retained experts for the purposes of comparing the source code in Defendants' *MPA* product with the *PT* source code. In support of its misappropriation claim, Aon offered the expert opinion

---

[9] Other circumstantial evidence Aon cites in support of its *PT* source code misappropriation claim is seriously disputed. For example, Aon claims that Evans commented that he could "print the code" of *PT* for use at a new company, but Evans denies ever saying he would print the code or that he did actually print the *PT* source code. Evans Decl., ¶ 5. And Goings testified, that as a result of Aon's forensic review, he was "aware of no instances of Mr. Evans physically printing the source code." Goings Dep., 211:10-15. Similarly, in text messages in October 2018, Evans and DiDomenico discussed sticking "with current compatibility" and not wanting to "rewrite everything" but those text messages did not refer to or mention the *PT* source code. Evans testified they were referring to compatibility with the Hello World app and the .NET skill set, and rewriting the Hello World app and the setup of the servers in Amazon Web Services. Pls' Prelim. Inj. Memo., Ex. R at 58876 & 58884; Evans Dep., 134:9-137:17.

17

of Ronald Schnell that *MPA*'s source code "contains sections that are significantly similar to versions of Aon source code" for *PT*, which "is consistent with Infinite starting with an exact copy of Aon's source code and modifying it over the months to follow to its state as of June 2019." Schnell Report, ¶¶ 20, 21. Aon's 30(b)(6) witness also opined that "*MyPerformanceAwards* was derived using the *PeerTracker* code." Goings Reply Decl., ¶ 17. Defendants' expert Chad Gough opined the opposite: there is "no evidence that any of the source code from *PeerTracker* was copied and used in whole or in part in *MyPerformanceAwards*; nor is there any evidence that Infinite Equity started with code from *PeerTracker* and then modified it." Gough Report, ¶ 92.

In his report, Schnell bases his opinion upon: (1) similarities between two-letter abbreviations for calculation variables utilized by the two programs (in the first instance, representing dividend reinvestment types, and in the second instance between Window Types and Period Types); (2) similarities between three database tables in both programs (TrancheDates.sql, AssetValues.sql, and ReinvestDividends.sql); (3) identical source code from both programs related to "split multipliers"; (4) identical portion of source code in the database connection (or "wrapper") of the programs; (5) "significantly similar" architecture of the programs where they have "overlapping functionality"; and (6) the short timeline for the development of *MPA*. Schnell Report, ¶¶ 48-49, 57-79. In his Motion Declaration, Schnell identified an additional example of "identical syntax" in source code from *PT*'s UpdateMasterTradingCalendar.sql file and *MPA*'s UpdateExchangeCalendars.sql file. Schnell Motion Decl., ¶¶ 6-13, 15.

Taken as a whole, this circumstantial evidence fails to make a strong showing that Aon will succeed on its claim that Defendants impermissibly acquired and used *PT*'s source code in the development of Infinite's *MPA*. In evaluating Aon's likelihood of success on the merits, the

Court examines each of Aon's specific proffered examples comparing Aon's *PT* with Infinite's *MPA* to demonstrate copying in turn below.

*First*, Aon advances the two letter abbreviations (which Schnell calls mnemonics), and claims that they are purportedly similar in *PT* and *MPA*, but they are not source code. Gough Report, ¶ 63. There is also no evidence that the actual code underlying the mnemonics is the same or was copied. *Id*., ¶¶ 65-67, 69-71. Moreover, Defendants presented evidence that the nearly identical mnemonics are generic ways of representing the underlying information, such as for dividend reinvestment types. Gough explained that the two-letter abbreviations are logical abbreviations that "any developer in the industry would use the same or similar letters" to abbreviate the longer formula. *Id*., ¶¶ 63, 69. In its response brief, Defendants give the example of an author abbreviating the word "Chapter" as "Ch." and then the same author writing another book and using that same abbreviation. Defs' Resp., Doc. 270 at 24. Aon's own 30(b)(6) witness admitted that the mnemonics are "a label," not a "command." Goings Dep., 224:3-14. And Schnell testified that the mnemonics have no functional value. Schnell Dep., 118:8-23. In other words, if the mnemonics were changed throughout the code, it would not change the program's calculation result. *Id*. Based on this evidence, the similarities between the non-functional, two-letter mnemonics in the two source codes likely resulted from the same coder (Evans) simply using his previous experience in the industry to abbreviate terms in the same way without copying. *Computer Associates Inter.*, 333 F.Supp.2d at 699 ("the same programmer is likely to write programs in similar ways using his/her previous experience as a guide."). Thus, this evidence fails to support Aon's burden of showing a likelihood of success on its claim that *PT* source code was copied and used in *MPA*.

19

*Second*, the database tables cited by Schnell, which he claims are similar, are also not source code. Gough Report, ¶¶ 74-75; Evans Resp. Decl., ¶ 4. Rather, they merely store data and do not perform any calculation function. Goings Dep., 233:24-234:13, 236:25-237:11, 238:15-25. Moreover, the evidence shows that the database tables in the two programs were auto-scripted based on variables inputted by each programmer. *Id.*, 232:6-233:15, 235:6-236:22, 237:24-238:13; Evans Resp. Decl., ¶ 4. Gough stated that the database table files in the two programs share certain phrases like "start date," "end date," and "weight" "because those are the variables necessary to run the calculation." Gough Report, ¶ 74. Defendants also presented evidence that the variables necessary to run the calculations are not unique and the phrases pertain to calculations that are standard in the industry. *Id.*, ¶¶ 74-75. Like the mnemonics evidence, this example is weak evidence of copying of the *PT* source code and insufficient to satisfy Aon's burden to show that it has some likelihood of success on the merits of its misappropriation claim.

*Third*, as to the common line of code related to "split multipliers," this appears to be Aon's best example of identical code. However, Defendants assert that this code carries out a simple math equation from the public domain. Defendants submitted expert evidence that the split-multiplier information "does not reveal unique coding or copied information." Gough Report, ¶ 79. And Schnell does not "opine that the 'split-multiplier' contains proprietary coding." *Id.*, ¶ 78. Gough opined that the "split multiplier" clause shows a "standard conditional statement that would have been similarly developed by any software developer with reasonable skill." *Id.*, ¶ 79; Evans Sur-Reply Decl., ¶ 5. Aon responds to this evidence by asserting that Gough is unqualified to give this opinion because he is not an expert in equity awards, but Aon points to no evidence to contradict Gough's opinion that the "split multiplier" code in question does not reveal unique coding and shows a standard conditional statement that would likely be similarly drafted by any

reasonably skilled software developer and therefore, does not reveal copied information. Aon's split multiplier example thus fails to carry its burden to show a strong likelihood of success on the merits of its copying of *PT* source code claim.

*Fourth*, Aon contends that the code that allows both programs to communicate with the databases "contains large portions of code that are identical." Schnell Report, ¶ 72. According to Defendants' expert, the database connection or "wrappers" in the two programs (*PT*'s DatabaseConnection.cs and *MPA*'s DBService.cs) "connect to a back-end database and run queries for information." Gough Report, ¶ 82. Gough opined, however, that no evidence of copying exists in the source code in the wrapper files of the two programs. *Id*., ¶ 83. The Court finds Aon's claim of large portions of identical code in the wrappers to be overstated. *MPA*'s DBService.cs contains 323 lines of code, and *PT*'s DatabaseConnection.cs contains 383 total lines of code. *Id*. There are only 85 identical lines of code between the two programs' wrappers. *Id*. Gough stated that many of those lines are "insignificant, such as white space, headers, and single characters," which Aon did not rebut. *Id*; Pls' Reply, Doc. 295 at 13. When asked to explain the common source code and developer comments, Evans, the software developer who worked on both *PT* and *MPA*, said the wrappers could have "come from a publicly-available source" or because he would have written both wrappers, he has a "coding style that would mean two functions that do the same thing would look very similar, if not exactly the same." Evans Dep., 297:8-24. Similarly, Gough stated that "wrappers are freely available on the internet, and it would not be uncommon for similarities to exist and, in some cases, [wrapper] code to be identical, especially if both were coded by the same programmer." Gough Report, ¶ 82; *see also* Evans Sur-Reply Decl. ¶ 5. In light of this credible evidence from Evans and Gough, Aon's proffered evidence does not amount to a strong showing that copying exists in the identical lines of code in the two programs' wrappers.

*Fifth*, Schnell's opinion that the "architecture of the two systems are significantly similar" where the programs have "overlapping functionality," does not evidence actual copying of *functional code*. Schnell Report, ¶ 79. Although Schnell testified that architectural similarity can be "consistent with copying and modification over time," he also confirmed that two programs can be "architecturally similar without being a direct copy." Schnell Dep., 175:17-21. On the current record, the Court does not find a likelihood of copying of *PT* source code based on this evidence, as Defendants have submitted expert evidence to rebut Schnell's opinion that the architecture of the two systems are significantly similar.[10] Gough Report, ¶¶ 84-88; Gough Sur-Reply Decl., ¶¶ 5-6.

*Sixth*, as to *MPA*'s development time, Aon offers Schnell's opinion "that the time between April 29, 2019 and the beginning of June 2019 is insufficient for two programmers to have written all of the initially committed code to the MyPerformanceAwards repositories from scratch." Schnell Decl., ¶ 49.[11] Yet that opinion is undermined by Schnell's own opinion that applying his metric to Version 4 of *PT*, it would take six coders about three and a half years to develop the current *PT* program. Schnell Reply Decl., ¶ 10. In fact, it took Aon only one year to develop the

---

[10]     The Court recognizes that in the context of ruling on the motions to dismiss and in the background section of his opinion, the district judge stated that the "*MyPerformanceAwards* code is structured similarly to the code of *PeerTracker*." *Aon PLC, et al.*, 2021 WL 4034068, at *3. The district judge's statement regarding the codes does not affect this Court's analysis of Aon's likelihood of success on the merits of its *PT* source code misappropriation claim. Because the district judge ruled on motions to dismiss under Rule 12(b)(2), which focused on whether all Defendants but Adamson and Coleman engaged in suit-related conduct in Illinois, under Rule 12(b)(3), which considered whether venue is proper is this District as to Burg, Stoudt, and Infinite, and under Rule 12(b)(6), which assumes the truth of the allegations in FAC, it was not presented with and did not address the evidentiary record relating to the merits of the misappropriation of *PT* source code claim. Specifically, the district judge did not have occasion to evaluate Aon's examples of alleged copying and the conflicting expert opinions submitted in connection with the preliminary injunction motion.

[11]     Evans left Aon on April 5, 2019. FAC, ¶ 142. He testified that he and DiDomenico wrote the source code for *MPA*. Evans Dep., 233:2-11. Evans stated that he began working on *MPA* on April 7, 2019. Evans Dep., 232:20-23. DiDomenico left Aon on April 19, 2019. FAC, ¶ 144. On April 29, 2019, DiDomenico was granted user rights to *MPA* by Evans. *Id.*

fourth version of *PT*. Goings Dep., 90:2-4. Additionally, Gough stated that about 95% of the code for *MPA* is from third-party, open-source materials. Gough Report, ¶ 49. After that material is removed, only 77,000 lines of code remain and much of that code was not hand-written due to scaffolding and use of a template. *Id.*, ¶¶ 50-51; *see also* Evans Resp. Decl., ¶ 12. As a result, *MPA* contains "very little hand-written code or otherwise customized code that could have been copied from Aon." Gough Report, ¶ 52. According to Gough, two programmers "could have easily written the remaining lines of code during the relevant time period (since they left Aon)." *Id.*, ¶¶ 53, 91. For now, Defendants' contrary development timeline evidence sufficiently undermines Aon's ability to establish a strong showing of its likelihood of success on the merits of its *PT* source code misappropriation claim.

*Lastly*, Schnell's Motion Declaration identified an example of identical source code and two developer comments between *PT*'s file called UpdateMasterTradingCalendar.sql and *MPA's* file called UpdateExchangeCalendars.sql that he had not mentioned in his report or at his deposition. Schnell Motion Decl., ¶¶ 6-15. But Defendants presented expert evidence that the code and comments in the trading calendar update files "are generic, partially autogenerated by a program called SQL Server Management Studio, and consistent with being coded by the same developer." Gough Resp. Decl. ¶ 14. Evans also explained that this code consists mainly of "select statements," which is a basic set of commands to collect data from a database. Evans Decl., ¶ 6. According to Evans, these types of generic commands are universally known and used by developers at nearly any company. *Id.*, ¶ 7. In other words, the "select statements" would look the same from program to program without copying. Based on Defendants' evidence, Aon's trading calendar update files evidence does not support a finding that Aon has made a strong showing of a likelihood of success on the merits of its *PT* misappropriation claim.

In sum, both parties rely on expert opinion to support their positions on the question of whether *PT* source code was used in the creation of *MPA*.  Neither party challenges the opposing expert's qualifications or the reliability of their reasoning and methodologies under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  Ultimately then, the misappropriation of *PT* source code issue comes down to a classic clash of the experts.  Based on the current record and at this preliminary stage, the Court does not find Schnell's opinion that Infinite started with an exact copy of Aon's source code and modified it to create *MPA*, and the examples he has provided, sufficiently convincing or well-supported to rise to the level of a strong showing.

Furthermore, taking a step back and looking at the overall picture, Schnell's comparison of the *PT* and *MPA* source codes found very little source code in common.  Out of 2.5 million lines of *PT* source code, Schnell's Report and deposition offered only one example of identical source code related to the calculation engines (the split-multiplier clause)—the core functionality of the two programs.[12]  That single clause, combined with the other two short sections of code that are allegedly copied (the "wrapper" and the trading calendar update), is hardly strong proof of Infinite "starting with an exact copy of Aon's source code and modifying it over the months to follow to its state of June 2019," particularly where there is no direct evidence that any of the Defendants, Evans, or DiDomenico improperly accessed, copied, or took any *PT* source code when they departed Aon. Schnell Report, ¶ 21.  As another example, Schnell performed a side-by-side comparison of a segment of code, attached as Exhibit L, to his report.  In the Court's view, that side-by-side comparison, instead of demonstrating identical code, shows significant differences between the two versions of code. Schnell Report, Ex. L.

---

[12]     The Court notes that Schnell made sweeping comments about the similarities in the codes, but when asked to provide examples, he provided only a few that were not particularly compelling, as discussed above.

Moreover, the mere presence of certain lines of common source code does not necessarily mean that *MPA* was not independently created, and Defendants presented expert evidence explaining how the same programmer (Evans) and the use of techniques and sequences common in the field and publicly-available information could yield the few overlapping portions of source code and other similarities in the source code (including developer comments) identified by Schnell. Gough Report, ¶¶ 63, 69, 78-79, 82; Gough Decl., ¶ 14; Evans' Sur-Reply Decl., ¶¶ 5-8. Schnell testified that identical comments and formatting in source code is "usually very illustrative of copying." Schnell Dep., 191:9-13. Tellingly, Schnell testified that he found "a lot of comments that were the same and formatting that was the same" but that he believed "that all of it was in third-party code that was shared between the two." Schnell Dep., 191:7-25. Thus, Schnell's failure to sufficiently distinguish between third-party source code and proprietary source code in his conclusion about copying significantly weakens his overall opinion.

So in the end and at most, Aon has established only that it is possible that Defendants misappropriated its *PT* source code, not that it is likely. Schnell's conclusions are vehemently disputed by an opposing expert (Gough), who has provided credible explanations. The Court recognizes that the timing here is suspicious—a group of Aon employees leave the company, and within about two months set up a competitor business and offer a program that essentially provides some of the same capabilities as they previously provided at Aon. However, there is no direct evidence of copying, and the circumstantial evidence rests almost entirely on expert opinions. As set forth above, Aon's expert evidence has been sufficiently rebutted by Defendants' own expert. Thus, the Court is left with the conclusion that a strong showing has not been made.

A full review of the evidence following discovery may result in a different conclusion. But at this stage, the Court is left with dueling experts, no forensic evidence showing direct

misappropriation of the code, no credible fact witness testimony that demonstrated Evans and DiDomenico were intent on and did steal the code prior to their departure from Aon, and no communications from the document production that allow a firm inference that Evans and DiDomenico were planning a theft. As a result, the Court cannot conclude at this juncture that Aon has satisfied its burden. Accordingly, Aon has not demonstrated that there is a substantial likelihood that it will prevail in demonstrating that Defendants improperly used *PT* source code in the development of *MPA*.

      **b.**      **Valuation Models**

Aon argues that its valuation models containing "compilations, designs, methods, techniques, and processes to project stock prices and EBITDA" constitute trade secrets. Pls' Prelim. Inj. Memo., Doc. 177 at 26. Aon's misappropriation of valuation models claim stems from its assertion that Coleman improperly acquired those trade secrets when he emailed Aon models to his personal email address while he was planning Infinite and printed a model on the last day of his employment at Aon that he had no business reason to print.

With respect to the trade secret factors, Aon argues that the secrecy of its models to project stock prices and EBITDA provides economic value because if the models were provided to clients, they would have no need for Aon's services. Aon presented evidence that its valuation models allow Aon to quickly and efficiently produce a stock valuation and run EBITDA simulations, which gives Aon a competitive advantage. FAC, ¶¶ 152, 155; Pls' Prelim. Inj. Memo., Ex. M, Answer to Interr. Nos. 8, 9, 12, 13; Surdel Dep. 192:18-22 ("Q: And what trade secrets are embedded in your valuation models? A: It's the ability to take the theory to operationalize it, to run the models faster, more efficient, more profitable."); Coleman Dep., 251:9-15 ("Q: Do you have an understanding as to why Aon did not share the models that it created with its clients? A: I

believe it was a business reason. Q: What was the business reason? A: You know, to prevent foregone revenue."). Aon submitted evidence showing that its creation of the valuation models to project stock prices and EBITDA required substantial time, effort, and expense. Pls' Prelim. Inj. Memo., Ex. M, Answer to Interr. Nos. 5. Aon has also offered evidence that it takes reasonable efforts to keep its valuation models secret by requiring employees to sign confidentiality agreements, password protecting its networks and devices, training employees on confidentiality, promulgating multiple policies to protect confidential information, and prohibiting the distribution of models to third-parties. FAC, ¶¶ 112, 114-119, Exs. F-1-F-5; Pls' Prelim. Inj. Memo., Ex. M, Answer to Interr. No. 10; Stoudt Dep., 108:22-24. Only the consultants in Aon's Equity Services Group or 0.0001% of Aon's workforce have access to Aon's valuation models. Pls' Prelim. Inj. Memo., Ex. M, Answer to Interr. Nos. 8, 10, 12.

The above evidence demonstrates a strong showing that the valuation models are trade secrets, and Defendant's arguments to the contrary are unconvincing. Defendants first argue that Aon cannot show that its valuation models constitute trade secrets because the models use equations or methods in the public domain and the formula used to project EBITDA is based on statistical concepts and methodologies that are in the public domain. Coleman Decl., ¶¶ 11-15. In asserting that its valuation models amount to a trade secret, Aon correctly responds that it is not the public accounting equations used in the valuation models that are a trade secret. Rather, it is the macros and coded formula used in the models to quickly and efficiently generate simulations that Aon claims trade secret protection over. Kapinos Dep., 303:16-23; Surdel Dep., 192:18-23, 194:17-196:3; Pls' Prelim. Inj. Memo., Ex. M, Answer to Interr. Nos. 8, 9, 12, 13. For example, Aon notes that one stock price projection may require hundreds of thousands or even millions of simulations in order to generate a distribution of outcomes that are then averaged for fair value.

27

Pls' Prelim. Inj. Memo., Ex. M, Answer to Interr. Nos. 12, 13. Aon submitted evidence that its formula allows it to run these hundreds of thousands to millions of simulations in a matter of minutes. *Id*.

Defendants also argue that Aon does not maintain the secrecy of such models, because it has disclosed its models in whole or in part through providing sample simulations to project stock prices to clients. However, Aon produced evidence, and Coleman's and Stoudt's testimony confirm, that Aon generally shares the simulations or the outputs from the valuation models with clients but not the proprietary macros and formula themselves with clients. Kapinos, Reply Decl., ¶ 8; Coleman Dep., 248:13-16; Stoudt Dep., 108:22-110:20. Based on this evidence, Aon has a reasonable likelihood of showing that Aon's valuation models used to project stock prices and EBITDA qualify as trade secrets.

Turning next to Defendants' argument regarding the allegations of misappropriation of Aon's valuation models, Defendants contend that there is no evidence that Coleman improperly acquired, misappropriated, or used any of the valuation models. The Court disagrees. The evidence demonstrates a reasonable likelihood that Coleman improperly acquired Aon's valuation models. Coleman gave notice of his intent to resign from Aon on April 24, 2019 and his last day with Aon was June 10, 2019. FAC, ¶ 149. The evidence establishes that on seven occasions in April and May 2019, Coleman forwarded emails from his Aon email address to his personal email address, attaching valuation models that Aon used to project stock prices for clients. FAC, ¶¶ 8, 151; Coleman Dep., 260:13-261:21, Exs. 24, 25; Kapinos Dep., 290:8-20; Kapinos Decl., ¶¶ 43, 48-53, Exs. 14, 19-24. Coleman testified that one of those clients is now an Infinite client and Infinite performs EBITDA projections for this client. Coleman, Dep., 260:13-261:21; Kapinos Decl., Ex. 20. Additionally, the evidence establishes that Coleman was not authorized to email

28

Aon's valuation models to his personal email address and it was a violation of Aon policy to do so. FAC, ¶¶ 114-118, 153, Exs. F-1-F4. Furthermore, the evidence shows that Coleman printed a model related to a client's EBITDA projections on his last day of employment which he admits he "had no business purpose at all in printing." Coleman Dep., 259:12-16, 256:24-257:9 (Coleman testifying that he printed the EBITDA projection because he thought it was a "clever solution."); Kapinos Decl., Ex. 16; Three days earlier, Burg solicited the same client on behalf of Infinite, stating that Coleman would soon be a part of the client's engagement team. Pls' Prelim. Inj. Memo., Ex. NN. Coleman testified that Infinite now performs the same services for this client. Coleman Dep., 252:14-21, 253:9-19.

Under these circumstances, Aon has shown a reasonable likelihood of success in demonstrating that Coleman acquired Aon valuation models by improper means. *Moss Holding Co.*, 2020 WL 1081730, at *7 (evidence of misappropriation where defendants used "their personal Gmail accounts, while still employed at [plaintiff], to send emails containing non-public client and project information."); *Aon Risk Servs. Cos., Inc.*, 415 F.Supp.3d at 848 (finding circumstantial evidence of misappropriation where the individual defendants had no valid business reason to download sensitive documents to USB drives); *Signal Financial Holdings LLC*, 2018 WL 636769, at *4 (employer likely to succeed on its misappropriation claim where former employee improperly emailed herself confidential slide deck); *Allied Waste Services of North America, LLC v. Tibble*, 177 F.Supp.3d 1103, 1112 (N.D. Ill. 2016) (denying motion to dismiss claim for misappropriation because the former employee emailed plaintiff's confidential information to his personal email account shortly before his employment ended). Furthermore, the above evidence also establishes that Aon has a likelihood of success with respect to showing that Coleman used or will use the misappropriated valuation models at Infinite. As described above, the misappropriated models, in

at least two cases, concern clients that are now at Infinite and Coleman does not state in his declaration that he did not use the models in his personal email after starting with Infinite, which thus warrants injunctive action to avoid future harm.[13]

Defendants maintain that Coleman did not acquire documents containing trade secrets by improper means when he emailed documents containing the valuation models to his personal e-mail account. According to Defendants, Coleman's actions did not violate Aon policy because he regularly emailed himself valuation models to run from his home computer while he worked at Aon, other employees engaged in the same practice, and no disciplinary action was ever taken against Coleman or anyone else in the Equity Service Group on this basis. Defendants' argument is contradicted by the plain language of Aon's policies, which, among other things, clearly instruct employees to "never send Aon client data or intellectual property to a personal email account" and strictly prohibits the "use of personal or other third party email accounts to conduct Aon business." FAC, ¶¶ 116-17, Exs. F-1-F-2. The fact that Coleman or other employees may have failed to comply with Aon's email policy in the past without discipline does not mean that Coleman did not violate Aon policy by emailing valuation models to his personal e-mail account in April and May of 2019. Moreover, even if Aon could have done more to ensure that Coleman did not email valuation models to his personal email account, Coleman still had a responsibility to comply with

---

[13]      In his declaration, Coleman states that he never retained any Aon valuation models that he *printed* while he worked at Aon and only used them to perform his duties with Aon. Coleman Decl., ¶ 17. If Coleman did not use the Aon valuation models in his personal email, the Court would expect that this would be stated in his declaration. Moreover, it is undisputed that Coleman did retain Aon valuation models in his personal email for months after he started with Infinite. On February 4, 2020, Defendants' counsel emailed Aon's counsel attaching "three emails related to Aon which Dan Coleman located in his personal Yahoo email account" attaching valuation models. Witz Decl., ¶ 4. On May 8, 2020, Defendants' counsel emailed Aon's counsel again attaching three additional emails, which emails attached "spreadsheets." *Id.*, ¶ 5. One email and attachment contain the words "Monte Carlo Simulation" in the subject line of the email and title of the spreadsheet attachment. *Id*. In another email, the three attached spreadsheets all include the words "Valuation" in the title. *Id*.

Aon's email policies. *See Vendavo, Inc. v. Long*, 397 F.Supp.3d 1115, 1137 (N.D. Ill. 2019) (rejecting defendants' argument that plaintiff had not sufficiently protected its information by failing to "actively monitor or put in place safeguards that would prevent individuals from downloading information from Plaintiff's Salesforce database and immediately emailing or otherwise sharing the information outside the company" because the plaintiff required employees to sign confidentiality agreements in which they agreed not to disclose proprietary information and "[a] company need not monitor its employees like a police state to garner trade secret protection for its confidential information. Rather it must take 'reasonable protective measures for its claimed trade secret under the circumstances.'").

In support of its argument that Coleman did not violate Aon's email policy, Defendants cite only *Call One, Inc. v. Anzine*, 2018 WL 2735089, at *9 (N.D. Ill. June 7, 2018), where the court granted summary judgment in favor of the defendant employee because it was not persuaded that "a reasonable jury could find that [the defendant] acquired the Customer Report by improper means simply by sending it to her personal e-mail account." But *Call One, Inc.* is distinguishable because there the plaintiff employer had a policy that all confidential information and trade secrets must be labeled as such and the Customer Report the employee emailed was not marked confidential. *Id*. As a result, the Court was not persuaded that the employee could reasonably be considered to have owed any duty to protect the confidentiality of the Consumer Report and thus, no reasonable jury could find she acquired the report through improper means by breaching a duty to maintain secrecy. *Id*. at *9. Here, there is no similar requirement in Aon's policies that confidential information and trade secrets must be affirmatively marked confidential. And Aon has successfully demonstrated that it is likely to succeed in showing that Coleman had a duty to maintain the secrecy of Aon's valuation models and that he violated Aon's policies by emailing

31

the valuation models to his personal e-mail account. *Aon Risk Servs. Cos., Inc.*, 415 F.Supp.3d at 848 (finding plaintiff made a sufficient showing of misappropriation where, among other things, an individual defendant improperly downloaded his outlook contacts that contained confidential client contacts prior to leaving for defendant).

Defendants further argue that the client information contained in the valuation models is only relevant to that particular client project and goes stale as soon as the project is completed. "Information that is too old to hold any value loses any protection it would otherwise be entitled to as a trade secret," *PrimeSource Bldg. Prod., Inc. v. Huttig Bldg. Prod., Inc.*, 2017 WL 7795125, at * 14 (N.D. Ill. Dec. 9, 2017), but Defendants do not demonstrate that the macros and coded formulas used in Aon's valuation models become stale or lose any value as soon as a particular valuation is completed. Kapinos Reply Dec., ¶ 9; *Walgreens Co. v. Peters*, 2021 WL 3187726, at *5 (N.D. Ill. July 28, 2021) ("Defendant has not demonstrated how the data [he took from plaintiff] is stale."). Thus, Aon has made a strong showing that it has a likelihood of success on its claim that these macros and coded formulas are trade secrets that were misappropriated.

### c.    Client Information

The third category of information Aon argues Defendants misappropriated is its client information, including the identities of Aon clients who utilize equity services, the relevant contacts at Aon clients who utilize equity services, the types of services those Aon clients require and their preferences as to how such services are delivered and billed, the pricing Aon charges to its clients for equity services and *PT*, and revenues received from clients. Pls' Prelim. Inj. Memo., Doc. 177 at 26. Aon describes the client-specific information regarding the types of services its clients require and their preferences as "whether the clients use an equity compensation tracking tool such as *PeerTracker*, whether those clients had a need for valuation of awards stock based compensation that vested upon the attainment of a target stock price, whether those clients had a

need for valuation of relative TSR performance shares, whether those clients had a need for valuation of long-term incentive awards that included a market condition, or whether those clients needed a valuation of stock based compensation." Pls' Prelim. Inj. Memo., Ex. M, Answer to Interr. No. 4.

Confidential client information can constitute a trade secret. *Aon Risk Servs. Cos., Inc.*, 415 F.Supp.3d at 848 (recognizing that "client information [and] client lists" may constitute trade secrets); *PepsiCo, Inc. v. Redmond*, 1996 WL 3965, at *26 (N.D. Ill. Jan. 2, 1996) ("Illinois courts routinely hold confidential customer information, confidential pricing procedures . . . used in the course of confidential employer-employee relationships as protectible."). At this preliminary stage, the record contains sufficient evidence that the identities of Aon's highest revenue generating clients, client-contact information, and client-specific information regarding needs and preferences are confidential and derive value from their secrecy. *Vendavo, Inc.*, 397 F.Supp.3d at 1131-32, 1134 (finding trade secret protection for client contact information and customer-specific information, including "pain points" and "specific solutions developed" for clients); *Mickey's Linen v. Fischer*, 2017 WL 3970593, at *9 (N.D. Ill. Sept. 8, 2017) (recognizing identities of plaintiff's "top 150 customers, its highest producing customers" protectable as a trade secret); *APC Filtration, Inc. v. Becker* 646 F.Supp.2d 1000, 1010 (N.D. Ill. 2009) (noting the "obvious and well recognized" value of customer and potential customer contact information as well as customer-specific information regarding product preferences).

Aon argues that there is economic value in keeping the identities of its highest revenue producing clients, client contacts, and client-specific information regarding needs and preferences secret because a competitor with access to that information could target Aon's largest equity clients just as Infinite has done here. The record evidence establishes that Aon invests significant time,

33

effort, and financial resources in developing and maintaining client relationships. *See* Pls' Prelim. Inj. Memo., Doc. 177 at 10. Aon has also presented credible evidence that it takes reasonable efforts to keep its non-public client information confidential by requiring employees to sign confidentiality agreements, password protecting its networks and devices, training employees on confidentiality, promulgating multiple policies to protect confidential information, and prohibiting the distribution of non-public client information to third-parties. FAC, ¶¶ 114-119, Exs. F-1-F-5 (Aon's "Code of Business Conduct" provides that confidential information includes non-public information that relates to clients); Pls' Prelim. Inj. Memo., Ex. M, Answer to Interr. No. 10. Additionally, Aon equity services client information is stored on a shared drive available only to members of the Equity Services Group. Kapinos Dep., 73:18-21; 138:15-19; Kapinos Decl., ¶¶ 4-7; Pls' Prelim. Inj. Memo., Ex. M, Answer to Interr. Nos. 1, 4. Based on these facts, Aon appears likely to succeed in proving that the identities of its highest revenue producing clients, client contacts, and client needs and preferences warrant protection as trade secrets.

Defendants raise two arguments in support of their contention that Aon has not sufficiently protected its confidential client information to warrant trade secret protection. With regard to the secrecy of client identities, Defendants cite a public video in which Aon identifies some of its equity service clients. Defs' Resp., Doc. 270 at 31, n. 25. While Aon disclosed a partial customer list in a public video on the internet, it did not disclose a list of its highest revenue producing clients or the contacts it had with those disclosed clients. The identities of the highest revenue producing clients may merit trade secret protection where that information is maintained in confidence even if some client identities are publicly known. *See Mickey's Linen*, 2017 WL 3970593, at *9 ("while some customer identities may be publicly ascertainable (if one knows what to look for), [plaintiff's] customer lists identifying its top 150 customers, its highest revenue producing

customers . . . go beyond mere public customer identities.").  Regarding Aon's claim of trade secret protection for its client preferences, Defendants point to the fact that equity services projects completed for clients are publicly available in SEC filings.  But Defendants do not support their argument with evidence showing that SEC filings contain information regarding the identities of Aon's highest revenue generating clients, the personal contacts Aon has with each client, and insider knowledge about client needs and preferences, which is some of the specific information for which Aon seeks trade protection.

The Court finds, however, that Aon is unlikely to succeed in showing that its client pricing information is sufficiently secret to warrant protection as a trade secret. "Pricing information can qualify as a trade secret where there is evidence that the trade secret holder takes steps to keep that information secret, it is not generally ascertainable from public information, and there is value derived from keeping the information secret." *Life Spine, Inc. v. Aegis Spine, Inc.*, 2021 WL 963811, at *20 (N.D. Ill. March 15, 2021) *aff'd*, 8 F.4th 531 (7th Cir. 2021).  Defendants point out that Aon shares pricing information with its clients without any confidentiality restrictions. "Pricing information shared freely with customers without confidentiality requirements is insufficiently secret to garner protection." *Arjo, Inc. v. Handicare USA, Inc.*, 2018 WL 5298527, at *4 (N.D. Ill. Oct. 25, 2018); *UTStarcom, Inc. v. Starent Networks, Corp.*, 675 F.Supp.2d 854, 866 (N.D. Ill. 2009).  In *Arjo*, the district court held that pricing information did not qualify for trade secret protection where the plaintiff "produced no evidence that its customers were prevented from freely sharing price information with anyone they please" and the defendants "offered evidence that confidentiality agreements were not required of customers." *Id*.  That is the case here, as Aon has come forward with no evidence that its clients are prevented from sharing pricing information and none of the engagement letters Aon produced contain any confidentiality

restrictions regarding Aon's pricing information. Kapinos Decl., Exs. 3, 4, 8; *Cf. Life Spine*, 2021 WL 963811, at * 20 (finding plaintiff had some likelihood of success in showing that its standard distributor price was a trade secret where plaintiff submitted evidence that it only provides access to its price information to entities with confidentiality agreements). Moreover, Defendants point out that the equity-compensation industry is highly commoditized and pricing is fairly standard across the market. Burg. Dec., ¶ 24; *PrimeSource Bldg. Prod., Inc.*, 2017 WL 7795125, at * 16 ("Where customers are at liberty to disclose pricing structures and those structures are not unique, without evidence that those details were closely guarded by the plaintiff the customer information does not amount to a trade secret.").

The Court next turns to whether Aon is likely to succeed in showing that Defendants misappropriated Aon's client information that the Court has concluded is generally protectable as a trade secret (the identities of Aon's top revenue generating clients, client contact information, and client-specific needs and preferences). "[B]oth the ITSA and DTSA provide that 'threatened' (as well as 'actual') misappropriation may be enjoined." *Mickey's Linen*, 2017 WL 3970593, at *12. Aon asserts that (1) Defendants improperly used Aon insider information about clients to solicit Aon clients and (2) will inevitably use or disclose Aon's confidential client information in their positions with Infinite. In response, Defendants claim that Aon has produced no evidence that any individual Defendant actually used or disclosed any of this client information on behalf of Infinite. Contrary to Defendants' assertion, at this preliminary stage, Aon has made a sufficient showing of a likelihood of succeeding on both its claims for actual and threatened misappropriation/inevitable disclosure of its trade secrets.

*First*, the general rule is that "a former employee may not use the specific, confidential information she gained from a former employer to win clients from her former employer."

*Vendavo*, 397 F.Supp.3d at 1139-40. "An employee has a right to use the skills and generalized industry she gained from her former employer when taking a new job at a competitor, but she may not simply take and use that employer's confidential information in her new position." *Id*. at 1140. Aon has presented evidence of actual unauthorized use of Aon confidential client information. Specifically, Aon cites the following facts indicating that Defendants improperly relied on confidential client information which they learned at Aon: (1) two apparently unsolicited emails Coleman sent to Aon clients to recruit business for Infinite in which he generally references prior Aon projects to client contacts as a means of reminding them who he is and provides information about Infinite; and (2) a November 13, 2019 draft email to Etrade with edits from Burg referencing the replication of a particular process a specific client used at Aon. Pls' Prelim. Inj. Memo., Doc. 177 at 31, n. 7, Exs. BBB, CCC; Evans Dep., Ex. 29; Pls' Reply, Doc. 295 at 14. With respect to the first category of evidence, Defendants assert that Coleman's emails make no reference to any details about the Aon projects and discloses nothing confidential. Pls' Prelim. Inj. Memo., Exs. BBB, CCC. But Defendants do not dispute that Coleman knew who to contact to solicit clients for Infinite based on his work for Aon.[14]

The evidence also shows Burg, Coleman, and Stoudt emailed or reached out to numerous other contacts at Aon clients on behalf of Infinite in the first several weeks and months of operation. Pls' Prelim. Inj. Memo., Exs. PP-CCC, XXX. Nearly all these solicitations were directed to clients with whom they worked while at Aon. *Id*., Exs. PP-SS, UU, VV, XX-CCC, XXX; Coleman Dep., 66:2-9, 150:1-3, 177:21-181:4, 186:3-16, Burg Dep., 204:19-206:6, 210:15-211:12; Kapinos Decl., ¶¶ 9-14, 16, 18, 19; FAC, ¶¶ 192-94. The record shows that as of May 8,

---

[14]    In March 2021, Aon lost one of these clients that Coleman directly solicited by email. Pls' Resp. to Defs' Post-Re-Deposition Brief, Doc.286 at 1.

2020, Defendants had contacted over 91 Aon clients. Pls' Prelim. Inj. Memo., Ex. YYY, Answer to Interr. No. 5. There is no evidence that Burg, Coleman, and Stoudt obtained the clients' contact information from their own, independent development of a contact list or from any source other than through their association with Aon. Therefore, it is reasonable to infer that Burg, Coleman, and Stoudt knew who to contact at these clients to solicit equity services business from working at Aon. Based on the totality of the evidence, the Court concludes that Burg, Coleman, and Stoudt could not have immediately initiated contact with Aon's clients without misappropriating confidential client contact information.

Moreover, Defendants do not appear to dispute that they used confidential information regarding the specific needs and preferences of a particular Aon client in an email to Etrade for a November 2019 meeting which explicitly referenced the "same process that was established with Aon originally." Evans Dep., Ex. 29. This evidence supports a finding that Defendants likely used proprietary Aon information regarding a particular client's needs and preferences. Defs' Sur-Reply, Doc. 272 at 9-10. The above evidence thus shows that in these instances, Aon has some likelihood of success in demonstrating Defendants actually used or disclosed confidential contact information for Aon clients and information about a particular client's needs and preferences on behalf of Infinite. *Vendavo, Inc.*, 397 F.Supp.3d at 1139 (concluding plaintiff had shown a likelihood of success that at least on one occasion, defendant employee misappropriated plaintiff's trade secret on behalf of her new employer where defendant's email to her co-worker regarding a prospective client contained "key 'pain points' or pricing issues" faced by the client, which was information defendant gained during her tenure with plaintiff).[15]

---

[15]     The Court emphasizes the parties have not engaged in full discovery and as a result, the Court has a limited record in ruling on the motion for preliminary injunction. Additional discovery may reveal other evidence and information about whether Defendants used Aon's confidential client information in soliciting Aon's clients or whether Aon's client information warrants trade secret protection. For example, not a

*Second*, Aon invokes the inevitable disclosure doctrine in support of its misappropriation claim.  Under the inevitable disclosure doctrine "a plaintiff may prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets." *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995). "Illinois law . . . allow[s] a court to enjoin the 'inevitable' disclosure of trade secrets." *Id.*[16]  When evaluating whether the disclosure of trade secrets is inevitable, courts in this district consider three factors: (1) the level of competition between the former and new employer; (2) whether the employee's new position is comparable to the position he held with the former employer; and (3) the actions of the new employer to prevent the employee from using or disclosing trade secrets of the former employer. *Vendavo*, 397 F.Supp.3d at 1140.  The "mere fact that a person assumed a similar position at a competitor does not, without more, make it 'inevitable that he will use or disclose . . . trade secret information[.]'" *PepsiCo, Inc.*, 54 F.3d at 1269.

---

single client who Aon believes Defendants solicited provided a declaration or a deposition.  Such evidence may be critical to the outcome of the misappropriation of client information claim.  But on the current record, the Court concludes that Aon has met its burden of demonstrating that on the above cited occasions, Defendants used Aon's confidential client information to target or convert Aon's clients.

[16]      Defendants argue that the inevitable disclosure doctrine is not available under the DTSA.  But "[o]ther courts in this district . . . have analyzed inevitable disclosure under both laws, which suggests that the doctrine is available in either context." *Packaging Corp. of America, Inc. v. Croner*, 419 F.Supp.3d 1059, 1069 n. 7 (N.D. Ill. 2020).  Defendants further argue the ITSA does not apply to Burg because he lived and worked in California at all relevant times.  They contend that California law applies to the trade secret misappropriation claims asserted against Burg  "California law does not allow a plaintiff to rely on a theory of inevitable disclosure when seeking an injunction on the basis of trade secret misappropriation." *Vendavo*, 397 F.Supp.3d at 1127 (citing *Whyte v. Schlage Lock Co.*, 101 Cal.App.4th 1443, 1464 (2002)) ("we reject the inevitable disclosure doctrine.").  The Court need not decide the choice of law issue at this preliminary juncture because even if California law applies, like Burg argues, Defendants do not dispute that Illinois law applies to Aon's trade secret misappropriation claims against Coleman, Stoudt, and Infinite.  An injunction restraining Infinite, Coleman and Stoudt would apply to Burg as an owner/partner of Infinite. *See* Fed. R. Civ. P. 65(d)(2)(A)-(C) (a preliminary injunction binds the parties, their officers, agents, servants, employees, and attorneys, and "other persons who are in active concert or participation" with the parties and who receive actual notice of the injunction)

In this case, the record shows that Burg, Coleman, and Stoudt did not just take a similar position at a competitor. *First*, there is substantial evidence that Aon and Infinite are direct competitors in equity services and products. FAC, ¶¶ 13, 28, 88, 152, 155, 172; Kapinos Dep., 86:12-25; Goings Dep., 164:16-165:3; Coleman Dep., 230:14-231:2; Burg Dep., 94:5-95:23. *Second*, based on the evidence, the Court concludes that Burg, Coleman, and Stoudt (1) assumed virtually identical consultant and leadership roles at Infinite, (2) provide the same equity services they provided at Aon, and (3) are pitching the same clients. FAC, ¶¶ 3, 12, 23-25, 51, 59, 66, 212, 231; Stoudt Dep., 52:7-25; Coleman Dep., 26:9-16, 87:17-88:1. The record evidence demonstrates that as of July 2020, at least 58 Aon Equity Services clients had transferred some or all of their business from Aon to Infinite. Pls' Prelim. Inj. Memo., Doc. 177 at 20, (iii), Ex. EEE, Doc. 275-7 at 190-92

*Third*, on the last inevitable disclosure factor, the record shows that Burg, Coleman, and Stoudt had extensive knowledge about and access to Aon's highly sensitive and confidential client contact and revenue information and information about the type of work that was being done or proposed to specific Aon Equity Services Group clients. Kapinos Dec., ¶ 7. In the portions of their briefs addressing the inevitable disclosure doctrine, Defendants are silent on any steps taken to prevent the disclosure and use of Aon's confidential client information. Defs' Resp., Doc. 270 at 40-43; Defs' Reply, Doc. 272 at 15-16. In another portion of their response brief, Defendants assert that when forming Infinite, Burg retained and relied on the advice of outside counsel to create a "handbook that would ensure all Infinite Equity employees observed and honored any existing obligation to former employers, including Aon." Burg Decl., ¶ 9. However, Defendants have not provided the relevant Infinite handbook or described any specific precautions it has taken to prevent the individual Defendants from using or disclosing Aon's confidential client

information. And, as described above, the handbook did not prevent Burg, Coleman, and Stoudt from using Aon's confidential client information on numerous occasions to solicit Aon clients and transfer an Aon client.

Defendants also point out that "on advice of counsel, and prior to starting with Infinite Equity, they searched for (and made sure to delete) any Aon information they inadvertently had in their possession by way of their duties for Aon."[17] But even if Defendants did not take or do not physically possess any confidential Aon client information, "the prohibition against using the trade secrets of one's former employer applies regardless of whether the information is stored in electronic or physical form, or simply resides in one's head." *Vendavo*, 397 F.Supp.3d at 1139. Aon has shown that Burg, Coleman, Stoudt had access to confidential information about the identities of Aon's top revenue generating clients, client-contact information, and client needs and preferences that "would be invaluable to [Defendants] as they seek to broaden their presence in the [equity services] marketplace." *Id*. at 1142. And Defendants do not deny that they retain some knowledge about revenue information related to specific clients, client-contact information, and specific client needs and preferences given to them while working for Aon. Nor have they shown that they can divorce this critical competitive information from their memories when targeting and servicing former Aon equity compensation clients for Infinite. All of this evidence suggests that Defendants will inevitably use this confidential client information to attempt to convert Aon clients to Infinite and service former Aon clients. *Id*. (finding inevitable disclosure doctrine applicable where defendant had on at least one occasion already shared specific knowledge about plaintiff's trade secrets and unless she possessed an "'uncanny ability to compartmentalize' or forget

---

[17]    It is undisputed, however, that Coleman failed to delete a few Aon valuation models in his personal email account prior to starting with Infinite which were discovered by counsel for Defendants in their search for electronic documents responsive to Aon's discovery requests in this case. Witz Decl., ¶¶ 4, 5; Defs' Resp., Doc. 270 at 40, n. 37; Defs' Reply, Sur-Reply, Doc. 272 at 11, n. 12.

information, she [could not] but rely on that information as she work[ed] on projects or supervise[d] those working on clients she received information regarding while at [plaintiff].").

Moreover, Defendants' failure to prevent the above instances of misappropriation despite retaining counsel to provide "advice to proactively prevent such transfers from occurring" "calls into question the efficacy of [their] measures and supports finding that without additional measures other disclosures [or uses] could occur." *Id*. at 1141-42.

In sum, the evidence of inevitability of disclosure, including the direct competition between Aon and Infinite in the equity services market, the virtually identical positions, and the lack of any adequate measures to ensure that Aon's confidential client information remains secret, coupled with Defendants use of Aon's confidential client information on numerous occasions to target or convert Aon clients for Infinite leads the Court to conclude that (1) Aon has shown that it is likely to succeed on its claims that Defendants misappropriated its trade secret client information and (2) there is a threat of inevitable use or disclosure of further Aon trade secret client information without preventive action.[18]

---

[18]     With respect to Aon's claim for threatened misappropriation of *PT* source code under a theory of inevitable disclosure, Aon argues that it is inevitable that Evans and DiDomenico will rely on their knowledge of *PT* in further developing *MPA*. As to their likely future conduct, Aon has not made a strong showing that it is inevitable that Evans and DiDomenico will use Aon's *PT* source code in their jobs at Infinite. *First*, there is no evidence that Evans and DiDomenico currently have access to Aon's *PT* source code. No evidence has been presented that Evans or DiDomenico ever copied or printed the *PT* source code while employed by Aon. *Saban v. Caremark Rx, L.L.C*, 780 F.Supp.2d 700, 734 (N.D. Ill. 2011) (finding no inevitable disclosure where, among other things, "no evidence . . . established that [former employee] has access to or ever gave [his new employer] any of [his former employer's] trade secret information."). And Evans and DiDomenico could not have memorized millions of lines of *PT* code for use at Infinite. *Second*, because Aon has not shown that it is likely to succeed on the merits of its claim that Defendants actually used *PT* source code to develop *MPA* or otherwise in the time they have already worked for Infinite, there is no reason to conclude that they need to use *PT* source code to continue to perform their jobs at Infinite. *Cintas Corp. v. Perry*, 2004 WL 2032124, at *18 (N.D. Ill. Aug. 20, 2004) (finding plaintiff's claim that it needed an injunction to prevent defendant from revealing its confidential information "mere speculation" and insufficient to establish inevitable disclosure where defendant did not use plaintiff's confidential information in the eight months that he worked for his new employer). Therefore, Aon appears unlikely to establish threatened misappropriation through the inevitability of *PT* source code disclosure so as to warrant a preliminary injunction.

### 2. Breach of Fiduciary Duty Claim

Aon's second basis for a preliminary injunction is its breach of fiduciary duty claim. Specifically, Aon asserts that the individual Defendants breached their fiduciary duties to Aon when they (1) failed to advise Aon that they formed a rival company to compete against Aon prior to their resignations from Aon; (2) solicited and hired fellow Aon employees, including their direct reports, to join Infinite; (3) used Aon resources and employees when planning and forming a competing business; and (4) Burg improperly signed a one-sided agreement with Carver Edison on behalf of Aon knowing he intended to work with Carver Edison at Infinite. Pls' Prelim. Inj. Memo., Doc. 177 at 34. "In Illinois, employees owe fiduciary duties to their employers while they are employed, but there is no post-employment duty that prevents an employee from competing with his former employer post-employment." *Industrial Packaging Supplies, Inc. v. Channell*, 2018 WL 2560993, at *4 (N.D. Ill. June 4, 2018) (noting contractual obligations "may extend an employee's duties post-termination.").

According to Defendants, Aon's breach of fiduciary duty claim cannot serve as a basis for a preliminary injunction and even if it could, Aon's claim will not succeed because Aon cannot show Defendants competed until after they resigned from Aon. As to Defendants' first point, they argue that none of the above alleged breaches are ongoing because each alleged breach is complete and Defendants no longer owe fiduciary duties to Aon. But Defendants concede that the Seventh Circuit recognized in *Foodcomm Intern. v. Barry*, 328 F.3d 300 (7th Cir. 2003), that a preliminary injunction can be based on the continuing irreparable harm caused by Defendants' past breaches.[19]

---

[19] In *Foodcomm*, the individual defendants, while still employed by plaintiff, formed a new company to directly compete with plaintiff, used plaintiff's computers and personal digital assistants to prepare a business plan for the new company, usurped plaintiff's corporate opportunity with respect to a redistribution agreement with a former customer, and failed to inform plaintiff about their plans with the new company and former customer. *Foodcomm*, 328 F.3d at 302-03. Although the individual defendants were no longer employees of the plaintiff and their

Acknowledging that a preliminary injunction may issue "to stop the ongoing harm that flowed from [a] breach [of fiduciary duty]," Defendants next assert that Aon has not alleged the threat of irreparable harm flowing from the alleged breaches in this case. Defs' Resp., Doc. 270 at 51. Contrary to Defendants' assertion, Aon argues that it is suffering continuing irreparable harm by being forced to compete with a company that got an unfair "head start" in the equity services market through Defendants' breaches of their fiduciary duties. Pls' Prelim. Inj. Memo., Doc. 177 at 33; Pls' Reply, Doc. 295 at 20. Under certain circumstances, a preliminary injunction can be granted to prevent defendants from gaining the advantage of an improper head start due to their fiduciary breaches. *See Regal-Beloit Corp. v. Drecoll*, 955 F.Supp. 849, 867-68 (N.D. Ill. 1996). The Court addresses further below in Sections II(B) and (C) Aon's showing regarding irreparable harm and the proper scope of a preliminary injunction.

The Court now turns to the likelihood that Aon will succeed on the merits of its breach of fiduciary duty claim against Burg, Coleman, and Stoudt. As noted by the Seventh Circuit, officers and directors have been found to have breached their fiduciary duties when, while still employed by the company, they (1) fail to inform the company that employees are forming a rival company or engaging in other fiduciary breaches; (2) solicit the business of a single customer before leaving the company; (3) use the company's facilities or equipment to assist them in developing their new

---

duty of loyalty had expired, the Seventh Circuit upheld the preliminary injunction preventing the defendants from servicing the customer or the new company. *Id*. at 302. The court found that the plaintiff had suffered irreparable harm, "the most important injuries of which are its inability to attempt to maintain its relationship with [a customer] and its complete loss of that relationship." *Id*. at 304. Because plaintiff's "irreparable harm was caused by and [was] maintained by [the individual defendants'] actions, an injunction [was] appropriate to prevent this harm from continuing." *Id*. at 305. Accordingly, the Seventh Circuit upheld the injunction preventing the defendants from providing any services to the customer or new company to prevent the continuing irreparable harm caused by the defendants' past breaches of loyalty while employed by the plaintiff. *Id*. at 304-05.

business; or (4) solicit fellow employees to join a rival business. *Foodcomm Int'l.*, 328 F.3d at 303. Defendants argue that Aon has failed to show that any of the individual Defendants were officers or directors. However, "[a] person may owe fiduciary duties equal to those owed by a corporate officer even when that individual does not possess a corporate title." *Exhibit Works, Inc. v. Inspired Exhibits, Inc.*, 2005 WL 3527254, at *3 (N.D. Ill. Dec. 21, 2005). Regardless of whether an employee is a named officer, "courts have found that employees with certain roles and influence owe a similar fiduciary duty." *Simpson v. Saggezza, Inc.*, 2018 WL 4538781, at *2 (N.D. Ill. Sept. 21, 2018). To determine whether a person qualifies as an officer with a heightened fiduciary duty, courts examine "the employee's management responsibilities, the extent of corporate oversight and guidance over him, and whether he exercised any powers of an officer sanctioned by the company." *Id.*

To the extent that Aon alleges that Burg, Coleman, and Stoudt owed heightened fiduciary duties equal to those owed by a corporate officer even though they did not possess a corporate officer job title, Aon has not shown a likelihood of success on the merits of that claim. In their declarations, Burg, Coleman, and Stoudt each attests that while employed by Aon: "I was never a corporate director or officer. I never held myself out as having such position, nor did I ever exercise corporate authority." Burg Decl., ¶ 3; Coleman Decl., ¶ 3; Stoudt Decl. ¶ 3; *see also* FAC, ¶ 135 (Aon alleging Burg had no authority to sign the Carver Edison agreement on behalf of Aon); Kapinos Dep., 14:6-15:14 (Kapinos, head of Aon's Equity Services Group (the same position Burg held immediately before he left Aon), testifying that he did not "know for certain" if he held an officer position).

In reply, Aon's brief points out that: (1) Burg testified that he had "no idea" whether he was an officer of any Aon entity; (2) Burg testified that he led the Aon Equity Services Group,

including a "global role" which included oversight of the "European" and "shared services" teams; and (3) Stoudt testified that Burg, Coleman, and Stoudt were the leaders of the Equity Services Group. Pls' Reply, Doc. 295 at 19, n. 44. Aon's showing does not describe the precise management responsibilities of Burg, Coleman, and Stoudt, the extent of Aon oversight and guidance over them, and whether they exercised any powers of an officer sanctioned by Aon. Given this record, Aon falls short of convincing the Court that Burg, Coleman, and Stoudt owed fiduciary duties to Aon commensurate with that of corporate officers. *Exhibit Works Inc.*, 2005 WL 3527254, at *4 (holding individual defendants who were "middle level managers" with plaintiff were "neither defacto nor *dejure* corporate officers" because they did not "[hold] themselves out as corporate officers" and "did not exercise any . . . corporate authority while employed."). Although it is possible that Aon may be able to present additional evidence that Burg, Coleman, and Stoudt were defacto corporate officers for purposes of determining their duties to Aon, the "possibility of success is not enough" at the preliminary injunction stage. *Illinois Republican Party*, 973 F.3d at 762.

Even if Burg, Coleman, and Stoudt are not considered to be officers of Aon with heightened fiduciary duties, this fact is not dispositive of the likelihood of success analysis on Aon's breach of fiduciary duty claim. Defendants do not, and cannot dispute, that they owed a fiduciary duty to Aon. "[E]mployees, as agents of their employer, do not fall outside the purview of a breach of fiduciary duties." *Foodcomm Intern.*, 328 F.3d at 304. "It is a fundamental principle of agency law that agents owe fiduciary duties of loyalty to their principals not to (1) actively exploit their positions within the corporation for their own personal benefits; or (2) hinder the ability of the corporation to conduct the business for which it was developed." *Id*., at 303; *Lumenate Technologies, LP*, 2013 WL 5974731, at *8 ("Under Illinois law, employees owe a duty of loyalty

to their employer."); *Beltran v. Brentwood N. Healthcare Ctr., LLC*, 426 F.Supp.2d 827, 831 (N.D. Ill. 2006) (While the "scope of the duty of loyalty may vary depending on whether a corporate officer or an employee is involved," "employees as well as officers and directors owe a duty of loyalty to their employer.").

Aon has established a significant likelihood of success on the merits of its breach of fiduciary duty claim based on the fact that Burg, Coleman, and Stoudt owed it a duty not to solicit employees while employed by Aon and will likely prove that they breached that duty. "During employment, an employee may plan to compete with his employer but cannot commence competition or entice co-workers away." *Guaranteed Rate, Inc. v. Thomas*, 2020 WL 6446947, at *3 (N.D. Ill. Nov. 3, 2020) (plaintiff stated a claim for breach of fiduciary duty where it alleged that while employed, a branch manager actively attempted to recruit employees to join plaintiff's competitor and successfully convinced one employee to leave plaintiff); *ABC Trans Nat. Transport, Inc. v. Aeronautics Forwarders, Inc.*, 379 N.E.2d 1228, 1237 (Ill. App. 1978) ("While acting as an agent or employee of another, one . . . cannot . . . entice coworkers away from his employer.").

Aon has produced substantial evidence that Burg, Coleman, and Stoudt solicited other Aon employees (Evans, DiDomenico, Ostenbridge, Sanfilipo, Salisbury, and Allen) to leave Aon and join Infinite while these three still worked for Aon. FAC, ¶¶ 142, 146, 147, 149, 156-159, 165; Evans Dep., 94:19-95:11; Burg Dep., 82:6-83:25, 272:19-275:14; Pls' Prelim. Inj. Memo., Exs. V, SSS, Docs. 275-6 at 246-48, 275-8 at 160-61. It is reasonable to infer, based on the closely timed resignations of the Aon colleagues, that while still employed by Aon, Burg, Coleman, and Stoudt recruited these six other Aon employees to leave Aon and join Infinite. These individual Defendants and other Aon colleagues resigned from Aon on the following dates: (1) on March 19,

2019, Evans resigned; (2) in March/April 2019, Burg gave notice of his resignation; (3) on April 19, 2019, DiDomenico resigned; (4) in mid-April 2019, Van Ostenbridge, a Director in Equity Services, resigned; (5) on April 24, 2019, Coleman gave notice of his resignation; (6) on or about May 20, 2019, Sanfilipo, a Director who reported to Burg, resigned; (7) on May 20, 2019, Salisbury, a Director who reported to Burg, resigned; (8) on May 20, 2019, Stoudt resigned; (9) on May 28, 2019, Allen, a Senior Consultant who reported to Coleman, tendered his notice of resignation. FAC, ¶¶ 142, 144, 147-149, 156-159.  Evans, DiDomenico, Sanfilipo, Salisbury, Allen, and Van Ostenbridge are all employed by Infinite. *Id*., ¶¶ 26, 27, 170.  According to Aon, and as this timeline convincingly illustrates, "it defies reason that each of the former Aon employees would miraculously quit from Aon, in silos and with no future plans, and then again miraculously converge immediately following their resignations from Aon to form Infinite Equity (what they themselves have described as a start-up venture) without having [been] previously solicited . . . , while employed by Aon, to do same." *Id*., ¶ 165.  In light of the timing, it is also reasonable to infer that while Burg, Coleman, and Stoudt were still employed by Aon, they arranged for Evans and DiDomenico to work on developing *MPA* for Infinite. FAC, ¶¶ 9, 144, 165, 173-175; Evans' Dep., 72:7-73:4.  A picture of a whiteboard with notes from Burg, Coleman, and Stoudt's meeting in November 2018 shows they discussed a competing company needing an application like "PT," which Stoudt confirmed referred to "PeerTracker." Pls' Prelim. Inj. Memo., Ex. V at 58958; Stoudt Dep., 104:18-24.  Finally, there is evidence that prior to leaving Aon, Coleman and Stoudt solicited another Aon employee, Amanda Benincasa. FAC, ¶¶ 161, 197; Coleman Dep., 237:1-243:6, Ex. 23; Benincasa Dep., 76:1-25; 104:16-25, 106:3-24.  Taken all together, Aon has shown a strong likelihood of success on its breach of fiduciary duty claim that,

while still Aon employees, Burg, Coleman, and Stoudt solicited fellow employees to leave Aon and join Infinite.

Aon also presented evidence supporting a conclusion that Burg violated his fiduciary duty while employed by Aon when he signed a one-sided agreement with Carver Edison on February 13, 2019. As part of that agreement, Aon agreed to provide accounting, valuation, stock plan design and other strategic advice to current and prospective public company clients as it relates to Carver Edison's offerings. Kapinos Decl., Ex. 10 § 1. Furthermore, Carver Edison, which provides an interest-free loan program that allows employees of publicly traded companies to purchase company stock, agreed to provide Aon access to its proprietary technology to help inform Aon in its work for current or prospective clients. *Id*. The agreement contains an exclusivity provision binding on Aon only. FAC, ¶ 135; Kapinos Decl, Ex. 10, § 7. In other words, the arrangement is not reciprocal, and there was no agreement that Carver Edison would have any exclusivity with Aon. *Id*. Aon agreed "to not engage a third-party that provides ESPP (employee stock purchase plan) loans for the term of [the] agreement and for five (5) years following the termination of [the] agreement under any conditions." *Id*. However, Carver Edison did not agree to not engage a third-party that provides equity compensation services for the term of the agreement and for five years following the termination of the agreement. Kapinos stated that Burg had no authority to sign the agreement on behalf of Aon. FAC, ¶ 135. Aon has also shown that at the time Burg signed the agreement on behalf of Aon, he intended to work with Carver Edison at Infinite. Pls' Prelim. Inj. Memo., Exs. AA & PPP, Docs. 275-6 at 276-77, 275-8 at 143-44. When Aon leadership inquired about the partnership after reading a *Bloomberg* article, Burg lied and said: "We do not have a formal partnership." Kapinos Decl., Ex. 11. This undisputed evidence supports a conclusion that

Aon has demonstrated a reasonable likelihood of success that in this instance, Burg impeded Aon's ability to do business.

Lastly with respect to the remaining evidence Aon cites, Defendants contend that Aon is unlikely to succeed in showing a breach of fiduciary duty because "employees may plan, form, and outfit a competing corporation while still working for the employer" as long as they do not "commence competition." *Alpha Sch. Bus Co., Inc. v. Wagner*, 910 N.E.2d 1134, 1149 (Ill. App. 2009); *Chicagoland Aviation, LLC v. Todd*, 2012 WL 5949358, at *5 (N.D. Ill Nov. 27, 2012) ("an employee may participate in the planning and outfitting of a rival business while still employed by a competitor without breaching his fiduciary duty."). "Only when the employee goes beyond preliminary planning activities and commences business as a rival while still employed does he breach his fiduciary duty to his employer." *Chicagoland Aviation, LLC*, 2012 WL 5949358, at *5.

Given the evidence presented at this point, Aon has not shown a strong likelihood of success on its claim that Defendants' remaining pre-departure actions went beyond planning and that they started competing against Aon while still employed by Aon. The evidence Aon cites shows that while still employed by Aon, Burg, Coleman, and Stoudt held a few meetings in 2018 to discuss leaving Aon to create a competing company and then, starting in December 2018 through the third week of May, weekly phone calls to plan Infinite. Pl's Prelim. Inj. Memo., Doc. 177 at 34 (citing timeline at (a)-(c), (i), (j)). However, Aon has not pointed to any evidence that Defendants actually competed with Aon and solicited Aon clients on behalf of Infinite before terminating their employment with Aon. *Lumenate Technologies, LP*, 2013 WL 5974731, at *8 (allegation that the "Individual Defendants plotted their departure from [plaintiff] a couple of months before actually terminating their employment with [plaintiff]" alone is insufficient to state a claim for breach of fiduciary duty); *Chicagoland Aviation, LLC*, 2012 WL 5949358, at *6

(finding no likelihood of success on the merits of plaintiff's claim that defendant established a rival business while employed by plaintiff where defendant discussed forming a new flight school with a co-worker, told the co-worker there was a spot available for him at defendant's new flight school, contacted the airport about starting a new flight school, looked into insurance, and discussed leasing an airplane where there was "no evidence that [the individual defendant] began actually competing with Plaintiff while still employed.").

Aon also claims that Defendants "used Aon resources, such as *PeerTracker*, web models, the assumption calculator, EBAT, and other Aon tools, as models for their rival business," and in support cites the deposition testimony of Stoudt regarding a November 2018 meeting in Chicago where Burg, Coleman, and Stoudt discussed their "options" the day they learned Adamson (the then leader of Aon's Equity Services Group) would be leaving Aon. Pls' Prelim. Inj. Memo., Doc. 177 at 34. But the evidence Aon cites does not demonstrate that Defendants actually used Aon's *PT* and other tools as models for Infinite—only that they talked about applications and tools that they "potentially wanted to build." Stoudt Dep., 104:9-105:19. Because Aon has not shown that Defendants began actually competing with Aon while still employed, Aon has not shown a likelihood of success on the merits with respect to this aspect of its breach of fiduciary duty claim.

### 3.   Remaining Claims

Aon also seeks a preliminary injunction with respect to its claims for breach of contract against Coleman, tortious interference with contract as to Infinite, Burg, Coleman, and Stoudt, and tortious interference with prospective economic advantage as to Infinite, Burg, Coleman, and Stoudt. The Court, however, need not address Aon's likelihood of success on the merits of those claims. Regarding Aon's breach of contract claim, Coleman's RSU Agreement provided that he would not solicit clients and employees for a period of two years post-employment. FAC, ¶¶ 108, 109, Ex. E, §§ 9(b), 9(c). The two-year non-solicitation clause of Coleman's RSU Agreement

expired on June 10, 2021. Aon has made no argument or showing that under the circumstances of this case, injunctive relief would be appropriate after the expiration of the contractual term. Thus, the Court need not decide whether Aon has established a likelihood of success on the merits of its breach of contract claim against Coleman. *Hecny Transp., Inc. v. Chu*, 430 F.3d 402, 405 (7th Cir. 2005) (holding the parties' dispute regarding enforcing defendant's covenant not to compete "need not be resolved, because [defendant's] covenant expired."); *PrimeSource Bldg. Prod., Inc.*, 2017 WL 7795125, at *28 ("given that [the individual defendants'] non-solicitation agreements have expired, injunctive relief tailored to prevent harm from claims that they breached those agreements is inappropriate."). The confidentiality clause of the RSU agreement is without a temporal limitation and has not expired, but the relief requested on that portion of the breach of contract claim is duplicative of the preliminary remedy already available on the misappropriation of Aon's trade secrets claims.

The Court also declines to address Aon's tortious interference claims because the misappropriation of trade secrets claims provide an adequate basis for a portion of the preliminary injunctive relief requested. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of America. Inc.*, 549 F.3d 1079, 1096 (7th Cir. 2008) (finding that because plaintiff "surpasses the threshold on at least one of its causes of action, we need not discuss [plaintiff's] likelihood of success on it remaining nine claims."). The Court has found that Aon has demonstrated a likelihood of success on its claim that Defendants misappropriated confidential valuation models and client information and breached their fiduciary duty not to solicit Aon employees while employed by Aon, and Aon does not appear to seek any different or additional relief based on the tortious interference claims. Any preliminary injunction that would address Defendants' alleged tortious interference conduct, which is based on the solicitation of Aon clients and employees, would thus be duplicative of any

preliminary injunction order the Court determines to be appropriate for the trade secrets misappropriation and breach of fiduciary duties claims. *SKF USA, Inc. v. Bjerkness*, 636 F.Supp.2d 696, 715 (N.D. Ill. 2009) (holding the court did not need to conduct an analysis of the trade secrets claim at the preliminary injunction stage where plaintiff had demonstrated a reasonable likelihood of success on its breach of contract claim because such analysis would be "mere dicta, as the remedy would be duplicative of whatever remedy [plaintiff] is entitled to based on violation of the Agreement.").

## B.    Inadequate Remedy and Irreparable Harm

Having demonstrated a likelihood of success on the merits of some of its misappropriation of trade secrets and breach of fiduciary duty claims, Aon must show "that it has no adequate remedy at law and, as a result, that it will suffer irreparable harm if an injunction is not issued." *Foodcomm, Int'l*, 328 F.3d at 304.  Irreparable harm is harm that is "not fully compensated or avoidable by the issuance of a final judgment (whether a damages judgment or a permanent injunction, or both) in the plaintiff's favor." *Kraft Foods Group Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 740 (7th Cir. 2013).  Aon first claims there is a presumption of irreparable harm when a plaintiff establishes a likelihood of success on the merits of a misappropriation of trade secrets claim.  The Seventh Circuit's recent decision in *Life Spine, Inc. v. Aegis Spine, Inc.*, --- F.4th ----, 2021 WL 3482921, at * 11 (7th Cir. Aug. 9, 2021), makes clear, however, that no presumption of irreparable harm attaches upon a showing of likely success on a trade secret claim.  Therefore, the Court does not apply a presumption of irreparable harm and Aon must show a likelihood of irreparable harm is likely to result in the absence of the preliminary injunction as a prerequisite for injunctive relief.

Beyond the presumption, Aon asserts that it will suffer irreparable harm without injunctive relief as to its trade secret misappropriation and breach of fiduciary duty claims because: (1) the loss of business that the individual Defendants have caused and threaten to cause and the profits lost with such business are unquantifiable, (2) Aon's client and employee losses and threatened loss of clients and employees has damaged its goodwill, reputation, and competitive position, and (3) it is impossible to value Infinite's "head start" that was achieved by Defendants' fiduciary breaches.[20]  In response, Defendants argue that (1) Aon has not demonstrated irreparable harm because it unduly delayed in seeking a preliminary injunction, (2) Aon has not demonstrated irreparable harm as to its trade secrets misappropriation claims because Aon has not shown that any individual Defendant misappropriated, used, or disclosed confidential information, and (3) Aon has an adequate remedy at law for any claims related to client solicitation—money damages for lost profits.

The first issue raised by Defendants is whether the preliminary injunction motion should be denied because Aon unreasonably delayed in seeking a preliminary injunction.  "A lengthy, unexplained delay in seeking relief calls into question how urgent the need for [preliminary] equitable relief really is." *Redbox Automated Retail, LLC v. Xpress Retail LLC*, 310 F.Supp.3d 949, 953 (N.D. Ill. 2018) (internal quotes and citation omitted); *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 903 (7th Cir. 2001).  Defendants point out that Aon waited four months after the expiration of the TRO Consent Order and well over a year after Defendants left Aon to file its preliminary injunction motion.  According to Defendants, this delay in moving for a preliminary

---

[20]     Citing *Foodcomm Intern.*, 328 F.3d at 305, Aon also points out that Infinite is a start-up business and questions whether the individual Defendants have assets to satisfy a money judgment, but there is simply no evidence in the record that Aon would be unable to collect damages from Defendants due to lack of assets.  Therefore, the Court does not see this as relevant to the irreparable harm inquiry.

injunction reflects that Aon "plainly does not believe it will suffer irreparable harm absent injunctive relief." Doc. 265 at 58.

Considering the totality of the circumstances, including issues caused by the COVID-19 pandemic and the multiple discovery disputes between the parties, the Court finds that the timeline here does not undermine Aon's claim of irreparable harm. Aon moved for a TRO on January 2, 2020 (eight to nine months after the individual Defendants left Aon). *Ty, Inc.*, 237 F.3d at 902-03 (eight month delay in pursuing preliminary injunction based on trademark infringement was not unreasonable and did not lessen plaintiff's claim of irreparable injury); *Life After Hate, Inc. v. Free Radicals Project, Inc.* 410 F.Supp.3d 891, 909-10 (N.D. Ill. 2019) (plaintiff's 14-month delay in seeking preliminary injunctive relief did not defeat its claim of irreparable harm). Defendants then voluntarily entered into a 90-day Consent Order, and the parties began expedited discovery in mid-February 2020. The Consent Order expired on April 28, 2020, shortly after the beginning of the pandemic. Due to the pandemic, the Court issued several General Orders which automatically extended the expedited discovery and motion deadlines by 77 days. Aon sought only one 24-day extension of fact discovery after the parties exchanged voluminous written discovery and were about to take over a dozen remote depositions in an entirely new virtual discovery process mandated by the pandemic. Doc. 136. The Court also heard and ruled upon several fully briefed discovery disputes between the parties during the expedited discovery process. Docs. 82, 86, 97, 98, 151, 152, 155, 156, 162, 163, 165, 169; *see also* Docs. 172, 189, 192, 269. Less than four months after the Consent Order expired, on August 17, 2020, and still during the pandemic, Aon move for a preliminary injunction. Given the numerous challenges of conducting significant expedited discovery and litigating numerous contested discovery issues during the midst of the

pandemic, the less than a four month delay in Aon seeking a preliminary injunction after the TRO Consent Order expired is reasonable and justified in this case.

Moreover, "delay is only relevant to the extent that [Aon] lulled [Defendants] into a false sense of security." *Miyano Mach. USA, Inc. v. MiyanoHitec Mach., Inc.*, 576 F.Supp.2d 868, 887-88 (N.D. Ill. 2008); *Ty*, *Inc.*, 237 F.3d at 903 ("evidence of mere delay alone, without any explanation on [defendants'] part of why such delay negatively affected them, would not lessen [plaintiff's] claim of irreparable injury."). Here, after Aon learned about the existence of Infinite, it sent Defendants cease and desist letters in June 2019. Aon then filed suit in November 2019 and its complaint gave Defendants notice that it requested a preliminary injunction. Cmplt., ¶ 147. Less than two months later, on January 2, 2020, Aon moved for a TRO, and Defendants voluntarily entered into a 90-day Consent Order. The Consent Order expired on April 28, 2020, and after extensive expedited fact and expert discovery in anticipation of a preliminary injunction motion, Aon moved for a preliminary injunction on August 17, 2020. Based on these facts and the chronology described, the record does not support a finding that Defendants were lulled into a false sense of security and any delay in seeking preliminary injunctive relief does not impact Aon's claim of irreparable harm. *Data Mgmt. Ass'n Int'l v. Enter. Warehousing Solutions, Inc.*, 2020 WL 7698368, at *5 (N.D. Ill. Dec. 28, 2020) (plaintiff not precluded from seeking injunctive relief based on 11-month delay in moving for a preliminary injunction after putting defendant on notice of trademark infringements where there was no evidence that defendant was lulled into a false sense of security).

Setting aside the claimed presumption, Aon has made a sufficient showing with respect to its trade secrets misappropriation claims that it would suffer future irreparable harm in the absence of a preliminary injunction. Aon argues that it has been and will continue to be irreparably harmed

by Defendants' use of Aon's trade secrets to attempt to convert Aon's equity services clients, which irreparably harms Aon's relationships with clients and cannot be adequately remedied with damages. Contrary to Defendants' arguments, the evidence strongly suggests that there is an immediate risk of future use of Aon's protected client information to target and service Aon's clients for Infinite for which there is no adequate legal remedy.

Aon has shown that while working for Infinite, Defendants used Aon's confidential client contact information to solicit clients and insider knowledge regarding a client's needs and preferences to transfer an Aon client to Infinite. The Court has also concluded that Defendants will inevitably use confidential client information in recruiting and servicing Aon's clients. "Th[e] inevitable [future] disclosure of trade secrets supports finding an irreparable harm that cannot be adequately addressed by a legal remedy because it would be essentially impossible to determine the costs [Defendants] unjustly avoided by using trade secrets, or the damage to [a plaintiff's] sales that could be caused by allowing [Defendants] to use its own secrets against it." *Vendavo, Inc.*, 397 F.Supp.3d at 1144.

Aon has shown that absent injunctive relief, it will suffer irreparable harm between now and trial that damages will not fully remedy. Aon submitted sufficient evidence that has lost and it is at serious risk of losing future clients to Infinite. The evidence shows that Defendants have aggressively targeted Aon's equity services clients. Since leaving Aon, Defendants have had contact with over 90 Aon clients, and solicited numerous Aon clients on behalf of Infinite. Pls' Prelim. Inj. Memo., Doc. 177 at 18-20, 39. Moreover, after the expiration of the TRO Consent Order, Defendants continued to solicit Aon clients and Aon clients continued to transfer their business to Infinite. Pls' Prelim. Inj. Memo., Doc. 177 at 21, (jjj)-(rrr), Doc. 177 at 46. Aon has lost at least 58 clients to Infinite, nine of which were lost since the expiration of the TRO Consent

Order.  Pls' Prelim. Inj. Memo., Doc. 177 at 20, (iii), Ex. EEE, Doc. 275-7 at 190-92.  Aon has also shown that a number of the highest revenue generating clients of Aon's Equity Services Group have been contacted by Infinite or transitioned their business from Aon to Infinite.  Kapinos, Decl., ¶ 8.  Finally, Defendants continue to target Aon clients, and have explicitly identified certain Aon clients as "prospects" and in the "pipeline." Pls' Prelim. Inj. Memo., Doc. 177 at 22, (sss); Ex. EEE, Doc. 275-7 at 192.  Defendants do not deny that they will continue to solicit Aon's clients.

Based on this evidence, it is reasonable to infer that there is a high probability Defendants will use Aon's confidential client information, even if inadvertently, unless prohibited from using such information and soliciting Aon clients on behalf of Infinite. *Vendavo, Inc.*, 397 F.Supp.3d at 1144 (defendant "undoubtably knows and remembers certain details about her former clients—as she has already demonstrated—that she may not share with her current employer.").  This is especially the case as to information regarding the names of specific contacts at Aon clients and those clients' needs and preferences, "which would allow [the individual Defendants] to continue to negotiate with [their] former clients as if [they] had never left [Aon]." *Id*.

Aon argues that it cannot be made whole through money damages in the event Defendants succeed in soliciting away additional clients.  Defendants disagree, arguing that potential lost business is compensable by an award of money damages and Aon has adequate information to estimate any lost profits it stands to lose for each client.  "[H]arm stemming from lost customers or contracts may be quantifiable if the lost customers or contacts are identifiable," *Life Spine*, --- F.4th ----, 2021 WL 3482921, at *11.  In *Life Spine*, the defendant was marketing its spinal product "in the same finite pool of hospitals and surgeons in which Life Spine markets [its] ProLift" product. *Id*. at 11.  Because hospitals do not publicize their contracts for spinal products, the Seventh Circuit upheld the district court's finding that identifying and quantifying lost business

58

"would be especially difficult" for Life Spine and thus, not remediable through money damages. *Id.* Here, while Aon's lost clients may be identifiable, Aon asserts that it will be difficult to calculate the potential future profits it will lose from diverted clients. "A damages remedy can be inadequate" if "[t]he nature of the plaintiff's loss . . . make[s] damages very difficult to calculate." *Roland Mach. Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 386 (7th Cir. 1984). Defendants point out that Aon has spreadsheets with detailed revenue information broken down by client and thus, they claim Aon has adequate information to estimate what, if any, lost profits it stands to lose for each client. But "[e]stimating the length of time any given client would remain with [Aon], and therefore the amount of future income [Aon] would lose, would be extremely difficult." *E\*TRADE Financial Corp. v. Pospisil*, 2018 WL 4205401, at \*5 (N.D. Ill. Sept. 4, 2018). The Court finds that damages flowing from Aon's loss of numerous clients is irreparable because it is difficult to predict the probable length of each lost client's relationship with Aon.

Beyond lost profits, the threat of Aon's loss of valuable client relationships also supports a finding of irreparable harm here. The Seventh Circuit has held that the "inability to attempt to maintain" a relationship with an important customer and the "complete loss" of that customer relationship may constitute irreparable harm. *Foodcomm*, 328 F.3d at 304. "Because it is not practicable to calculate damages to remedy this kind of harm, no remedy can adequately compensate [a plaintiff] for [this] injury." *Id.* And if Defendants are allowed to continue to use Aon's confidential client information to solicit established clients away, "there is no way to 'unring' the bell, as the client cannot be forced to return" to Aon. *E\*TRADE Financial Corp.*, 2018 WL 4205401, at \*5.

Even if Aon could quantify the loss of future profits for each converted client, money damages would be inadequate to compensate Aon for the full extent and scope of its injuries

flowing from Defendants' use of its confidential client information. Aon submitted evidence showing that the development of its confidential client information and client relationships have been secured through the investment of significant financial resources and time, the loss of which would be impossible to calculate with any degree of certainty. *Mickey's Linen*, 2017 WL 3970593 at *18. It would also be difficult to determine the extent to which Aon's confidential information regarding client needs and preferences will be used by Defendants to service Aon's former clients and gain a competitive advantage for Infinite. *Id*. (granting a preliminary injunction in part because it is "impossible to determine at this time the extent to which [the plaintiff's] confidential information will be pirated away by [the defendant] and his new employer") (internal quotes and citation omitted). The use of Aon's protected client needs and preferences information is not easily measured in money damages and a preliminary injunction will eliminate the commercial advantage derived from Defendants' use of such information. Thus, Aon has demonstrated that at least some of the economic harm it would suffer due to Defendants' future use of its confidential client information to convert and service Aon's clients is not easily quantifiable.

Defendants' argument also misses the mark because Aon does not merely assert economic harm flowing from its loss of clients. The other harm that Aon has asserted is reputational damage from the ongoing loss of long-term clients in which goodwill has been developed. "And it is well established that the loss of goodwill and reputation, if proven, can constitute irreparable harm." *Life Spine, Inc.*, --- F.4th ----, 2021 WL 3482921, at *11; *Ty, Inc.*, 237 F.3d at 902 ("it is virtually impossible to ascertain the precise economic consequence of intangible harms, such as damage to reputation, and loss of goodwill."). Regarding the harm to its reputation, Aon has invested significant resources in developing and maintaining its long-term client relationships and reputation as a leader in the equity services industry. FAC, ¶ 2; Pls' Prelim. Inj. Memo., Doc. 177

at 10. Aon has shown that many of its client relationships extend at least five years, and prior to the emergence of Infinite, client turnover was low. Kapinos Decl., ¶¶ 9, 10, 12-14, 16-21, 23-25, 27-38, 55; Knopping Dep., 120:25-121:22. Kapinos, an Aon employee of over 12 years, testified: "I honestly can't even recall situations where we lost clients to other competitors before Infinite Equity was created." Kapinos Dep., 15:18-20, 86:15-18. Aon cannot determine with any certainty the extent of damage caused by Defendants to its reputation and goodwill. And by the time the litigation is complete, monetary damages will be inadequate to redress the harm to Aon's reputation resulting from Defendants' targeting and converting of Aon's clients. Continued loss of long-term clients due to Defendants' use of Aon's protected client information will thus cause future irreparable harm in the form of damage to Aon's reputation and goodwill and erosion of its competitive position in the equity services market. *Aon Risk Servs. Cos., Inc.*, 415 F.Supp.3d at 852; *PrimeSource Bldg. Prod., Inc.*, 2017 WL 7795125, at \*11 ("Where trade secrets and goodwill are involved, the threat is significant that the harm experienced by the misappropriation or misuse of trade secrets will be irreparable."); *Mickey's Linen*, 2017 WL 3970593, at \*18 (loss of competitive position justifies preliminary injunctive relief).

For all these reasons, Aon has made a strong showing of an inadequate remedy at law and a likelihood of irreparable harm absent an injunction barring Defendants' use of its confidential client information and solicitation of its client base.

The evidence also strongly suggests that Aon will suffer irreparable harm to its ability to fairly compete absent preliminary injunctive relief with respect to the valuation models misappropriated by Coleman. The threat of use and disclosure of Aon's valuation models is significant given that Defendants created a business directly competing with Aon and Coleman printed numerous documents on his last day, including a proprietary business model that he took

61

home and admitted he had no business reason to print, and improperly emailed Aon's models to his personal email address shortly before leaving Aon which he retained in his personal email for months after he started with Infinite.  This evidence gives rise to a reasonable inference that Coleman intended to use this information to benefit Infinite.  Moreover, Coleman's declaration is incomplete, as he has indicated that he only used the Aon valuation models that he printed to perform his duties with Aon, but he does not say that he only used the Aon valuation models in his personal email to perform his duties with Aon.  And, in any event, the Court and Aon need not take Coleman's word that he never retained any Aon valuation models that he printed while he worked at Aon and only used them to perform his duties with Aon. *Walgreens*, 2021 WL 3187726, at *5.  Furthermore, Coleman testified that he does not believe Aon's valuation models are proprietary. Coleman Dep., at 251:2-8 ("I don't believe they're proprietary models.").  Aon has also presented evidence that the proprietary macros and coded formulas are not stale and could still be useful to Defendants. FAC, ¶ 152.  Infinite continues to provide services to clients involving the projection of stock prices and EBITDA.  If a competitor like Infinite obtained Aon's valuation models, the competitor would not need to invest the time and money to develop the information and would able to unfairly compete, resulting in harm to Aon.  Thus, the use or continued use of Aon's valuation models could put Aon at a competitive disadvantage that a legal remedy could not address because it is "difficult to determine the value of" use of Aon's valuation models. *Walgreens*, 2021 WL 3187726, at *5.  In sum, Coleman's conduct during the final months of his employment paired with Coleman's testimony that he does not consider Aon's models proprietary and his incomplete denial of use of Aon's valuation models at Infinite support a finding that Coleman used or will use Aon's valuation models to its competitive advantage and a preliminary injunction is needed to ensure that Aon's trade secret information remains protected.

Aon's breach of fiduciary claim, however, does not support a preliminary injunction. The harm from the improper solicitation of Aon employees has already occurred. Any Aon Equity Services Group employee who wanted to work at Infinite is already there, and Aon has not presented evidence of a threat of future irreparable harm flowing from the breach of fiduciary duty by soliciting Aon employees. As to future injury, Aon says it is "still scrambling to minimize the damage caused by Defendants, and the unlawful head start Defendants obtained by their breaches of fiduciary duty." Pls' Prelim. Inj. Memo., Doc. 177 at 35. This suggests that there could be some ongoing harm from lost employees, but Aon fails to cite any evidence or facts to support this assertion. *E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 705-06 (7th Cir. 2005) ("a plaintiff cannot obtain a preliminary injunction by speculating about hypothetical future injuries."). Moreover, the unfair seven-month head start period Aon alleges has expired now so, even if Aon's showing rose above a speculative level, preliminary injunctive relief would not be warranted on this basis. Preliminary injunctive relief is also precluded because Aon does not and cannot allege that Defendants are engaged in an ongoing breach of fiduciary duty as the individual Defendants no longer owe fiduciary duties to Aon. *Abrasic 90 Inc.*, 364 F.Supp.3d at 907. Even if the individual Defendants had such a duty, there is no evidence that Defendants are currently targeting Aon employees.

## C.    Balance of the Harms and the Public Interest

The final two factors the Court considers are the balance of harms and the public interest if an injunction were entered. "In balancing the harms, the court must weigh the error of denying a preliminary injunction to the party who would win the case on the merits against the error of granting an injunction to the party who would lose." *Foodcomm*, 328 F.3d at 305. "[T]his balancing process should also encompass any effects that granting or denying the preliminary

injunction would have on nonparties (something the courts have termed the 'public interest')." *Girls Scouts*, 549 F.3d at 1086. "Taking into account all these considerations, the district court must exercise its discretion to arrive at a decision based on a subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case." *Id*. (internal quotes and citation omitted). Finally, because Aon has established a significant likelihood of success on the merits of its misappropriation of confidential valuation models and client information claims and that it will suffer irreparable harm prior to final resolution of these claims, Aon's burden on the balance of the harms and the public interest factors is minimal. *Id*. ("[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor.").

Applying the above considerations, the Court finds that the balance of the harms and the public interest favor entry of an injunction in this case. Regarding its misappropriation of trade secret claims, Aon seeks an injunction prohibiting Defendants from directly or indirectly: (1) disclosing or using any Aon trade secrets, confidential, or proprietary information and (2) calling upon, soliciting, accepting, engaging in, servicing or performing any business of the same type of kind as the business performed by Aon from or with respect to clients of Aon for whom the individual Defendants performed services, either alone or with others, had a business relationship with, whose account he/she worked on or became familiar with, or supervised, either directly or indirectly the servicing activities related to such clients the 24 months prior to his/her resignation from Aon and further provided that such clients were clients of Aon either on the date he/she resigned or within 12 months prior to such resignation.

Having found a likelihood of success and irreparable harm in connection with Coleman's improper acquisition and use or threatened use of Aon's confidential valuation models, the Court finds that the balance of harms favors entry of an injunction prohibiting any disclosure or use of

64

valuation models misappropriated from Aon. The record does not disclose any actual harm to Coleman and Infinite if the Court prohibits them from using or disclosing Aon's valuation models Coleman improperly sent to his personal e-mail account and printed on his last day. *Mintel Intern. Group, Ltd. v. Neergheen*, 2008 WL 2782818, at *6 (N.D. Ill. July 16, 2008) (finding any harm defendant may suffer if preliminary injunctive relief is granted "would be in large part a consequence of his own conduct in the days leading up to his departure from [plaintiff]."). Defendants claim that Coleman could not have used the materials he emailed to his personal email in April and May 2019 and printed on his last day following his employment with Aon, he has searched for and deleted any Aon models he found in his personal email account, and the information would have been stale by the time he worked for Infinite. Under these circumstances, a preliminary injunction preventing Coleman and Infinite from using Aon's confidential valuation models that Coleman improperly acquired will cause no harm to them. *Walgreens*, 2021 WL 3187726, at *6 (concluding "an injunction will not harm [defendant] by prohibiting him from using information that does not belong to him."); *Mintel Intern. Group, Ltd.*, 2008 WL 2782818, at *6 (balance of harms favored injunctive relief related to the confidential information defendant removed from plaintiff's computers because "[g]ranting the requested relief to that extent only would prohibit defendant from using material it appears he should not have taken in the first place."). Finally, the public interest is served by protecting trade secrets. *Life Spine, Inc.*, 2021 WL 963811, at *23.

Next, given that Aon has shown a likelihood of success on its claim that there is a threat of inevitable use or disclosure of further Aon trade secret client information in targeting Aon clients, the balance of harms also weigh in Aon's favor on an injunction tailored to address that harm. To fit the particular circumstances of this case, the Court finds that a more narrowly tailored injunction

than Aon has proposed can adequately protect Aon against the risk of additional irreparable harm related to the use of its trade secret client information to solicit Aon clients. *See PepsiCo*, 54 F.3d at 1272 (district courts have "wide latitude in fashioning injunctive relief").

*First*, enjoining Defendants from "servicing" former Aon clients that have already transferred business to Infinite or "accepting" clients who choose on their own to take their business to the Defendants is not warranted. Aon acknowledges as much by carving out "clients that, as of the filing of the motion for preliminary injunction on August 17, 2020, have already been invoiced by Infinite Equity for services previously provided by Defendants" from its proposed injunction order. Pls' Proposed Order, Doc. 176 at 8. This totals at least 58 former Aon clients, for which Infinite Equity can continue to retain and service. Even at the time of the temporary restraining order, Aon entered into a consent order that carved out 49 former Aon clients. In addition, the instances where Defendants actually used Aon's confidential client information all involve the individual Defendants "actively soliciting business from their former clients (as opposed to merely accepting business)." *Aon Risk Servs. Cos., Inc.*, 415 F.Supp.3d at 852. It is thus the solicitation, rather than the servicing, that is more directly tied to the Court's findings on the misappropriation claims that have a likelihood of success. Moreover, an injunction prohibiting Defendants from servicing Aon's past clients or accepting former clients "even where those former clients choose on their own to take their business to the Defendant[s]" would shift the balance of hardships in favor of Defendants. *Id.* Such a restriction would cause substantial harm to Defendants and would be unfair to the clients who chose to conduct business with Infinite. *Id.* (prohibiting defendants from working with their clients is "against the public interest because it denies such clients their free choice of who to work with and as such, is an overly burdensome restraint on trade.").

*Second*, Defendants' use and inevitable use of Aon's confidential client information to target Aon clients warrants an injunction against use of that information and solicitation of Aon's Equity Service Group's clients. Such an injunction adequately addresses the potential irreparable harm to Aon by preventing an improper competitive advantage through the use of confidential client information, but would not impose an undue hardship on Defendants or harm the public interest. Defendants insist that Aon's proposed injunction "would put Infinite Equity out of business and result in a loss of employment for ten employees" as well as deny Defendants "access to most of the addressable market," but Defendants offer no factual support for their claims. Defs' Resp., Doc. 270 at 61; Defs' Reply, Doc. 272 at 28; *see Inventus Power*, 2020 WL 3960451, at *14 (rejecting Defendant's claim that balance of harms tipped in its favor because injunctive relief would cause stoppage of all of its manufacturing and distribution of its products worldwide where defendant "offer[ed] no legitimate factual support for this claim."). The individual Defendants are not barred from continuing to work for Infinite, a direct competitor of Aon. Nor are the individual Defendants barred from using their general skills and know-how to compete against Aon for non-Aon clients. *APC Filtration, Inc.*, 646 F.Supp.2d at 1008 ("in a competitive market, an employee must be entitled to utilize the general knowledge and skills acquired through experience in pursuing his general occupation."). Rather, they are prevented, during this litigation, from soliciting Aon's equity services clients, leaving them non-Aon clients to solicit, existing Infinite clients to service, and the ability to accept business from Aon clients that they do not contact or solicit. *See Aon Risk Servs. Cos., Inc.*, 415 F.Supp.3d at 852 (entering TRO that "bars soliciting business but does not bar merely accepting or servicing former clients."). On the other hand, Aon stands to continue to suffer irreparable losses if an injunction prohibiting Defendants from disclosing or using Aon trade secret client information to solicit Aon's clients is denied.

*Third*, it is in the public interest to protect Aon's confidential client information. *PrimeSource Bldg. Prod., Inc.*, 2017 WL 7795125, at *27. The public interest also favors fair competition in the equity services market that can be achieved without the improper use of confidential information to target a competitor's clients. The public interest is served by such an injunction because it allows Infinite to compete fairly. On balance, the hardship to Defendants by issuance of a narrowed injunction is less than the hardship to Aon absent an injunction. Thus, the balance of harms favors Aon as to an injunction prohibiting use of Aon's trade secret client information and solicitation of Aon's equity services clients for a limited period of time.

In sum, and in view of the record as a whole, the Court concludes that Aon is entitled to a preliminary injunction prohibiting: (1) Infinite, Burg, Coleman, and Stoudt from directly or indirectly during the pendency of this action, contacting or soliciting any Aon client for which Burg, Coleman, and Stoudt provided services, or had a business relationship, or on whose account these Defendants worked or became familiar, or supervised directly or indirectly any servicing activities, during the twelve (12) months prior to the date he/she resigned; (2) Infinite and Coleman from disclosing or using valuation models used to project stock prices and EBITDA misappropriated from Aon; and (3) Infinite, Burg, Coleman, and Stoudt from disclosing or using the identities of Aon's highest revenue generating clients, Aon's client-contact information, and Aon's client-specific information regarding needs and preferences recognized as trade secrets by this opinion in Sections II(A)(1)(b) and (c). Within seven days after entry of this order, Aon shall provide Defendants' counsel with a list identifying the clients that are encompassed within this order.

68

### D.     Defendants' Motion to Strike

Defendants also move to strike Schnell's Declarations, Kapinos' Declarations, and Goings'

Reply Declaration (the "Declarations"), along with all attached exhibits, and to "exclude Aon's

reply brief in its entirety or all statements in Aon's motion for preliminary injunction that are

dependent on the contents of these declarations." Defs' Motion to Strike, Doc. 220 at 3.

Defendants argue that Schnell's Declarations improperly disclose new, belated expert opinion and

offer conclusory opinions which do not explain the methodology Schnell used to reach his

opinions. Defendants also object that the Schnell Declarations, the Kapinos Declarations, and the

Goings Reply Declaration all contradict the deponent's prior sworn testimony. Finally,

Defendants contend that the Schnell Reply Declaration, the Goings Reply Declaration, and the

Kapinos Reply Declaration improperly proffer facts, evidence, and arguments for the first time on

reply. Defendants also request leave to file a sur-reply as an alternative to the Court granting their

motion to strike.

The general rule is that motions to strike are disfavored because they "potentially serve

only to delay." *Heller Fin., Inc. v. Midwhey Powder Co. Inc.*, 883 F.2d 1286, 1294 (7th Cir. 1989).

The Court finds it unnecessary to strike the Declarations for several reasons. *First*, Defendants

were given leave file a sur-reply, which the Court has considered in drafting this Opinion. Since

Defendants were given the opportunity to respond to these Declarations, the Court perceives no

prejudice to Defendants from failing to strike the Declarations. *Sunnybrook LP v. City of Alton,

Illinois*, 425 F.Supp.3d 1035, 1045 (S.D. Ill. 2019).

*Second*, because the Court denied Aon's motion for preliminary injunction as to

Defendants' alleged misappropriation of *PT* source code to create *MPA*, the Court finds no reason

to consider whether to strike any portions of Schnell's Declarations or Goings' Reply Declaration

regarding that claim which might arguably be considered improper. *SFG, Inc. v. Musk*, 2021 WL 972887, at *4 (N.D. Ill. Feb. 10, 2021) ("Having denied [plaintiff's] motion for preliminary injunction, the Court sees no reason to go further and strike [plaintiff's] motions or exhibits."). To consider the issues raised by Defendants' objections to Schnell's Declarations and Goings' Reply Declaration at this time would only cause the delay which makes motions to strike disfavored.

*Third*, Defendants take issue with Aon's use of Kapinos' Declarations to support client relationships necessary to show a likelihood of success on its breach of contract, breach of fiduciary duty, and tortious interference claims. Defs' Memo., Doc. 271 at 21. However, the Court did not reach a decision on the merits of Aon's likelihood of success on its breach of contract and tortious interference claims. The Court also did not rely on Kapinos' client relationship statements which Defendants seek to strike in holding that Aon will likely succeed on its breach of fiduciary duty claim based on soliciting subordinates and Burg entering into an agreement with Carver Edison.

*Lastly*, to the extent any other challenged portions of Kapinos' Declarations were relevant to the preliminary injunction motion, the Court assessed the evidence and decided the weight to afford such evidence. *Johnson & Johnson v. Advanced Inventory Mgmt., Inc.*, 2020 WL 6119516, at *9 (N.D. Ill. Oct. 16, 2020) (in a non-jury proceeding, the Court can simply disregard any objectionable portions of declarations); *Luxottica Grp. S.p.A. v. Light in the Box Limited*, 2016 WL 6092636, at *3 (N.D. Ill. Oct. 19, 2016) (in ruling on a preliminary injunction motion, "[t]he Court is 'able to sift through the evidence and consider each piece under the applicable federal rules without going to the additional work of editing and striking out portions of the parties' declaration.").

Accordingly, there is no need to strike the Declarations because Defendants responded to them and thus suffered no prejudice, the Court did not rely on the objected-to evidence in finding a likelihood of success on the merits of portions of Aon's breach of fiduciary duty claim, and the Court gave the challenged evidence the credit to which it was due.

### E.      Bond

Finally, there is no dispute that Aon should be required to post an injunction bond under Federal Rule of Civil Procedure 65(c).  Under Rule 65(c), "the court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).  "The purpose of an injunction bond is to compensate the defendant, in the event he prevails on the merits, for the harm that an injunction entered before the final decision caused him." *Ty, Inc.*, 292 F.3d at 516.  "The appropriate amount of the bond is subject to the court's discretion." *Monster Energy Co. v. Wensheng*, 136 F.Supp.3d 897, 910 (N.D. Ill. 2015).  However, the Seventh Circuit has stated that "[w]hen setting the amount of security, district courts should err on the high side." *Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 888 (7th Cir.), *amended on other grounds,* 209 F.3d 1032 (2000).  A defendant would still have to prove its loss, so "[a]n error in setting the bond too high is . . . not serious." *Id*.  But "an error in the other direction produces irreparable injury, because the damages for an erroneous preliminary injunction cannot exceed the amount of the bond." *Id*.

If the Court enters a preliminary injunction, Defendants request a "bond equivalent to the value of Infinite Equity's and Individual Defendants' potential losses, which will likely be the amount of the entire company (an amount in the millions of dollars)." Defs' Resp., Doc. 270 at 62, n. 58.  Aon does not oppose a bond and proposes security in the amount of $50,000.  Given the

lack of evidence that Defendants' potential losses could cause Infinite to dissolve because of the narrowed injunction the Court is entering, a bond in the amount of $100,000 is sufficient to protect Defendants from being erroneously enjoined. See *Vendavo*, 397 F.Supp.3d at 1147 ($100,000 bond for preliminary injunction).

### III.  Conclusion

For the reasons stated above, Aon's motion for preliminary injunction [176, 194] is granted in part and denied in part.  The motion is granted as to Aon's misappropriation of trade secrets claims relating to Aon's valuation models and confidential client information recognized as trade secrets by this opinion in Sections II(A)(1)(b) and (c) but denied as to the remainder of Aon's claims.  Defendants' motion to strike [220] is denied, and Defendants' motion for leave to re-file two briefs in excess of their respective page limits [264] is granted.  Aon shall post a $100,000 bond with the Clerk of the Court within ten business days of the entry of the injunction order.

**SO ORDERED.**

Dated:  September 15, 2021

Sunil R. Harjani
United States Magistrate Judge

72